# ORIGINAL

FILED

APR 14 2011

U.S. COURT OF
FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DEMODULATION, INC.

    V.

THE UNITED STATES

OF AMERICA

No.: **11-236  C**

## COMPLAINT

1.  Demodulation, Inc. ("Demodulation") is a corporation formed under the laws of the State of Delaware, with its principle place of business at 121 Goodwin Terrace, Westwood, New Jersey.

2.  This Complaint makes allegations that the federal government breached contracts with Demodulation and misappropriated Demodulation's patented technology and trade secrets.

3.  Jurisdiction is conferred upon the United States Court of Federal Claims by 28 U.S.C. § 1491, and 28 U.S.C. § 1498.

4.  On Easter Sunday, 2005, Roger Lewis of the National Nuclear Security Administration ("NNSA") called the CEO of Demodulation at his home and expressed the government's intense interest in acquiring Demodulation's patented and proprietary technology, intellectual property and other trade secrets.

5.  The NNSA is a department of the United States Department of Energy ("DOE") and is responsible for the operation of several federal facilities including Sandia National Laboratory ("Sandia") in Albuquerque, New Mexico and the Y-12 National Security Complex ("Y-12") near Oak Ridge, Tennessee.  The NNSA is charged with ensuring the security of the United States "by maintaining the safety, security, and effectiveness of the U.S. nuclear weapons stockpile

without nuclear testing; reducing the global danger from the proliferation of nuclear weapons and materials; providing the U.S. Navy with safe and effective nuclear propulsion; and providing the Nation with an effective nuclear counterterrorism and incident response capability."

6. Sandia is managed and operated by Lockheed Martin Corporation.

7. Y-12 is managed and operated by BWXT Y-12, LLC ("BWXT"). All of BWXT's actions and inactions alleged herein are alleged to have occurred in the course of BWXT's operation of Y-12.

8. After receiving Roger Lewis' invitation to present its technology to the government, Demodulation executed two confidentiality agreements with the NNSA whereby NNSA agreed that it would not "disclose, publish or otherwise reveal any of the Confidential Information received from Demodulation to any other party whatsoever." Demodulation also executed a confidentiality agreement with BWXT.

9. Pursuant to the confidentiality agreements, Demodulation disclosed proprietary information concerning its technology to NNSA and BWXT. Among the disclosures made was a presentation given in December 2005 by Demodulation at a wireless technologies workshop at the DOE's facility in Germantown, Maryland.

10. At all times from Easter of 2005 forward, Mr. Lewis and other NNSA and BWXT personnel told Demodulation that the purpose of Demodulation's disclosure of information was for Demodulation to obtain a contract to provide its technology and intellectual property to the United States government in exchange for payment to Demodulation and to help Demodulation commercialize its technology for sale to others.

11. Mr. Lewis and other NNSA personnel told Demodulation that there were a broad array of disruptive applications for Demodulation's technology and intellectual property within the

government market including homeland security, intelligence, defense, logistics and anti-counterfeiting applications.

12. In 2006, NNSA personnel directed Demodulation to a potential opportunity at Y-12.

13. On or about February 12, 2007, Demodulation entered a written Cooperative Research and Development Agreement ("CRADA") with the DOE.

14. The CRADA was executed on behalf of DOE by BWXT, the contracted operator of Y-12, a federal government facility.  DOE induced Demodulation to enter the CRADA with promises to assist Demodulation in commercializing its technology and by recognizing the validity of Demodulation's patents, intellectual property and trade secrets.

15. Pursuant to the terms of the CRADA, Demodulation and DOE agreed to allow the DOE to verify and validate Demodulation's microwire technology platform, pursuant to the provisions of the law governing the CRADA, including but not limited to the Wydler-Stevenson-Technology Transfer Innovation Act, amendments thereto, corresponding and related federal regulations, and the "Class Waiver" of the government's rights in or to any inventions and other intellectual property derived from the CRADA relationship.

16. The legislative purpose of a CRADA is to help private parties, like Demodulation, to commercialize government technologies that are being underutilized.  Demodulation expected that the government had the same understanding of the purpose of the CRADA. However, the CRADA was used by the DOE, BWXT and others as a vehicle to extract technology, intellectual property and trade secrets from Demodulation without having to pay for it.

