# In the United States Court of Federal Claims

No. 11-236C
Filed: February 29, 2012
**TO BE PUBLISHED**

| | |
|---|---|
| **************************************** <br> * <br> * <br> * <br> * <br> * <br> DEMODULATION, INC.,         * <br> * <br> Plaintiff,         * <br> * <br> v.         * <br> * <br> THE UNITED STATES,         * <br> * <br> Defendant.         * <br> * <br> * <br> * <br> * <br> * <br> * <br> **************************************** | Contract Disputes Act, 41 U.S.C. §§ 601-13 (2006); <br> Cooperative Research and Development Agreement; <br> Failure to State a Claim, RCFC 12(b)(6) (2010); <br> Fifth Amendment to the U.S. CONSTITUTION; <br> Jurisdiction, Motion to Dismiss, RCFC 12(b)(1) (2010); <br> Standing; <br> Stevenson-Wydler Technology Innovation Act of 1980, Pub. Law No. 96-480 (1980) (codified, as amended, at 15 U.S.C. §§ 3701-22); <br> Tucker Act, 28 U.S.C. § 1491 (2006); <br> Trade Secrets Act, 18 U.S.C. § 1905 (2006); <br> 10 C.F.R. § 782.1 (2011); <br> 31 U.S.C. § 6303 (2006); <br> 48 C.F.R. § 52.227-14(d)(2) (2011); <br> RCFC 12(f) (2010). |

**Benjamin D. Light**, Aromando, Light & Croft, LLC, West Caldwell, New Jersey, Counsel for Plaintiff.

**Douglas T. Hoffman**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

## MEMORANDUM OPINION AND ORDER
## REGARDING DEFENDANT'S MOTION TO DISMISS

**BRADEN,** *Judge.*

## I.    RELEVANT FACTS.[1]

Plaintiff Demodulation, Inc. ("Demodulation" or "Plaintiff") has developed patented and proprietary technology, intellectual property, and other trade secrets that can detect microwire from at least a distance of twenty miles.  Am. Compl. ¶¶ 2, 17.  Microwire has "sensing capabilities" that can "harvest energy from the ambient electromagnetic conditions in the atmosphere and . . . render objects invisible to radar."  Am. Compl. ¶ 18.  Microwire also can be engineered to transmit digital information.  Am. Compl. ¶ 18.  Demodulation is the owner of "numerous valid patents covering the manufacture, detection and manipulation of microwire."  Am. Compl. ¶ 56.  The alleged patents at issue are: U.S. Patent Serial Nos. 6,270,591 B2 (Amorphous and Nanocrystalline Glass-Covered Wires); 5,577,085 (Method and device for electronic identification); 5,576,693 (Method and device for remote sensing of objects); 6,018,297 (Method and device for coding electronic labels); 6,137,411 (Article surveillance system); 6,225,905 (Sensor for remote detection of objects); 6,232,879 (Sensor and method for remote detection of objects); 6,417,771 (Sensor, a method, and a system for remote detection of objects); 7,075,439 (Marker for remote detection of articles); 7,071,417 B2 (Optically Encoded Glass-Coated Microwire); 7,233,249 (Multi-Bit Encoded Glass-Coated Microwire and Articles Composed Thereof); 7,354,645 (Engineered Glasses for Metallic Glass-Coated Wire); 7,368,166 (Polymerase Chain Reaction Using Metallic Glass-Coated Microwire).  Am. Compl. ¶ 53.

On Easter Sunday 2005, Mr. Roger Lewis, a senior official at the National Nuclear Security Administration ("NNSA"),[2] called Demodulation's CEO to express NNSA's interest in acquiring Plaintiff's "patented and proprietary technology, intellectual property and other trade secrets."  Am. Compl. ¶ 4.

On June 7, 2005, a non-disclosure agreement ("NDA") was reviewed by attorneys in NNSA's Office of General Counsel, who suggested certain modifications.  Pl. Resp. Ex. B.  On June 17, 2005, Mr. Loren Dale Sivils, NNSA's Senior Science and Technology Advisor signed a NDA with Demodulation.  Am. Compl. Ex. A.  On June 16, 2005, Ms. Nathalie Lemmon, "Program Manager II," signed a second NDA.  Am. Compl. Ex. B.  The NDA with Mr. Sivils was not signed by a representative of Demodulation (Am. Compl. Ex. A), but the NDA with Ms. Lemmon was signed by Mr. James O'Keefe, Jr., Demodulation's President.  The "Recipient" line of each NDA lists the names of Mr. Sivils and Ms. Lemmon respectively, but does not

---

[1]  The relevant facts were derived from: the September 1, 2011 Amended Complaint ("Amended Complaint" or "Am. Compl.") and attached exhibits ("Am Compl. Exs. A-D"); exhibits attached to the United States' September 16, 2011 Motion To Dismiss ("Gov't Exs. 1-4"); and exhibits attached to Plaintiff's October 31, 2011 Memorandum Of Law In Opposition To The United States' Motion To Dismiss ("Pl. Resp. Exs. A-F").

[2]  NNSA is an agency within the United States Department of Energy ("DOE") that operates federal research facilities including the Sandia National Laboratory in Albuquerque, New Mexico (the "Sandia Lab") and the Y-12 National Security Complex near Oak Ridge, Tennessee (the "Y-12 Complex").  Am. Compl. ¶ 5.  The Sandia Lab is managed and operated by the Lockheed Martin Corporation; the Y-12 Complex is managed and operated by BWXT Y-12, LLC ("BWXT").  Am. Compl. ¶¶ 6-7.

identify their institutional affiliations.  Am. Compl. Exs. A-B.  The words "government," "NNSA," and "DOE" do not appear in either NDA.  Am. Compl. Exs. A-B.  The NDAs provide that the "Recipient" of Demodulation's confidential information will not disclose, publish, or otherwise reveal it to any other party.  Am. Compl. ¶ 8; Am. Compl. Exs. A-B.

In December 2005, Demodulation disclosed proprietary information concerning its microwire technology to NNSA and BWXT at a workshop at DOE's offices in Germantown, Maryland.  Am. Compl. ¶¶ 9-10.[3]  The purpose of Demodulation's presentation was to ascertain whether DOE, NNSA and/or BWXT would enter into a contract whereby Demodulation would provide its proprietary technology and intellectual property to the Government in exchange for a monetary payment, and/or assistance with "commercializ[ing] its technology for sale to others."  Am. Compl. ¶ 10.  After learning about Demodulation's proprietary technology, the NNSA advised Demodulation that there was a "broad array of disruptive applications for Demodulation's technology and intellectual property within the government market[.]"  Am. Compl. ¶ 11.

Some time in 2006, NNSA personnel informed Demodulation of a potential research/investment opportunity at the Y-12 Complex.  Am. Compl. ¶ 12.  On or about March 23, 2007, Demodulation entered into a contract with DOE, described as a Cooperative Research and Development Agreement ("CRADA").  Am. Compl. ¶ 12; *see also* Am. Compl. Ex. C.  CRADAs are agreements authorized by the Stevenson-Wydler Technology Innovation Act of 1980, Pub. L. No. 96-480 (1980) (codified, as amended, at 15 U.S.C. §§ 3701-22 (2006)) ("Stevenson-Wydler Act");[4] *see also Spectrum Sci.* v. *United States*, 84 Fed. Cl. 716, 733-35 (2008) (describing the legislative history of the Stevenson-Wydler Act and CRADAs).

---

[3] Demodulation was one of several companies that made presentations to NNSA and BWXT at the December 2005 meeting.  Pl. Resp. Ex. A at 4.

[4] The Stevenson-Wydler Act, as amended, provides that:

Each Federal agency may permit . . . the director of any of its Government-owned, contractor-operated laboratories--

(1) to enter into cooperative research and development agreements ("CRADA") *on behalf of such agency* (subject to subsection (c) of this section) . . . with . . . industrial organizations (including corporations, partnerships, and limited partnerships, and industrial development organizations)[.]

15 U.S.C. § 3710a(a)(1) (2006) (emphasis added).

Thus, Section § 3710a authorizes private contractor-operators of federally-owned laboratories to enter into contracts *on the government's behalf*, *i.e.*, as agents of the federal government.  This statutory language is almost identical to that authorizing contracting officers to enter into government contracts.  *See* 48 C.F.R. § 1.601(a) (2011) ("[Procurement c]ontracts may be entered into and signed *on behalf of the Government* only by contracting officers." (emphasis added)).

The March 23, 2007 CRADA states that it is a "Stevenson-Wydler . . . Cooperative Research And Development Agreement" "between BWXT Y-12, L.L.C.," acting under U.S. Department of Energy Contract No. DE-AC05-00OR22800 as "Contractor" and "Demodulation, Inc." as "Participant" for the purpose of "Targeted Assessment Detection and Monitoring (TADAM)." Am. Compl. Ex. C. at 1.  Before being signed, however, the March 23, 2007 CRADA was forwarded to "DOE/NNSA" for approval.  Pl. Resp. Ex. C (e-mail documenting approval process).