17. Demodulation's proprietary microwire technology platform consists of an amorphous metal, glass coated wire and electronic systems to detect the wire from distances up to and beyond twenty miles.

18. As a general description, a one inch strand of microwire is a fraction of the width of a human hair, may be covertly embedded, and may be remotely detected without the need for a source of power connected to the wire. The microwire has applications beyond sensing capabilities, such as the ability to harvest energy from the ambient electromagnetic conditions in the atmosphere and to render objects invisible to radar. Additionally, the microwire may be engineered to transmit digital information.

19. Pursuant to the CRADA, DOE thoroughly vetted and characterized the microwire and its myriad applications. DOE concluded that the applications for this technology, as stated by Y-12 Section Manager L. Neville Howell, Jr., "are limited only by your imagination." Mr. Howell was one of the DOE employees or agents primarily responsible for administering the CRADA on behalf of the government.

20. The evaluation conducted pursuant to the CRADA concluded, among other things, that: the slightest tension on the microwire alters the response from the microwire making it suitable for "temperature, pressure, chemical and biological sensing;" the microwire's response is altered by its angular relation to an alternating magnetic field making it suitable for a "pitch, yaw and roll" sensor; a break in the microwire can be detected making it suitable for tamper indication; the microwire can detect tension when deployed in nonferrous material; "[m]icrowires appear to have unique signatures, similar to differences among fingerprints or snowflakes. These signatures can be modified by incorporating minute magnetic material at different locations along the length of the microwire. In addition, if localized stress variations along the length are incorporated, these, too, change the signature. This experiment validated the belief that an encoding method is feasible and supports Demodulation's encoding patents. The unique signature and/or ability for encoding could have many benefits, including a defense for

counterfeiting;" the microwire was superior to magnetic strips found on credit cards and other items because microwire is practically invisible and never wears out, unlike the magnetic strips; the microwire was an "excellent candidate" for *in-situ* sensors and there is a robust market with "few competing products;" the microwire was well suited for detection of "gas, pressure, temperature, humidity;" if microwire were attached to a seal, a broken seal would be identified; the glass coating on a microwire may be "coated with a substance that will react when attacked by a chemical or biological agent;"

21. In addition to the conclusions reached by DOE recited above, DOE conducted additional research and reached additional conclusions concerning microwire which are contained in a report which DOE has denoted as "classified" and has refused to provide to Demodulation.

22. The CRADA expired on or about February 12, 2009.

23. Two days prior to the expiration of the CRADA, Mr. Howell wrote to Demodulation: "I have stated this many times to my guys and to my senior managers – It will be disappointing for us (Y-12) to develop this application and then have to deal with an enormous license fee that would shoot the practicality of the application out of the water. I guess we will just deal with that issue at the appropriate time."

24. On Monday March 2, 2009, Mr. Howell wrote to Demodulation that there was "a small sub-contract in FY10 for you (and Wes if available) providing consulting services to us on a feasibility project. I'm thinking 20 employee-days at $1,000 per employee-day plus travel and per diem expenses. The not-to-exceed total would be $30K. The microwire used in the feasibility study would NOT be consumed. The detection system will be RF. I can share with you most of the details the next time I see you. Are you interested? If so, I need a reply. The

proposal is due Wednesday and our chances of winning are at least 90%. This will keep us going one more year."

25. In the fall of 2008, after DOE reached the conclusions in Paragraph 8 above, representatives of Demodulation met with Mr. Bud Albright, Under Secretary of Energy, to finally disclose the "subject inventions" developed pursuant to the CRADA and to discuss the federal government's purchase or license of Demodulation's technology, intellectual property and various applications. At this meeting, Mr. Albright stated that there was "no applications" for Demodulation's technology. In a prior meeting between Mr. Albright and Demodulation personnel, Mr. Albright had stated that there were numerous applications for the technology throughout the federal government.

26. After the expiration of the CRADA, DOE and other branches of the federal government engaged in continuing development of applications for Demodulation's technology. For example, on March 1, 2009, the federal government gave a grant to Thermal Solutions, Inc. for the development of a temperature sensing system comprised of a wireless reader capable of remote interrogation of amorphous microwire temperature sensors.

27. During the course of the CRADA, Demodulation disclosed proprietary information and trade secrets to DOE concerning its microwire technology. The disclosed information related to, without limitation, the composition of the wire, the method for making the wire and variations in its chemistry, means for detecting the wire and proprietary signal processing technology.