The objective of the March 23, 2007 CRADA was for DOE to provide funding for research conducted "through [BWXT's] contract with DOE." Am. Compl. Ex. C at 3, Art. III B. In exchange,

> [e]ach Party agrees to not disclose Proprietary Information provided by another Party to anyone other than the CRADA Participant and Contractor without written approval of the providing party, except to Government employees who are subject to the statutory provisions against disclosures of confidential information set forth in the Trade Secrets Act (18 U.S.C. [§] 1905).

Am. Compl. Ex. C at 4 (Art. VII B).

In addition, the March 23, 2007 CRADA provided:

> [i]n no case shall the Contractor provide Proprietary Information of Participant to any person or entity for commercial purposes, unless otherwise agreed to in writing by such Participant.

Am. Compl. Ex. C at 4 (Art. VII E).

The March 23, 2007 CRADA also specified that it was

> entered into by [BWXT] under the authority of its prime Contract with DOE. [BWXT] is authorized to and will administer this CRADA in all respects unless otherwise specifically provided for herein.  Administration of this CRADA may be transferred from [BWXT] to DOE or its designee with notice of such transfer to the Participant[.]

Am. Compl. Ex. C at 12 (Art. XXV).

Significantly, the March 23, 2007 CRADA contains a clause, under which any dispute first must be submitted to the DOE Contracting Officer for a decision to be issued within 60 days.  Am. Compl. Ex. C at 13-14 (Art. XXVIII: Disputes).  The Contracting Officer's decision becomes final, unless an action for adjudication is filed within 120 days "in a court of competent jurisdiction in the State of Tennessee."  Am. Compl. Ex. C at 14 (Art. XXVIII: Disputes).

After the March 23, 2007 CRADA was entered, DOE "thoroughly vetted and characterized the microwire and its myriad applications."  Am. Compl. ¶¶ 19-20.  During this

process, Demodulation disclosed "proprietary information and trade secrets" to DOE, including: the composition of the wire; the method for making the wire; construction; chemistry; and means for detecting the wire and proprietary signal processing technology.  Am. Compl. ¶ 27.  After evaluating Demodulation's technology, DOE concluded that microwires are suitable for "temperature, pressure, chemical, and biological sensing" and other applications, based on several experiments conducted by DOE.  Am. Compl. ¶¶ 20-21.  DOE also conducted other research, the conclusions of which are contained in a classified DOE Report.  Am. Compl. ¶ 21.

In the fall of 2008, representatives from Demodulation met with the DOE Under Secretary to "disclose the 'subject inventions' developed pursuant to the CRADA" and "discuss the federal government's purchase or license" of Demodulation's "technology, intellectual property and various applications."  Am. Compl. ¶ 25.  At this meeting, however, the Under Secretary informed Demodulation that there were "no applications" for Demodulation's technology, despite previous indications by the NNSA that there were numerous uses for microwire technology.  Am. Compl. ¶ 25; *see also* Am. Compl. ¶¶ 11, 19.

On or around February 10, 2009, the Section Manager of the Y-12 Complex wrote a letter to Demodulation, expressing concerns about developing microwire applications after the March 23, 2007 CRADA expired, "and then hav[ing] to deal with an enormous license fee that would shoot the practicality of the application out of the water.  I guess we will just deal with that issue at the appropriate time."  Am. Compl. ¶ 23.

On or around February 12, 2009, the CRADA expired, without DOE or BWXT agreeing to purchase or license Demodulation's microwire technology.  Am. Compl. ¶ 22.  On March 1, 2009, Thermal Solutions, Inc., received a federal grant to develop "a temperature sensing system comprised of a wireless reader capable of remote integration of amorphous microwire temperature sensors."  Am. Compl. ¶ 26.

On March 2, 2009 BWXT offered Demodulation an opportunity to secure a small sub-contract in fiscal year 2010 to provide consulting services on a "feasibility project," estimated to involve "20 employee-days at $1,000 per employee-day plus travel and per diem expenses" and a not-to-exceed project total of $30,000.  Am. Compl. ¶ 24.

Nevertheless, during the existence of the March 23, 2007 CRADA and afterwards, DOE disclosed Demodulation's proprietary technology and trade secrets to other government and private parties without Demodulation's permission.  Am. Compl. ¶¶ 28-31 (citing unauthorized disclosure to Mentai Fong, of the Intelligence Advanced Research Projects Agency; Zach Nienstedt, a graduate student at the North Carolina State University; the Cubic Corporation; Raytheon Company; and Sekuworks, LLC).

In December 2009, BWXT issued a Final Report describing the work conducted under the March 23, 2007 CRADA as having been sponsored by "an agency of the United States government" and concluding that "[a]morphous wire technology appears to be viable and suitable for many applications."  Am. Compl. ¶ 34; *see also* Am. Compl. Ex. D at 1.

In 2010, DOE received and/or provided funding for the production of a product that

included the use of Demodulation's proprietary microwire technology, intellectual property, and trade secrets. Am. Compl. ¶ 32. Specifically, Demodulation is aware that the DOE, the United States Army, the Naval Surface Warfare Center, the Defense Advanced Research Projects Agency ("DARPA"), the Sandia Lab, and other private entities are developing and/or using Demodulation's microwire technology in various applications. Am. Compl. ¶ 35. DOE failed to disclose any of this activity to Demodulation, as required. Am. Compl. ¶ 33.

In addition, at some point the Central Intelligence Agency ("CIA") expressed a separate interest in acquiring Demodulation's proprietary microwire technology, but required negotiations be conducted with a company called In-Q-Tel Corp ("In-Q-Tel"). Am. Compl. ¶ 67. In-Q-Tel is a not-for-profit Delaware corporation that "works to identify, adapt, and deliver innovative technology solutions to support the missions of the [CIA] and broader U.S. Intelligence Community." Gov't Ex. 4 at GA 18 (emphasis omitted). In-Q-Tel invests in technology and research, but "has only one customer (the CIA) for its development activities." Pl. Resp. Ex. F at ix. At the CIA's request, Demodulation "presented its technology" to In-Q-Tel "for its consideration whether to acquire microwire for the [G]overnment." Am. Compl. ¶ 71. In-Q-Tel, however, declined to acquire Demodulation's technology or to invest in the company. Am. Compl. ¶ 72.

## II.   PROCEDURAL HISORY.

On January 26, 2010, Demodulation filed a formal request with the DOE for dispute resolution, pursuant to 10 C.F.R. § 782. Am. Compl. ¶ 36. The DOE accepted and acknowledged the request, but failed to respond. Am. Compl. ¶ 36. Consequently, on April 14, 2011, Demodulation filed a Complaint in the United States Court of Federal Claims, asserting five different causes of action against the United States ("the Government") for the alleged disclosure and use of Demodulation's proprietary technology, trade secrets, intellectual property, and patents.

On June 10, 2011, the Government filed an Unopposed Motion For Extension Of Time To File Answer. On June 13, 2011, the court granted that Motion.

On August 12, 2011, the Government filed a Motion To Dismiss, together with supporting Exhibits. *See* Gov't Ex. 1-4.

On September 1, 2011, Plaintiff filed a First Amended Complaint. Count I thereof alleges that NNSA breached express contracts to maintain in confidence certain of Demodulation's proprietary technology, intellectual property, and trade secrets. Am. Compl. ¶¶ 37-50. In the alternative, Count II alleges that NNSA breached an "implied in fact" contractual agreement to maintain Demodulation's trade secrets in confidence. Am. Compl. ¶¶ 51-54. Count III alleges that DOE, the United States Army and Navy, and the Department of Homeland Security, all have infringed at least one of thirteen microwire-related patents held by Demodulation. Am. Compl. ¶¶ 55-64. Count IV alleges that the Government violated the Takings Clause of the Fifth Amendment by misappropriating Demodulation's trade secrets and intellectual property and that In-Q-Tel violated Demodulation's rights under the Due Process Clause of the Fifth Amendment, by refusing to acquire Demodulation's proprietary microwire

technology for the CIA.   Am. Compl. ¶¶ 65-74.   Count V alleges that the Government unlawfully has misappropriated Plaintiff's trade secrets.  Am. Compl. ¶¶ 75-79.  In addition, the First Amended Complaint clarified that DOE "induced Demodulation to enter the [March 23, 2007] CRADA with promises to assist Demodulation in commercializing its technology, by recognizing the validity of Demodulation's patents, intellectual property and trade secrets[,] and by promising lucrative government contracts if the technology met expectations."  Am. Compl. ¶ 14; *see also* Am. Compl. Exs. A-D.  The First Amended Complaint also added allegations to Count I that the NNSA breached the implied covenant of good faith and fair dealing and that the Tennessee choice of venue clause in the March 23, 2007 CRADA is unlawful and must be stricken.  Am. Compl. ¶¶ 40-49.