28. During the course of the CRADA and after, DOE disclosed Demodulation's proprietary information and trade secrets to one or more third parties without the permission of Demodulation. The disclosures include but are not limited to the one DOE made to "another part of the government" in connection with a DOE proposal to get a fulfillment contract with

"another part of the government" and the "classified" information DOE provided to Mentai Fong of the Intelligence Advanced Research Projects Agency ("IARPA").

29. DOE also disclosed Demodulation's proprietary information to Zach Nienstedt, a graduate student at the North Carolina State University. After this disclosure was made, Mr. Nienstedt engaged in research concerning the proprietary information sponsored by North Carolina State University.

30. DOE violated its non-disclosure obligations by disclosing Demodulation's confidential information to Cubic Corporation. Cubic Corporation later passed off the information as its own while presenting the information to Raytheon. Cubic presented Raytheon with proposals for classified and non-classified applications including but not limited to tracking, anti-counterfeiting, tamper indication, space, homeland security, military, and long range detection between an aircraft and the ground.

31. DOE violated its non-disclosure obligations by providing Demodulation's intellectual property and trade secrets to Sekuworks for anti-tamper and anti-counterfeiting applications.

32. After the expiration of the CRADA, DOE received and/or provided funding in the year 2010 for production of a product or system that included the use of microwire and Demodulation's intellectual property and trade secrets.

33. DOE was obligated to disclose to Demodulation any "subject inventions" that arose from the research and development performed under the CRADA. Despite the overwhelmingly positive results of DOE's evaluation and its several statements that it was working on developing inventions through 2010, DOE has not disclosed any subject inventions to Demodulation.

34. Despite DOE's failure to disclose any inventions, DOE and other branches of the federal government are using microwire in various applications. Evidence of these applications include

but is not limited to the following: The United States Army is using microwire and Demodulation's trade secrets in its mission to gather intelligence and track friendly soldiers through the Aerial Common Sensor program and other similar program programs; Frank Downs of the Naval Surface Warfare Center in Panama City, Florida, stated that Demodulation's technology has been deployed in operations and that the government has obtained a detection range of at least twenty miles; in 2009, Dr. Steven Wax stated that the Defense Advanced Research Projects Agency ("DARPA") had been working on microwire for a long time, that the government had a right to take Demodulation's technology and that Demodulation would have to "catch us if you can;" Dr. Toni Marechaux stated that Sandia was developing microwire technology; representatives of Lockheed Martin advised Demodulation that the government had detected microwire from an Unmanned Aerial Vehicle using dual tone frequency radar; Rick Ward of the Appleton Paper Company advised Demodulation that the government had established a secure facility for the production of microwire; Chuck Loomis, formerly of Naval Intelligence and formerly of Science Applications International Corporation, informed Demodulation that microwire technology is being deployed by the government.

35. On January 26, 2010, Demodulation filed with DOE a formal request for dispute resolution pursuant to 10 C.F.R. §782. DOE has not responded to this request.

## COUNT ONE

### Breach of Express Contract – Tucker Act, 28 U.S.C. 1491

36. Demodulation incorporates each of the foregoing paragraphs of the complaint as if each were set forth at length herein.

37. Four express contracts were entered into between Demodulation and the government: two confidentiality agreements with the NNSA; one confidentiality agreement with BWXT, and; the CRADA.

38. The government breached the confidentiality obligations of these agreements by disclosing confidential information to one or more third parties including but not limited to the National Security Agency ("NSA"), the persons who were present at or who otherwise received the information presented at the "Innovation Colloquium" presented by Chuck Agle, Jr. and those parties mentioned elsewhere in this complaint.

39. DOE breached the terms of the CRADA by spending federal funds to obtain a supply of Demodulation's microwire and Demodulation's intellectual property and trade secrets.

40. DOE breached the terms of the CRADA by failing to disclose any subject inventions to Demodulation though the government has in fact deployed Demodulation's technology, intellectual property and trade secrets in various applications and has otherwise become aware of subject inventions.

41. DOE breached the terms of the CRADA by disclosing Demodulation's confidential information to one or more third parties including but not limited to those disclosures mentioned elsewhere herein and the disclosure made by Bill Barrett of Y-12 to the United States Army.