On September 16, 2011, the Government filed a Motion To Dismiss Counts I, II, IV, and V of the First Amended Complaint ("Gov't Mot."), for lack of jurisdiction under RCFC 12(b)(1). Therein, the Government also argues that certain portions of Count I, as well as Count IV, should be dismissed for failure to state a claim under RCFC 12(b)(6).

On October 11, 2011, Plaintiff filed an Unopposed Motion For Extension Of Time To File Response that the court granted.

On October 31, 2011, Plaintiff filed a Response To The Government's September 16, 2011 Motion To Dismiss ("Pl. Resp.").  On November 17, 2011, the Government filed a Reply ("Gov't Reply").

## III.   DISCUSSION.

### A.   Jurisdiction.

The jurisdiction of the United States Court of Federal Claims is established by the Tucker Act.  *See* 28 U.S.C. § 1491 (2006).  The Tucker Act authorizes the court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).  The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists."  *United States* v. *Testan*, 424 U.S. 392, 398 (1976).  Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages.  *See Fisher* v. *United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc) ("The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages.").  The burden of establishing jurisdiction falls upon the plaintiff.  *See FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden is on the plaintiff to allege facts sufficient to establish jurisdiction); *see also* RCFC 12(b)(1).

The adequacy of the jurisdictional allegations in Counts I, II, IV, and V of the First Amended Complaint is discussed below.

### B.     Standing.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975).    Standing must be determined "as of the commencement of suit."   *Rothe Dev. Corp.* v. *Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005).   The party invoking federal jurisdiction bears the burden of establishing standing.   *See Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).   Specifically, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."   *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000) (internal citations omitted).

The Government argues that Plaintiff does not have standing to seek an adjudication of the claim in paragraph 41 of the First Amended Complaint that "DOE breached the terms of the CRADA . . . by spending federal funds to obtain a supply of Demodulation's microwire and Demodulation's intellectual property and trade secrets."   Gov't Br. at 8.   The Government correctly argues that Plaintiff cannot rely upon the public's injury to establish standing. Accordingly, this allegation in paragraph 41 of the First Amended Complaint is dismissed.

The First Amended Complaint, however, also alleges that Plaintiff is the owner of proprietary technology, intellectual property, trade secrets, and patents that NNSA unlawfully disclosed, and that NNSA and other federal government agencies unlawfully have used this information and trade secrets and engaged in patent infringement.   Am. Compl. ¶¶ 37-79.

Therefore, assuming that the court has jurisdiction to adjudicate these claims, the First Amended Complaint adequately has alleged that Plaintiff suffered an injury-in-fact that can be remedied by an order requiring the United States to pay money damages.

### C.     Standard For Decision On Motion To Dismiss Pursuant To RCFC 12(b)(1).

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." *Palmer* v. *United States,* 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required.   But a party may assert the following defenses by motion: (1) lack of subject-matter jurisdiction[.]").

When a defendant challenges the court's jurisdiction, pursuant to RCFC 12(b)(1), the standard of review depends upon the type of challenge.   *See Cedars-Sinai Med. Ctr.* v. *Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1994).   If the jurisdictional challenge is "facial," *i.e.*, if the challenge asserts that the pleadings' allegations are insufficient to establish jurisdiction, then all

non-conclusory allegations in the pleadings "are taken as true and construed in a light most favorable to the complainant." *Id.* at 1583. If, however, the RCFC 12(b)(1) motion "denies or controverts the pleader's allegations of jurisdiction" then the challenge is a factual one and "only uncontroverted factual allegations are accepted as true for purposes of the motion." *Id.* In determining jurisdictional facts, the court "may review evidence extrinsic to the pleadings, including affidavits and deposition testimony." *Id.* at 1584; *see also Reynolds* v. *Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question . . . [the plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."); WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1363 (2011) ("[I]f the movant, either in its motion or in any supporting materials, denies or controverts the pleader's allegations of subject matter jurisdiction, then numerous courts have held that the movant is deemed to be challenging the actual existence of subject matter jurisdiction, and, as many of those courts have held, the allegations of the complaint are not controlling.") (collecting cases).

### D.     Standard For Decision On Motion To Dismiss Pursuant To RCFC 12(b)(6).

Although a complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp.* v. *Twombly,* 550 U.S. 544, 555 (2007) (citations omitted) (internal quotation marks omitted). In order to survive a motion to dismiss, however, the court "[does] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *see also Ashcroft* v. *Iqbal,* 129 S. Ct. 1937, 1950 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."). When reviewing a motion to dismiss for failure to state a claim upon which relief may be granted, the court "must accept as true all the factual allegations in the complaint, and . . . indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co.* v. *United States,* 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted); *but see Iqbal,* 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Furthermore, any "copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes," and thus, the attachments to Plaintiff's pleadings are deemed allegations on par with the Complaint itself. RCFC 10; *see also Boye* v. *United States*, 90 Fed. Cl. 392, 398 n.1 (2009) ("The amended complaint is deemed to include any written instrument attached to it as an exhibit[.]" (internal quotation marks omitted)).

### E.     The Government's Motion To Dismiss Count I Of The First Amended Complaint.

#### 1.     The Government's Argument.

The Government argues that the United States Court of Federal Claims does not have subject matter jurisdiction over claims in Count I of the First Amended Complaint that NNSA/DOE breached the NDAs and the CRADA, because neither of these agreements allegedly were "with the Government." Gov't Mot. at 2 (citing 28 U.S.C. § 1491). Specifically, the First Amended Complaint contains only conclusory allegations that the NNSA was a party to the

NDAs and fails to cite sufficient facts to establish that a contract was entered between Plaintiff and the United States. Gov't Mot. at 3-4. For example, the signatories are referred to as "Contractors." Am. Compl. Exs. A-B. The NDAs suggest only that the individuals listed were government contractors, not that they were authorized to enter into contracts on behalf of NNSA/DOE. Gov't Mot. at 4-5; Gov't Reply at 5-6.

In addition, the March 23, 2007 CRADA does not provide any substantive right to recover money damages against the United States, because the document is between BWXT and Plaintiff, not between the Government and Plaintiff. Gov't Mot. at 5-6. Moreover, the First Amended Complaint does not allege, nor could it, that any authorized official signed this document on behalf of the Government. *Id.* at 6-7. The March 23, 2007 CRADA provides only that it is an agreement between the "Contractor," BWXT, and the "Participant," Demodulation. Am. Compl. Ex. C at 1, 15. In addition, the March 23, 2007 CRADA requires suits against the Government and any suit challenging a final decision of the Contracting Officer to be filed in a Tennessee court. Am. Compl. Ex. C at 13-14 (Art. XVIII: Disputes). The United States, however, cannot be made subject to a Tennessee court, without express congressional authorization. Gov't Mot. at 6. As such, the March 23, 2007 CRADA does not establish "the *sine qua non* of jurisdiction in the Court of Federal Claims," *i.e.*, "privity between [Plaintiff] and the [G]overnment[.]" *Katz* v. *Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994).

### 2.    The Plaintiff's Response.

Plaintiff responds that the First Amended Complaint properly alleges that the NDAs and the March 23, 2007 CRADA are agreements with the Government. Pl. Mot. at 2-13. There is sufficient evidence to conclude that both documents were contracts between Demodulation and the NNSA. Pl. Mot. at 5-13. Both NDAs were reviewed and approved by attorneys in the NNSA's Office of General Counsel, who suggested revisions. Pl. Resp. Ex. B. One NDA was signed by Mr. Loren D. Sivils, in his capacity as NNSA's "Senior Science and Technology Advisor." Am. Compl. Ex. A at 3; *see also* Pl. Resp. Ex. A (DOE e-mails to and from Mr. Sivils listing his job title and affiliation with NNSA).