42. DOE breached the terms of the CRADA by failing to perform the obligations which it and its agents agreed to perform under the contract and by performing research not permitted under the CRADA.

43. Y-12 breached the terms of the CRADA by entering into a contract with the Joint Improvised Explosive Device Defeat Organization ("JIEDDO") for the application of microwire to JIEDDO's mission.

44. DOE breached the CRADA and the implied covenant of good faith and fair dealing by taking or failing to take the actions described herein and by misrepresenting to Demodulation that there was no government or military applications for Demodulation's technology.

45. DOE breached the CRADA and the implied covenant of good faith and fair dealing by failing to assist Demodulation in commercializing its technology and by in fact taking actions to prevent Demodulation from doing so.

46. As a direct and proximate result of the government's breach of contract, the government has irreparably harmed Demodulation and caused severe financial damage to Demodulation.

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Fifty Million Dollars ($50,000,000) and to further award Plaintiff all costs, interest, fees, expenses and attorneys' fees as allowed by the Equal Access to Justice Act and other applicable law, and such other and further relief as the Court may deem appropriate.

## COUNT TWO

### Breach of Implied in Fact Contract - Tucker Act, 28 U.S.C. 1491

47. Demodulation incorporates each of the foregoing paragraphs of the complaint as if each were set forth at length herein.

48. An implied in fact contract was created when Demodulation revealed trade secrets to the government thereby imposing on the government an obligation to maintain the confidentiality of Demodulation's trade secrets and to refrain from using the trade secrets for the government's benefit without providing compensation to Demodulation.

49. The government breached this contract by failing to maintain Demodulation's trade secrets in confidence and by in fact utilizing those trade secrets to deploy Demodulation's technology in government applications.

50. As a direct and proximate result of the government's breach of contract, the government has irreparably harmed Demodulation and caused severe financial damage to Demodulation.

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Fifty Million Dollars ($50,000,000) and to further award Plaintiff all costs, interest, fees, expenses and attorneys' fees as allowed by the Equal Access to Justice Act and other applicable law, and such other and further relief as the Court may deem appropriate.

## COUNT THREE

### Patent Infringement – 28 U.S.C. §1498

51. Demodulation incorporates each of the foregoing paragraphs of the complaint as if each were set forth at length herein.

52. As recognized by the DOE in the CRADA, Demodulation obtained numerous valid patents covering the manufacture, detection and manipulation of microwire.   While Demodulation held these patents, including through the present, the United States used and manufactured inventions covered by these patents without a license from Demodulation.  Due to the wrongful acts of the Defendant and others, Demodulation has not been able to pay the required registration fees required by the United States Patent and Trademark Office.  Those patents for which such fees have not been paid were infringed during the period while the fees had been paid.

53. The patents at issue are: US 6,270,591 B2 - Amorphous and Nanocrystalline Glass-Covered Wires; US 5,557,085 - Method and device for electronic identification; US 5,576,693 - Method and device for remote sensing of objects; US 6,018,297 - Method and device for coding electronic labels; US 6,137,411 - Article surveillance system; US 6,225,905 - Sensor for remote detection of objects; US 6,232,879 - Sensor and method for remote detection of objects; US 6,417,771 - Sensor, a method and a system for remote detection of objects; US 7,075,439 - Marker for remote detection of articles; US 7,071,417 B2 - Optically Encoded Glass-Coated Microwire; US 7,233,249 - Multi-Bit Encoded Glass-Coated Microwire and Articles Composed Thereof; US 7,354,645 - Engineered Glasses for Metallic Glass-Coated Wire; US 7,368,166 - Polymerase Chain Reaction Using Metallic Glass-Coated Microwire.

54. These patents have been infringed by the United States and by others acting for the United States including but not limited to Thermal Solutions, Inc.

55. The United States Army has infringed one or more of these patents by putting out a request for proposal to develop a system associated with the Army's program to track friendly soldiers on the battlefield using "μ-fiber microwire." This request for proposal was issued in 2008 through the Army's small business innovation research ("SBIR") program under request number A08-087. This request indicates that the Army was and is running a program using technology that infringed one or more of the subject patents.

56. The United States Navy has infringed one or more of the patents by utilizing technology at the Navy's Underwater Warfare Center in Newport, Rhode Island and other Navy locations including but not limited to the Navy's Carderock facility where Art Clark, a Navy employee or sailor, obtained a patent with Ikea Corporation as a result of work done for the Navy or in the name of the Navy. This patent was later obtained by Demodulation because it concerned the detection of microwire.