Furthermore, a CRADA is a special type of contract created by the Stevenson-Wydler Act, requiring the United States to be a party. Pl. Resp. at 8. Although the enabling statute authorizes "Government-owned, contractor-operated laboratories" to enter into CRADAs, they do so "on behalf of" the federal agency. *See* 15 U.S.C. § 3710a(a)(1) (2006). In addition, the NNSA is required to review and approve a CRADA before it becomes effective. *See* 15 U.S.C. § 3710a(c)(5)(C)(ii) ("No [CRADA] may be entered into by a Government-owned, contractor-operated laboratory under this section before both approval of the agreement and approval of a joint work statement under this clause."); *see also* Pl. Resp. Exs. C-D (e-mails documenting NNSA's approval of the March 23, 2007 CRADA). For these reasons, the United States Court of Federal Claims has held that money damages are available for a breach of a CRADA. *See D'Andrea Bros., LLC* v. *United States*, 96 Fed. Cl. 205, 215 (2010) ("The . . . ordinary presumption of the availability of money damages applies . . . given the finding that the CRADA is a contract."); *see also Spectrum Sci.*, 98 Fed. Cl. at 16-18 (determining damages in a CRADA-breach case). In this case, the March 23, 2007 CRADA contains numerous references to NNSA's rights thereunder, *e.g.*, to receive status reports, confidential information, and

intellectual property rights, and allows amendment only with express permission of the Government. Pl. Resp. at 8-10 (citing Am. Compl. Ex. C). Further evidence that the March 23, 2007 CRADA is a government contract is the separate "Class Waiver" agreement that refers to the Y-12 Complex as a "federal laboratory." Pl. Resp. Ex. E. Likewise, BWXT's December 2009 Final Report to DOE describes the research conducted, pursuant to the March 23, 2007 CRADA, as "sponsored by an agency of the United States Government" and acknowledges that the Y-12 Complex is owned by the NNSA. Am. Compl. Ex. D ("Disclaimer" page); *see also id.* at i, 1, 3.

In addition, Plaintiff argues that the Tennessee choice of venue clause is invalid to the extent that it attempts to circumvent the jurisdiction of the Tucker Act. Pl. Resp. at 13-15.

In the alternative, if the court determines that the allegations in the First Amended Complaint are inadequate to establish jurisdiction, Plaintiff requests "jurisdictional discovery" to ascertain the Government's precise involvement in the NDAs and the March 23, 2007 CRADA. Pl. Resp. at 15.

### 3.   The Government's Reply.

With respect to the NDAs, the Government concedes, *arguendo*, that the signatories may be NNSA employees, but argues that Plaintiff has not established by a preponderance of the evidence that the signatories had actual authority to bind the Government. Gov't Reply at 5-6 & n.3. Moreover, nothing in the NDAs suggest that the Government is bound by the terms therein; on their face, the NDAs bind only the individual signatories. Gov't Reply at 6.

As to the March 23, 2007 CRADA, it is the governmental contractor that "enter[s] into" the agreement, not the Government. *See* 15 U.S.C. § 3710a(a)(1). The cases that Plaintiff cites for the proposition that CRADAs are agreements with the Government were those where the Government unambiguously was a signatory to the CRADA, unlike the case here. Gov't Reply at 9. Furthermore, the portions of the March 23, 2007 CRADA describing the Government's rights only establishes that the Government is a *beneficiary* thereunder. *Id.* Likewise, the "Class Waiver" agreement between BWXT and NNSA has no bearing here; it is simply a governmental waiver as to certain intellectual property rights. Gov't Reply at 10-11.

Finally, Plaintiff's request for additional jurisdictional discovery is untimely, entirely "nonsensical," and should be denied, because any additional evidence would only be parole evidence that cannot change the plain meaning of the NDAs or the March 23, 2007 CRADA. Gov't Reply at 12-13.

### 4.   The Court's Resolution.

#### a.   The Court Has Subject Matter Jurisdiction Over A Claim For Breach Of The Non-Disclosure Agreement In This Case.

Plaintiff has pointed to various indicia that evidence the Government was a party to the NDAs. For example, e-mails establish that lawyers in NNSA/DOE's Office of General Counsel

received and approved the NDAs prior to their being signed.  Pl. Resp. Ex. B (e-mail from NNSA Program Analyst to Plaintiff stating "I've had our attorney's [sic] review the confidentiality agreement from your company.  They have recommended some changes.").  One of the NDAs was signed by Mr. Loren D. Sivils, whose job title indicates that he is a senior government official, contrary to the Government's assertions.  *Compare* Pl. Resp. Ex. A (listing Mr. Sivils' job title as "Senior Science & Technology Advisor, National Nuclear Security Administration"), *with* Gov't Reply at 5 n.3 ("The Government asserts that [Mr. Sivils] is a contractor[.]").  In addition, among the obligations imposed by the NDAs is that the recipient is obligated to keep information confidential, except for disclosure to persons subject to 48 C.F.R. § 52.227-14(d)(2) (authorizing the Government to disclose confidential data to its contractors, under certain circumstances).  *See* Am. Compl. Ex. A ¶ 2.A; *see also* Am. Compl. Ex. B ¶ 2.A.

The court has determined that the allegations in the First Amended Complaint regarding the NDAs state sufficient facts at this juncture to establish subject matter jurisdiction.  *See Trusted Integration* v. *United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) ("In determining jurisdiction, a court must accept as true all undisputed facts asserted in plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff.").  Additional discovery, however, will establish whether Mr. Sivils and Ms. Lemmon were acting as Government agents when they signed the NDAs.  *See Gill* v. *United States*, 7 Ct. Cl. 522 (1871) ("[P]arole evidence is admissible to show the agent was acting for the principal.").

> **b.**    **The Government's Motion To Dismiss Allegations That The Department Of Energy Breached A Cooperative Research And Development Agreement Is Stayed Until Plaintiff Complies With The Jurisdictional Requirement To Seek Relief From A Contracting Officer.**

As a threshold matter, the Government ignores the critical words "on behalf of such agency" in 15 U.S.C. § 3710(a)(1) (2006) that authorize a contractor operating a Government laboratory to enter into CRADAs as an agent of the Government.  The court does not, however, reach the question of whether the Government is necessarily a party to a CRADA signed by a contractor-operated laboratory at this time, because it is unlikely that the March 23, 2007 document was a CRADA.  Although the Government did not challenge the First Amended Complaint's allegation that the March 23, 2007 Agreement is a CRADA, in fact, the document indicates otherwise.

The Stevenson-Wydler Act, as amended, defines a CRADA as:

[A]ny agreement between one or more Federal laboratories and one or more non-Federal parties under which the Government, through its laboratories, provides personnel, services, facilities, equipment, intellectual property, or other resources with or without reimbursement (*but not funds to non-Federal parties*) and the non-Federal parties provide funds, personnel, services, facilities, equipment, intellectual property, or other resources toward the conduct of specified research or development efforts which are consistent with the missions of the laboratory;

except that such term does not include a procurement contract or cooperative agreement as those terms are used in sections 6303, 6304, and 6305 of Title 31[.]

15 U.S.C. § 3710a(d)(1) (2006) (emphasis added).

Therefore, if the Government provides funding as part of an agreement, that agreement *ipso facto* cannot be a CRADA. The March 23, 2007 document at issue, however, appears expressly to involve Government funding. Am. Compl. Ex. C at 3 ("The Government's estimated contribution, which is provided through the Contractor's contract with DOE, is [redacted] subject to available funding."); *but see* Am. Compl. ¶ 16 ("[T]he CRADA was used by the DOE, BWXT and others as a vehicle to wrongfully extract technology, intellectual property and trade secrets from Demodulation *without having to pay for it*." (emphasis added)). Accordingly, without further evidence, the court is not prepared to determine that the March 23, 2007 document is a CRADA. Instead, it appears likely to be a procurement contract, subject to 31 U.S.C. § 6303(1) (2006), which states that the "principal purpose [of a procurement contract] . . . is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government.")). *See Chem Serv., Inc.* v. *Envtl. Monitoring Sys. Lab.*, 12 F.3d 1256, 1265 (3d Cir. 1993) (observing that an agreement labeled as a CRADA may actually be a procurement contract).

If the March 23, 2007 document is a procurement contract, Count I of the First Amended Complaint suffers from a different jurisdictional defect. The mandatory requirements of the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601–13 (2006),[5] must be satisfied before the court has subject matter jurisdiction over a procurement contract dispute. *See B.D. Click Co.* v. *United States*, 1 Cl. Ct. 239, 241 (1982) ("The plaintiff . . . [must] produce or cite . . . evidence establishing either that it submitted a written claim to the contracting officer or that the contracting officer rendered a final decision."). Specifically, the plaintiff must submit a written and certified claim to a Contracting Officer and obtain a final decision before the United States Court of Federal Claims has subject matter jurisdiction to adjudicate contract claims. *See M. Maropakis Carpentry, Inc.* v. *United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (CDA jurisdiction "requires both a valid claim and a contracting officer's final decision on that claim"). Although the CDA does not define the term "claim," the United States Court of Appeals for the Federal Circuit has stated that a "claim" is a "'written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain[.]'" *England* v. *Swanson Grp., Inc.*, 353 F.3d 1375, 1380 (Fed. Cir. 2004) (quoting 48 C.F.R. § 2.201). For claims over $100,000, the failure of a federal contracting entity to "issue a decision" or "notify the contractor of the time within which a decision will be issued," within sixty days of receipt of the claim is "deemed to be a decision by the contracting officer denying the claim[.]"