57. All of the uses alleged in Paragraph 35 above are herein incorporated by reference and are alleged to be infringing uses by the United States.

58. The Department of Homeland Security infringed the patents by running a program to track luggage employing infringing products at Logan International Airport in or near Boston.

59. Several persons currently or formerly employed by the United States Military or Intelligence Community have indicated that the government is engaged in pervasive, classified, infringing uses of microwire. Therefore, Demodulation alleges that the government is engaged in other infringing uses of which Demodulation is not specifically aware at this time.

60. As a direct and proximate result of the government's patent infringement, the government has irreparably harmed Demodulation and caused severe financial damage to Demodulation.

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Fifty Million Dollars ($50,000,000) and to further award Plaintiff all costs, interest, fees, expenses and attorneys' fees as allowed by the Equal Access to Justice Act and other applicable law, and such other and further relief as the Court may deem appropriate including but not limited to invalidation of any patents held by the United States or others which conflict with Plaintiff's patents and reinstatement of any patents that have expired due to the non-payment of registration fees.

## COUNT FOUR

### Violation of the Fifth Amendment

61. Demodulation incorporates each of the foregoing paragraphs of the complaint as if each were set forth at length herein.

62. The United States' misappropriation of trade secrets and other property described above and its infringement of Demodulation's patents constitutes a violation of the Constitutional

guarantees of substantive and procedural due process provided by the Fifth Amendment and elsewhere in the Constitution. These actions also constitute a taking by the government for which Demodulation is entitled to just compensation.

63. At the suggestion of personnel from the Abraxas Corporation, Demodulation presented its technology to the Central Intelligence Agency. The CIA indicated interest in acquiring the technology and informed Demodulation that it must negotiate an acquisition contract through In-Q-Tel and only upon In-Q-Tel's approval.

64. In-Q-Tel is an instrumentality of the United States Government and is operated with federal funds pursuant to a charter between the CIA and In-Q-Tel.

65. In-Q-Tel is in the business of brokering acquisition contracts between companies and individuals possessing technology one the one hand and the CIA and other government intelligence groups on the other.

66. In Q-Tel is also in the business of acquiring equity stakes in technology companies including but not limited to Nanosys Incorporated and Qynergy Corporation in exchange for the investment of federal funds in the companies.

67. At the direction of the CIA, Demodulation presented its technology to in-Q-Tel for its consideration whether to acquire microwire for the government.

68. In-Q-Tel declined to either acquire Demodulation's technology for the government or to invest in Demodulation.

69. In-Q-Tel rejected Demodulation without due process of law and in violation of laws governing the government's acquisition of property.

70. As a direct and proximate result of the government's violation of Demodulation's constitutional rights, the government has irreparably harmed Demodulation and caused severe financial damage to Demodulation.

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Fifty Million Dollars ($50,000,000) and to further award Plaintiff all costs, interest, fees, expenses and attorneys' fees as allowed by the Equal Access to Justice Act and other applicable law, and such other and further relief as the Court may deem appropriate.

## COUNT FIVE

### Misappropriation of Trade Secrets

71. Demodulation incorporates each of the foregoing paragraphs of the complaint as if each were set forth at length herein.

72. This action for misappropriation of trade secrets involves conduct of the government arising out of and related to the express and implied contracts between Demodulation and the government.

73. Demodulation possessed trade secrets related to microwire.

74. The government is using or has used those trade secrets in violation of its agreement with Demodulation and as a result of its discovery of the trade secrets by improper means.

75. As a direct and proximate result of the government's misappropriation of trade secrets, the government has irreparably harmed Demodulation and caused severe financial damage to Demodulation.

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Fifty Million Dollars ($50,000,000) and to further award Plaintiff all costs, interest, fees, expenses and attorneys' fees as allowed by the Equal Access to Justice Act and other applicable law, and such other and further relief as the Court may deem appropriate.

Dated: April 13, 2011

Benjamin D. Light, Esq.
AROMANDO, LIGHT & CROFT, LLC
195 Fairfield Avenue – Suite 4D
West Caldwell, New Jersey 07006
973-403-9100 – phone
973-403-9110 - facsimile