---

[5] Effective January 4, 2011, Congress amended certain provisions of the CDA, and recodified the Act, as amended, at 41 U.S.C. §§ 7101–7109. *See* Public Contracts Act of Jan. 4, 2011, Pub. L. No. 111–350, § 3, 124 Stat. 3677, 3816–26 (2011). Although the Public Contracts Act repealed 41 U.S.C. §§ 601–13, any "rights and duties that matured, penalties that were incurred, and proceedings that were begun before the date of enactment of this Act" are still governed by these sections of the United States Code. Pub. L. No. 111–350, § 7, 124 Stat. at 3855.

41 U.S.C. § 605(c)(2), (5) (2006).  The First Amended Complaint, however, does not allege that Plaintiff submitted any of its allegations for breach of contract to a Contracting Officer.[6]  To invoke the jurisdiction of the court under the Contract Disputes Act, however, Plaintiff must first submit its claims to the relevant Contracting Officer.

Assuming *arguendo* that the March 23, 2007 document is, in fact, a CRADA, a similar issue arises.  The "Disputes" clause requires that any dispute regarding the CRADA "shall be decided by the DOE Contracting Officer, who shall reduce his/her decision to writing within 60 days of receiving in writing the request for a decision by either Party to this CRADA."  Am. Compl. Ex. C at 13-14.  The United States Court of Federal Claims previously has determined that "[w]here a [CRADA], or any other contract with the Government not covered by the Contract Disputes Act of 1978 . . . contains a disputes clause which provides a specific administrative remedy for a dispute, 'the *contractor must exhaust its administrative contractual remedies prior to seeking judicial relief.*'"  *PDR, Inc.* v. *United States*, 78 Fed. Cl. 201, 205-06 (2007) (emphasis added) (quoting *Me. Yankee Atomic Power Co.* v. *United States*, 225 F.3d 1336, 1340 (Fed. Cir. 2000)); *see also SUFI Network Servs., Inc.* v. *United States*, __ Fed. Cl. __, No. 11-453C, 2012 WL171908 at *4 (Jan. 17, 2012) (same).  Since the March 23, 2007 document imposes essentially the same requirements as the CDA, Plaintiff must submit its claim to a DOE Contracting Officer for a final decision before invoking the court's jurisdiction.

For these reasons, the Government's Motion to Dismiss Count I as to the March 23, 2007 "CRADA" is stayed to afford Plaintiff the opportunity either to seek leave to further amend Count I of the First Amended Complaint to allege compliance with the jurisdictional requirements of the CDA and/or the March 23, 2007 "CRADA," or to allow Plaintiff the opportunity to submit contract claims to the relevant Contracting Officer.

## F.   The Government's Motion To Dismiss Count II Of The First Amended Complaint.

### 1.   The Government's Argument.

The First Amended Complaint alleges that an "implied in fact contract was *created* when Plaintiff revealed trade secrets to the government *thereby imposing* on the government an obligation to maintain the confidentiality of Demodulation's trade secrets[.]"  Am. Compl. ¶ 52 (emphasis added).  The Government insists that this allegation pleads an implied-in-*law* contract, since it assumes that Plaintiff's disclosure of trade secrets to the Government presumptively created a duty of confidentiality, although no concrete facts are pled as to the requirements of mutuality of intent, consideration, or that a government representative had actual authority to assume any such duty.  Gov't Mot. at 12.

---

[6] The First Amended Complaint alleges that "Demodulation filed with DOE a formal request for dispute resolution[,] pursuant to 10 C.F.R. § 782.  DOE accepted and acknowledged the request, but has not otherwise responded."  Am. Compl. ¶ 36.  That regulation, however, only concerns "claims asserted against the Department of Energy of infringement of privately owned rights in patented inventions[.]"  10 C.F.R. § 782.1 (2011).  Compliance therewith, however, does not satisfy the jurisdictional requirements of the CDA.

In addition, neither the NDAs nor the March 23, 2007 CRADA provides a basis for an implied-in-fact contract with the Government, since those agreements were between Plaintiff and BWXT and/or individual persons.  Gov't Mot. at 11, 13.

### 2.     The Plaintiff's Response.

Plaintiff responds that the court has jurisdiction to adjudicate the claims alleged in Count II of the First Amended Complaint because the following facts establish an implied-in-fact contract:

1.     NNSA contacted Plaintiff about acquiring Plaintiff's trade secrets.  Am. Compl. ¶ 5.

2.     The Y-12 Complex is a federal laboratory that was operated by BWXT, but the actions of contractors thereof remained the legal responsibility of the Government.  Am. Compl. ¶ 7.

3.     NNSA and BWXT advised Plaintiff that, in return for sharing its trade secrets and intellectual property, Plaintiff would receive financial and other assistance to commercialize its proprietary technology.  Am. Compl. ¶ 10.

4.     NNSA acknowledged there were broad applications for Plaintiff's proprietary technology.  Am. Compl. ¶ 11.

5.     NNSA violated the non-disclosure obligations implicit in the parties' negotiations, by disclosing Plaintiff's trade secrets and intellectual property to private competitors.  Am. Compl. ¶ 30.

Pl. Resp. at 17-18.

In addition, the parties' "tacit understanding" that the Government would not share Plaintiff's trade secrets is established by the fact that federal employees are prohibited by statute from disseminating trade secrets.  *See* 18 U.S.C. § 1905 (2006) ("Whoever, being an officer or employee of the United States or of any department or agency thereof . . . publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties . . . which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association . . . shall be fined under this title, or imprisoned not more than one year, or both; and shall be removed from office or employment.").

These allegations and facts together are sufficient, if proven, to establish an implied-in-fact contract, under which the Government benefited by obtaining Plaintiff's trade secrets by improper means.  Pl. Resp. at 19-20.

### 3.     The Government's Reply.

The Government replies that Plaintiff's argument that the simple existence of 18 U.S.C. § 1905 demonstrates the existence of an implied contract further evidences that Count II concerns an implied-in-law contract.  Gov't Reply. at 13.  In the alternative, Count II also should be dismissed for failure to state a claim, because the First Amended Complaint does not plead any offer, acceptance, consideration, mutuality of intent, or agreement by an authorized Government representative.  Gov't Reply at 14.

### 4.     The Court's Resolution.

An implied-in-law contract is defined as judicially "'impose[d] duties that are deemed to arise by operation of law' in order to prevent an injustice, whereas implied-in-fact contracts are 'founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." *Lumbermens Mut. Cas. Co.* v. *United States*, 654 F.3d 1305, 1316 (Fed. Cir. 2011) (quoting *City of Cincinnati* v. *United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998)); *see also City of El Centro* v. *United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) (holding that an implied-in-fact contract has four requirements, *i.e.*, "1) mutuality of intent to contract; 2) consideration; . . . 3) lack of ambiguity in offer and acceptance[,]" and "[4] the Government representative whose conduct is relied upon must have actual authority to bind the government in contract."  (internal quotation marks omitted)).

It is well established, however, that the United States Court of Federal Claims does not have jurisdiction to adjudicate a claim based upon an implied-in-law contract.  *See Hercules* v. *United States*, 516 U.S. 417, 423 (1996) ("We have repeatedly held that [the United States Court of Federal Claims'] jurisdiction extends only to contracts either express or implied in fact, and not to claims on contracts implied in law.").  An implied-in-fact contract, in turn, is not adequately alleged by a pleading that does no more than assert that the Government received a benefit from the plaintiff.  *See Lumbermens*, 654 F.3d at 1316 ("[T]he mere provision of goods or services to the government in excess of a party's legal obligation does not create an implied-in-fact contract[.]" (internal quotation marks omitted)); *see also Trauma Serv. Grp.* v. *United States*, 104 F.3d 1321, 1327 (Fed. Cir. 1997) ("[T]he mere receipt of [a] service[], even to the benefit of the Government, would not create an implied-in-fact contract to pay for [it].").  Although a "contractor can be compensated under an implied-in-fact contract when the contractor confers a benefit to the government in the course of performing a government contract that is subsequently declared invalid," an actual contract must exist between the parties.  *See Gould, Inc.* v. *United States*, 67 F.3d 925, 930 (Fed. Cir. 1995); *see also Perri* v. *United States*, 340 F.3d 1337, 1344 (Fed. Cir. 2003) ("We know of no case . . . in which either [the Federal Circuit], the Court of Claims, or the Court of Federal Claims has permitted . . . recovery in the absence of some contractual arrangement between the parties.").

The Government is correct that inartful language in the First Amended Complaint suggests that Plaintiff primarily relies on the fact that it nominally conferred a benefit on the Government to support the existence of an implied-in-fact contract.  Am. Compl. ¶ 52 ("An implied in fact contract was created *when Demodulation revealed trade secrets* to the

government thereby *imposing* on the government an obligation to maintain the confidentiality of Demodulation's trade secrets[.]" (emphasis added)). Count II of the First Amended Complaint, however, also alleges that Plaintiff provided trade secrets to the Government only because authorized government employees signed NDAs and promised to pay and/or help Plaintiff commercialize its proprietary technology. Am. Compl. ¶¶ 5, 8, 10, 52. Although these averments do not allege that the Government *authorized* the named government officials to bind the Government, "[t]o the extent that the government means that [Plaintiff] was required to identify and plead the particular person who approved the [implied-in-fact] contractual arrangement . . . we disagree. It was sufficient for the complaint to allege that the government's promise was authorized by a person having legal authority to do so[.]"). *Sommers Oil Co.*, 241 F.3d at 1379; *see also Janowsky* v. *United States*, 133 F.3d 888, 891-92 (Fed. Cir. 1998) (suggesting that a plaintiff may be able to establish an implied-in-fact contract by pleading a promise was made by an unauthorized official combined with subsequent agency ratification based on the continued receipt of benefits).

The Government's Motion To Dismiss argues only that Count II of the First Amended Complaint should be dismissed under RCFC 12(b)(1), because it alleges an implied-in-law contract. The Government initially did not argue that Count II should be dismissed for failure to state a claim. *Compare* Gov't Mot. at 10 (requesting that Count II be dismissed because "it asserts an implied-in-law contract that is not within the court's *jurisdiction*" (emphasis added)), *with* Gov't Mot. at 13 (requesting that a different count be dismissed "for lack of jurisdiction *and/or* [for] failure to state a claim" (emphasis added)). The Government waited until its Reply Brief to suggest that Count II also should be dismissed for failure to state a claim. The court, however, declines to consider this alternative ground for dismissal, without allowing the Plaintiff to respond. *See Novosteel SA* v. *United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising [an] issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief — they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration."); *see also Data Comp. Corp. of Am.* v. *United States*, 80 Fed. Cl. 606, 608 n.1 (2008) ("To the extent that [a party's] reply brief could be considered to have brought forward new issues for the court to consider . . . those issues are waived because the [other party] has had no opportunity to respond to them.").

For these reasons, the Government's Motion to Dismiss Count II, pursuant to RCFC 12(b)(1), is denied, as the court has determined that it has jurisdiction to adjudicate implied-in-fact contract allegations as set forth in Count II of the First Amended Complaint, subject to the jurisdictional prerequisites discussed as to Count I being satisfied. The Government's November 17, 2011 Reply Brief, however, will be treated as a Motion To Dismiss Count II for failure to state a claim under RCFC 12(b)(6), but stayed to allow Plaintiff the opportunity to seek leave to further amend the First Amended Complaint or otherwise conform to the jurisdictional requirements discussed herein as to Count I. After this stay is lifted, Plaintiff will respond in due course to the Government's November 17, 2011 Motion to Dismiss for failure to state a claim.[7]

--------

[7] Plaintiff should be advised that it will not be able to rely solely upon the fact that it disclosed confidential information to the Government to establish that an implied-in-fact contract existed. If that is the sole basis for Plaintiff's claim, Count II must be dismissed as it alleges implied-in-law contract claims over which the court does not have jurisdiction. Instead, Plaintiff must plead and establish evidence of an implied-in-fact contract, via proffering evidence or

**G.    The Government's Motion To Dismiss Count IV Of The First Amended Complaint.**

**1.    The Government's Argument.**

Count IV of the First Amended Complaint alleges that the Government has effected a "taking" of Plaintiff's trade secrets and intellectual property. Am. Compl. ¶ 66. In addition, Count IV alleges that In-Q-Tel, "an instrumentality of the United States Government," declined to acquire Plaintiff's technology "for the Government" or to invest in Plaintiff's technology, in violation of the Due Process Clause. Am. Compl. ¶¶ 68-73. Therefore, the Government argues that Count IV must be dismissed for several jurisdiction-related reasons. Gov't Mot. at 13-21. First, Plaintiff is precluded from asserting patent infringement as a Fifth Amendment "takings" claim, because "the [United States Court of Federal Claims] lack[s] Tucker Act jurisdiction over [patent] infringement [claims] under a takings theory." *See Zoltek Corp.* v. *United States*, 442 F.3d 1345, 1351 (Fed. Cir. 2006) (per curiam), *cert. denied*, 551 U.S. 1113 (2007). Second, a claim based upon misappropriation of trade secrets cannot be asserted as a Fifth Amendment "takings" claim, because "[m]isappropriation of a trade secret is a tort and, as such, [the United States Court of Federal Claims] is without jurisdiction to grant relief on such a claim." *Radioptics, Inc.* v. *United States*, 621 F.2d 1113, 1130 (Ct. Cl. 1980) (per curiam). Third, allegations that In-Q-Tel, a private corporation that nominally assists the CIA with procurement, violated Plaintiff's Due Process rights and federal procurement laws must be dismissed. More fundamentally, the Due Process Clause "do[es] not mandate payment of money by the government." *LeBlanc* v. *United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). In addition, In-Q-Tel is a private, not-for-profit corporation, not a government instrumentality. Gov't Mot. at 16-19. The court, however, does not have jurisdiction over a private party that is not an instrumentality of the government. Gov't Mot. at 16-19.

In the alternative, even if the court had jurisdiction to adjudicate Plaintiff's allegations that In-Q-Tel violated its rights, Count IV fails to state an actionable claim. Gov't Mot. at 19-21. Without conclusory statements of law, the remainder of Count IV of the First Amended Complaint consists only of allegations that Plaintiff presented its technology to In-Q-Tel, but In-Q-Tel declined to purchase it or invest in Plaintiff. Gov't Mot. at 20 (citing Am. Compl. ¶¶ 71-73). On their face, such allegations do not state a claim under RCFC 12(b)(6). Gov't Mot. at 20-21.

**2.    The Plaintiff's Response.**

With respect to *Zoltek*, Plaintiff responds that it "is anything but . . . clear precedent . . . . [It] is a 31-page decision, with two separate concurring opinions, and one dissenting opinion." Pl. Resp. at 21. On the other hand, governmental misappropriation of a trade secret can be the basis of a "takings" claim. The United States Supreme Court held in

_____

conducting additional limited discovery, to demonstrate that the signatories to the NDAs and March 23, 2007 CRADA had actual authority to enter into an implied-in-fact contract to maintain in confidence Plaintiff's proprietary technology and trade secrets.

*Ruckelshaus* v. *Monsanto Co.*, 467 U.S. 986 (1984), that "to the extent that [Plaintiff] has an interest . . . cognizable as a trade-secret property right under [state] law, that property right is protected by the Taking Clause of the Fifth Amendment." *Id*. at 1003-04. Therefore, the court has jurisdiction to adjudicate a Takings Clause claim alleged under the Fifth Amendment, if the misappropriation arises, as it does here, as a result of a contractual obligation to maintain confidentiality. Pl. Resp. at 22.

As to the First Amended Complaint's Due Process Clause claims against In-Q-Tel, since Plaintiff requests monetary damages against the United States, the Due Process Clause must afford monetary recovery. Pl. Resp. at 20-21. Moreover, contrary to the Government's view, In-Q-Tel *is* a government instrumentality. Pl. Resp. at 22-25. Plaintiff insists that the court must "look[] to a variety of factors to make th[e] determination [whether a private entity is a federal instrumentality]." *Mount Olivet Cemetery Ass'n.* v. *Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998). Plaintiff has presented evidence that: (1) In-Q-Tel was founded at the request of the CIA; (2) In-Q-Tel is subject to congressional oversight and receives congressional appropriations; (3) the CIA is In-Q-Tel's only customer; and (4) In-Q-Tel maintains an "interface center" on the premises of the CIA and receives assistance "in the discovery of new IT solutions on high priority problems and their deployment and acceptance in the [CIA]." Pl. Resp. Ex. F (Executive Report prepared at the request of Congress by the Independent Panel on the Central Intelligence Agency on the In-Q-Tel venture). As such, Plaintiff insists that the Government's Motion to Dismiss Count IV must be dismissed.

### 3.    The Government's Reply.

The Government replies that: "We do not understand what Demodulation finds unclear about the Federal Circuit's *per curiam* opinion in *Zoltek*," holding that patent infringement claims are not actionable under the Takings Clause. Gov't Reply at 16-17. The Government, however, does not dispute that *Monsanto* "stands for the proposition that trade secrets could be subject to a Fifth Amendment taking." Gov't Reply at 15. But, *Monsanto* involved a taking arising from congressional enactment of the Federal Pesticide Act of 1978, Pub. L. No. 95-396, 92 Stat. 819 (1978) (amending the Federal Insecticide, Fungicide, and Rodenticide Act, Pub. L. No. 80-104, 61 Stat. 163 (1947)), *i.e.*, the corporate trade secrets were "taken" by legislative fiat. *See Monsanto*, 467 U.S. at 1020 n.22. Count IV of the First Amended Complaint, however, alleges wrongful misappropriation of Plaintiff's trade secrets, as opposed to "a taking due to impositions of law." Gov't Reply at 16. Therefore, Plaintiff's claims are in tort. Gov't Reply at 15-16.

As to In-Q-Tel, assuming *arguendo*, that Plaintiff could maintain a cause of action for patent infringement under the Takings Clause, nevertheless, Plaintiff must demonstrate that In-Q-Tel is an instrumentality of the United States by a preponderance of the evidence since the Government has challenged that jurisdictional fact. Gov't Reply at 17-19. Plaintiff, however, has not met this burden, as the allegations in Count IV are conclusory and therefore must be ignored under *Iqbal*, 129 S. Ct. at 1949. Moreover, Plaintiff's reliance upon *Mount Olivet Cemetery* is misplaced, as that case held that the association at issue was *not* a government instrumentality, because it "d[id] not perform a significant or indispensable governmental function." 164 F.3d at 487. Finally, nothing in the Executive Report to Congress, on which

Plaintiff relies (Pl. Resp. Ex. F), demonstrates that In-Q-Tel enjoyed "the rights and privileges of Government instrumentalities" or "performs a significant or indispensable governmental function," required for the court to have jurisdiction over claims against a government instrumentality. Gov't Reply at 18-19 (citing *Chas H. Tompkins Co.* v. *United States*, 230 Ct. Cl. 754 (1982) (Order) ("[P]laintiff must make a showing that the entity is functioning as an instrumentality of the United States. The mere presence of appropriated funds . . . is insufficient, in itself, to confer jurisdiction on this court[.]")).

**4.      The Court's Resolution.**

**a.      The United States Court Of Federal Claims Does Not Have Subject Matter Jurisdiction To Adjudicate A Claim Of Alleged Patent Infringement As A Violation Of The Takings Clause Of The Fifth Amendment.**

In *Schillinger* v. *United States*, 155 U.S. 163, 169 (1894), the United States Supreme Court held that a lawsuit alleging "wrongful appropriation [of patent rights] by the government" was a tort and, therefore, the United States Court of Claims had no jurisdiction to entertain such a lawsuit under the guise of a "takings" claim. In *Zoltek*, 442 F.3d 1345, our appellate court, in a *per curiam* opinion, confirmed this holding in no uncertain terms:

> In [*Schillinger*,] the Supreme Court rejected an argument that a patentee could sue the government for patent infringement as a Fifth Amendment taking under the Tucker Act. *Schillinger* remains the law.

*Id.* at 1350 (internal citations omitted).

The *Zoltek* court, however, recognized that *Schillinger* may be in tension with at least one recent United States Supreme Court decision, but explained that the Court "did not overrule *Schillinger*, and we must follow [it] until it is overruled by the Supreme Court[.]" *Id.* at 1352 n.3.

Therefore, the court does not have jurisdiction to adjudicate the patent infringement claims alleged in Count IV of the First Amended Complaint, as violations of the Takings Clause of the Fifth Amendment.

**b.      The United States Court Of Federal Claims Has Subject Matter Jurisdiction To Adjudicate A Claim Of Alleged Trade Secret Misappropriation As A Violation Of The Takings Clause Of The Fifth Amendment.**

The "[m]isappropriation of a trade secret is a tort and, as such, [the United States Court of Federal Claims] is without jurisdiction to grant relief on such a claim[.]" *Radioptics, Inc.* v. *United States*, 621 F.2d 1113, 1130 (Ct. Cl. 1980) (citing *Schillinger*, 155 U.S. at 169); *see also Keene Corp.* v. *United States*, 508 U.S. 200, 214 (1993) ("[T]ort cases are outside the jurisdiction of the Court of Federal Claims."). Subsequently, however, the United States

Supreme Court held that trade secrets can be "property right[s] . . . protected by the Taking Clause of the Fifth Amendment." *Monsanto*, 467 U.S. at 1003-04; *see also Zoltek*, 442 F.3d at 1352 n.3 (recognizing that *Monsanto* holds that "government interference with interests 'cognizable as trade-secret property right[s]' could constitute a taking depending on the circumstances," but noting that *Monsanto* does not overturn *Schillinger* and does not render patent infringement a taking (quoting *Monsanto*, 467 U.S. at 1003-04)). Therefore, *Monsanto* squarely holds that the United States Court of Federal Claims has jurisdiction to adjudicate claims alleging a governmental taking of trade secrets. *See Monsanto*, 467 U.S. at 1019 ("[W]here the operation of . . . [the statute] effect[s] a taking of [trade secret] property . . . an adequate remedy for the taking exists under the Tucker Act."). Thus, *Radioptics* does not bar the United States Court of Federal Claims from adjudicating a "takings" claim involving trade secrets. *See Gal-Or* v. *United States*, No. 2011-5122 at 8 (Fed. Cir. Feb. 9, 2012) (non-precedential) ("It is undisputed that trade secrets are protected by the Taking Clause of the Fifth Amendment. . . . In light of this fact, the Court of Federal Claims erred when it determined that the amended complaint did not state Fifth Amendment takings claims[.]" (citing *Monsanto*, 467 U.S. at 1003-04)).

The Government, however, attempts to limit *Monsanto* to its facts, arguing that a Fifth Amendment "taking" of trade secrets can only occur if the taking is the result of direct congressional enactment. Accordingly, any action by executive branch officials that is not expressly authorized by legislation is a tortious act, beyond the court's jurisdiction. This argument, however, ignores our appellate court's takings jurisprudence. The United States Court of Appeals for the Federal Circuit has explained that the issue of whether a wrongful government action is a "taking" is not governed by whether the alleged act was done, pursuant to an express order of Congress, but by whether "the government action in question is authorized." *Del-Rio Drilling Programs, Inc.* v. *United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998); *see also Rith Energy, Inc.* v. *United States*, 247 F.3d 1355, 1365 (Fed. Cir. 2001) (same). Specifically, a governmental action is authorized, if the government agent "act[s] within the *general scope* of their duties, *i.e.*, if their actions are a natural consequence of Congressionally approved measures, *or are pursuant to the good faith implementation of a Congressional Act*." *Del-Rio*, 146 F.3d at 1362 (emphasis added). Therefore, "[m]erely because a government agent's conduct is unlawful does not mean that it is unauthorized; a government official may act within his authority even if his conduct is later determined to have been contrary to law." *Id.*

Accordingly, the fact that a government agent is alleged to have unlawfully misappropriated a trade secret does not necessarily bar the court from adjudicating a trade secrets claim under the Takings Clause of the Fifth Amendment. The proper inquiry is whether the First Amended Complaint has alleged that the "taking" was an "authorized act," as described by *Del-Rio*. Paragraph 35 of the First Amended Complaint alleges that a DARPA employee advised Demodulation that "the government *had a right* to take Demodulation's technology[.]" Am. Compl. ¶ 35 (emphasis added) (internal citations and quotation marks omitted). Drawing every inference in Plaintiff's favor, as it must at this juncture of the proceeding, the court has

determined that this allegation is sufficient to suggest that the governmental actors in this case believed they were acting within their authority.[8]

For these reasons, the court has determined that it has jurisdiction to adjudicate the claims alleged in Count IV of the First Amended Complaint to the extent that they allege a taking of trade secrets through governmentally authorized actions.

> **c.     The United States Court Of Federal Claims Does Not Have Subject Matter Jurisdiction Over A Claim Alleging A Violation Of The Due Process Clause.**

It is well established that the Due Process Clause of the Fifth Amendment is not "a sufficient basis for jurisdiction [in the United States Court of Federal Claims] because [it does] not mandate payment of money by the government." *LeBlanc*, 50 F.3d at 1028. Plaintiff's argument that a *request* for money damages in the First Amended Complaint overcomes *LeBlanc* is without merit. Accordingly, the claims alleged in Count IV of the First Amended Complaint regarding the Due Process Clause of the Fifth Amendment are dismissed. *See* RCFC 12(b)(1).

Furthermore, even assuming, *arguendo*, that In-Q-Tel is a government instrumentality, the court agrees with the Government that the allegations contained in paragraphs 65-74 of the First Amended Complaint fail to allege a single incident from which the court reasonably could conclude that any violation of law has occurred. The allegation that "In-Q-Tel rejected Demodulation without due process of law and in violation of laws governing the government's acquisition of property" (Am. Compl. ¶ 73) is exactly the type of conclusory pleading that the United States Supreme Court has instructed courts to disregard. *See Iqbal*, 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). For this additional reason, the court has determined that Plaintiff's claims against In-Q-Tel must be dismissed, because they fail to state a claim. *See* RCFC 12(b)(6).

> **H.     The Government's Motion To Dismiss Count V Of The First Amended Complaint.**

> **1.     The Government's Argument.**

The Government argues that the United States Court of Federal Claims does not have jurisdiction to adjudicate Count V of the First Amended Complaint, alleging that the Government misappropriated Plaintiff's trade secrets. Gov't Mot. at 21.

---

[8] Again, Plaintiff should note, however, that it will not be able to survive a summary judgment motion on this claim, unless it is able to establish that the governmental actors alleged to have misappropriated its trade secrets were, in fact, "authorized" to do so.

### 2.  The Plaintiff's Response.

Plaintiff acknowledges that the United States Court of Federal Claims generally does not have jurisdiction over a misappropriation of trade secrets claim, but where a tort claim arises from a breach of contract, the cause of action arises in contract, and therefore is within the court's jurisdiction.  Pl. Resp. at 25.

### 3.  The Government's Reply.

The Government replies that the rule authorizing jurisdiction over tort claims is limited to where the tort claim is based on an underlying breach of contract.  Count V, however, is not based entirely on the Government's alleged breach of contract, because it also alleges "[t]he government is using or has used [Plaintiff's] trade secrets in violation of its agreement with [Plaintiff] *and* as a result of its discovery of the trade secrets *by improper means*."  Am. Compl. ¶ 78 (emphasis added).  Since part of the Government's misappropriation was by allegedly "improper means," Count V is not based entirely on a breach of contract.  Gov't Reply at 20.

### 4.  The Court's Resolution.

The RESTATEMENT (FIRST) OF TORTS (1939)[9] describes the tort of misappropriation of trade secrets as follows:

> One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if
>
> > (a) he discovered the secret by improper means, or
> > (b) his disclosure or use constitutes a breach of confidence reposed in him
> by the other in disclosing the secret to him[.]

*Id.* at § 757.

Thus, the tort of misappropriation arises where a breach of confidence is "reposed" in the defendant, *e.g.*, through a contract.  *See id.* at § 757 cmt. a ("The theory that has prevailed is that the protection is afforded only by a general duty of good faith and that the liability rests upon breach of this duty; that is, *breach of contract*, abuse of confidence or impropriety in the method of ascertaining the secret." (emphasis added)); *cf. Monsanto*, 467 U.S. at 1002 (holding that "the extent of the [trade secret] property right [protected] therein is defined by the extent to which the owner of the secret protects his interest from disclosure" such that "[i]f an individual discloses his trade secret to others *who are under no obligation to protect* the confidentiality of the information . . . his property right is extinguished." (emphasis added)).

---

[9] The SECOND RESTATEMENT OF TORTS does not discuss misappropriation of trade secrets.  *See* RESTATEMENT (SECOND) OF TORTS (1979) Div. 9, Introductory Note.  Therefore, the United States Supreme Court continues to rely on the RESTATEMENT (FIRST) OF TORTS in defining the scope of the tort for misappropriation of trade secrets.  *See Monsanto*, 467 U.S. at 1001 (defining the term "trade secret" based upon the RESTATEMENT (FIRST) OF TORTS).

Although the United States Court of Federal Claims does not have jurisdiction to adjudicate a case "sounding in tort," our appellate court has explained that "where a tort claim stems from a breach of contract, the cause of action is ultimately one arising in contract, and thus is properly within the exclusive jurisdiction of the Court of Federal Claims[.]" *Awad* v. *United States*, 301 F.3d 1367, 1372 (Fed. Cir. 2002). An alleged tort "stems from a breach of contract" and is within the court's jurisdiction, where the "sole source" of the duty that the Government is alleged tortiously to have violated "was contractual." *Id.* at 1373 (holding that, because the plaintiff failed to demonstrate any governmental duty not to injure him "apart from the contractual obligations," jurisdiction over a tort claim properly was before the United States Court of Federal Claims); *see also Paradigm Learning, Inc.* v. *United States*, 93 Fed. Cl. 465, 476 (2010) (determining that the court has jurisdiction over a contract claim that would otherwise be fashioned as a misappropriation of trade secrets claim but for the contract); *Aldridge* v. *United States*, 67 Fed. Cl. 113, 121 (2005) ("If the tort claims in this case [for identity misappropriation] had arisen from a contract between Plaintiff and the Government, the United States Court of Federal Claims would have jurisdiction based on the inherently contractual nature of the claims.").

Paragraph 78 of the First Amended Complaint alleges that "[t]he government is using or has used [Plaintiff's] trade secrets in violation of its *agreement* with [Plaintiff] and as a result of its discovery of the trade secrets by improper means." Am. Compl. ¶ 78 (emphasis added). As such, the First Amended Complaint alleges a misappropriation of trade secrets based on a contractual duty, and the court has jurisdiction to adjudicate this claim. *Radioptics'* holding that "[m]isappropriation of a trade secret is a tort" is not an impediment to the court's jurisdiction, because the United States Court of Appeals for the Federal Circuit in that case had already determined that no contract existed between the plaintiff and the Government. *See* 621 F.2d at 1130; *see also id.* at 1115 ("Radioptics has failed to establish . . . that a contractual relationship existed . . . between Radioptics and defendant[.]"). Therefore, *Radioptics* stands for the proposition that the United States Court of Federal Claims does not have jurisdiction to adjudicate trade secret misappropriation claims, unless such claims specifically are derived from contractual duties. *See Paradigm Learning*, 93 Fed. Cl. at 476. Therefore, if the court later determines that Counts I and II of the Amended Complaint must be dismissed, then Plaintiff's misappropriation of trade secrets claims necessarily will also be dismissed.

The Government, however, is correct to point out that the court does not have jurisdiction over trade secret misappropriation claims based on the "discovery of . . . trade secrets by improper means." Am. Compl. ¶ 78. Accordingly, this clause will be struck from Paragraph 78 of the First Amended Complaint. *See* RCFC 12(f).

For these reasons, the court has determined that it has jurisdiction to adjudicate the misappropriation claims alleged in Count V of the First Amended Complaint to the extent that they arise from an agreement with the Government. The phrase "and as a result of its discovery of the trade secrets by improper means," however, will be stricken from paragraph 78 of the First Amended Complaint.

**IV.     CONCLUSION.**

Paragraph 41 of the First Amended Complaint is dismissed, because Plaintiff does not have standing to seek an adjudication of this allegation.

The Government's Motion to Dismiss Count I of the First Amended Complaint as to the NDAs is denied.  The Government's Motion to Dismiss Count I of the First Amended Complaint as to the March 23, 2007 "CRADA" is stayed to afford Plaintiff the opportunity either to seek leave to further amend Count I of the First Amended Complaint to allege compliance with the jurisdictional requirements of the CDA and/or the March 23, 2007 "CRADA," or to allow Plaintiff the opportunity to submit its contract claims to the relevant Contracting Officer.

The Government's Motion to Dismiss Count II of the First Amended Complaint, pursuant to RCFC 12(b)(1), is denied.  The Government's November 17, 2011 Reply Brief will be treated as a Motion to Dismiss Count II for a failure to state a claim under RCFC 12(b)(6), but is stayed to allow Plaintiff the opportunity to seek leave to further amend the First Amended Complaint, or to otherwise conform to the jurisdictional requirement discussed herein as to Count I.   After this stay is lifted, Plaintiff will respond in due course to the Government's November 17, 2011 Motion to Dismiss for failure to state a claim.

The Government's Motion to Dismiss the patent infringement claims alleged in Count IV of the First Amended Complaint as a violation of the Takings Clause of the Fifth Amendment is granted.  *See* RCFC 12(b)(1).

The Government's Motion to Dismiss the misappropriation of trade secrets claims alleged in Count IV of the First Amended Complaint as a violation of the Takings Clause of the Fifth Amendment is denied.  *See* RCFC 12(b)(1).

The Government's Motion to Dismiss the allegations in Count IV of the First Amended Complaint concerning a violation of the Due Process Clause of the Fifth Amendment is granted. *See* RCFC 12(b)(1); *see also* RCFC 12(b)(6).

The Government's Motion to Dismiss the misappropriation claim alleged in Count V of the First Amended Complaint that arises from an agreement with the Government is denied, but the phrase in Paragraph 78 of the First Amended Complaint "and as a result of its discovery of the trade secrets by improper means" is stricken.  *See* RCFC 12(f).

The court will convene a telephone status conference with the parties during the week of March 19, 2012 to ascertain how Plaintiff wishes to proceed in light of the court's rulings herein.

**IT IS SO ORDERED.**

s/Susan G. Braden    
**SUSAN G. BRADEN**
**Judge**