# In the United States Court of Federal Claims

No. 11-236
Filed: July 12, 2013
**TO BE PUBLISHED**

| | |
|---|---|
| ****************************************** | Cooperative Research and Development Agreement; |
| | Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891; |
| DEMODULATION, INC., | Motion to Dismiss, RCFC 12(b)(1); |
| | Stevenson-Wydler Technology Innovation |
| Plaintiff, | Act of 1980, codified as amended at 15 |
| | U.S.C. §§ 3701-22 (2006); |
| v. | 35 U.S.C. § 41(c) (delayed payment of patent maintenance fees); |
| THE UNITED STATES, | 37 C.F.R. § 1.378(b) (same); |
| | 10 C.F.R. § 782 (patent infringement claims |
| Defendant. | against the Department of Energy); |
| | RCFC 12(f)(1) (striking text from a pleading); |
| | RCFC 19(a)(1) (joinder); |
| | RCFC 56 (summary judgment). |
| ****************************************** | |

**Benjamin D. Light**, Aromando, Light & Croft, LLC, West Caldwell, New Jersey, Counsel for Plaintiff.

**Gary Lee Hausken**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

### MEMORANDUM OPINION AND ORDER REGARDING PARTIAL SUMMARY JUDGMENT

**BRADEN,** *Judge*.

**I.     RELEVANT FACTS.**[1]

Demodulation, Inc. ("Demodulation") owned patents, trade secrets, and proprietary technology concerning microwire.[2]  Sec. Am. Compl. ¶¶ 2, 18.  Demodulation's patents

---

[1] The relevant facts were derived from: the May 4, 2012 Second Amended Complaint ("Sec. Am. Compl."); exhibits attached to the United States' ("Government's") September 10, 2012 Motion For Partial Summary Judgment ("Gov't PSJ Mot., App. at A1-A30"); exhibits attached to Plaintiff's October 26, 2012 Response ("Pl. Resp. Ex. 1-3"); and exhibits attached to the Government's September 16, 2011 Motion To Dismiss ("Gov't Mot. Dismiss Ex. 1-4").

concerned the "manufacture, detection[,] and manipulation of microwire" and included: U.S. Patent Nos. 5,577,085 "Method and device for electronic identification" ("the '085 patent"); 7,368,166 "Polymerase Chain Reaction Using Metallic Glass-Coated Microwire" ("the '166 patent"); 7,233,249 "Multi-Bit Encoded Glass-Coated Microwire and Articles Composed Thereof" ("the '249 patent"); 6,018,297 "Method and Devoice for Coding Electronic Labels" ("the '297 patent"); 6,137,411 "Article Surveillance System" ("the '411 patent"); 7,071,417-B2 "Optically Encoded Glass-Coated Microwire" ("the '417 patent"); 7,075,439 "Marker for Remote Detection of Articles" ("the '439 patent"); 7,354,645 "Engineered Glasses for Metallic Glass-Coated Wire" ("the '645 patent"); 5,576,693 "Method and Device for Remote Sensing of Objects" ("the '693 patent"); 6,417,771 "Sensor, a Method and a System for Remote Detection of Objects" ("the '771 patent"); 6,232,879 "Sensor and Method for Remote Detection of Objects" ("the '879 patent"); and 6,225,905 "Sensor for Remote Detection of Objects" ("the '905 patent").  Sec. Am. Compl. ¶ 57.

In addition, on April 10, 2002, the Romanian National Institute of Research and Development for Technical Physics ("Institute") licensed U.S. Patent No. 6,270,591-B2 "Amorphous and Nanocrystalline Glass-Covered Wires" ("the '591 patent") to Demodulation. Pl. Resp. Ex. 3 (Decl. of James O'Keefe, Jr.).

On Easter Sunday 2005, an official with the National Nuclear Security Administration ("NNSA"),[3] called Demodulation's CEO at his home to express NNSA's interest in acquiring Demodulation's "patented and proprietary technology, intellectual property[,] and other trade secrets."  Sec. Am. Compl. ¶ 4.  On June 16 and 17, 2005, Demodulation executed two confidentiality agreements that required NNSA and its employees "not [to] disclose, publish[,] or otherwise reveal any of the Confidential Information received from Demodulation to any other party whatsoever."  Sec. Am. Compl. ¶ 8, Exs. A, B.

In December 2005, Demodulation was invited to make a presentation to NNSA at a workshop at DOE's offices in Germantown, Maryland.  Sec. Am. Compl. ¶ 9.  At that event, Demodulation disclosed certain proprietary information and intellectual property concerning its microwire technology in order to ascertain whether DOE would enter into a contract, whereby Demodulation would provide its proprietary information and intellectual property in exchange for a monetary payment or for DOE to work with Demodulation to "commercialize its

---

[2] "Microwire" is "very fine glass-coated wire."  9 THE OXFORD ENGLISH DICTIONARY 717 (2d ed. 1989).  Microwire has "sensing capabilities" and can "harvest energy from the ambient electromagnetic conditions in the atmosphere and . . . render objects invisible to radar." Sec. Am. Compl. ¶ 19.  Microwire also can be engineered to transmit digital information.  Sec. Am. Compl. ¶ 19.

[3] The NNSA is an agency of the United States Department of Energy ("DOE") that operates federal research facilities, including the Sandia National Laboratory in Albuquerque, New Mexico (the "Sandia Lab") and the Y-12 National Security Complex near Oak Ridge, Tennessee (the "Y-12 Complex").  Sec. Am. Compl. ¶ 5.  The Sandia Lab is managed and operated by the Lockheed Martin Corporation; the Y-12 Complex is managed and operated by BWXT Y-12, LLC ("BWXT").  Sec. Am. Compl. ¶¶ 6-7.

technology for sale to others." Sec. Am. Compl. ¶¶ 9, 10. After the December 2005 presentation, NNSA personnel advised Demodulation that there were a "broad array of disruptive applications for Demodulation's technology and intellectual property within the government market[.]" Sec. Am. Compl. ¶ 11.

Sometime in 2006, NNSA informed Demodulation of a potential research/investment opportunity at the Y-12 Complex. Sec. Am. Compl. ¶ 12.

On or about February 12, 2007, DOE entered into a Cooperative Research and Development Agreement ("CRADA") with Demodulation.[4] Sec. Am. Compl. ¶ 13, Ex. C. Thereafter, DOE "thoroughly vetted and characterized the microwire and its myriad applications." Sec. Am. Compl. ¶ 20. During this process, Demodulation also disclosed other "proprietary information and trade secrets" to DOE, including: "the composition of the wire, the method for making the wire and variations in its chemistry, means for detecting the wire and proprietary signal processing technology." Sec. Am. Compl. ¶ 28. After evaluating Demodulation's technology and conducting several experiments, DOE concluded that

---

[4] A CRADA is an agreement authorized by the Stevenson-Wydler Technology Innovation Act of 1980, Pub. L. No. 96-480, 94 Stat. 2311 (1980) (codified, as amended, at 15 U.S.C. §§ 3701-22 (2006)) ("Stevenson-Wydler Act"), whereby

> Each Federal agency may permit . . . the director of any of its Government-owned, contractor-operated laboratories--
>
> (1) to enter into cooperative research and development agreements *on behalf of such agency* (subject to subsection (c) of this section) . . . with . . . industrial organizations (including corporations, partnerships, and limited partnerships, and industrial development organizations)[.]

15 U.S.C. § 3710a(a)(1) (2006) (emphasis added); *see also Spectrum Sci. v. United States*, 84 Fed. Cl. 716, 733-35 (2008) (describing the legislative history of the Stevenson-Wydler Act and CRADAs).

> A CRADA is defined as
>
> [A]ny agreement between one or more [f]ederal laboratories and one or more non-[f]ederal parties under which the [g]overnment, through its laboratories, provides personnel, services, facilities, equipment, intellectual property, or other resources with or without reimbursement (but not funds to non-[f]ederal parties) and the non-[f]ederal parties provide funds, personnel, services, facilities, equipment, intellectual property, or other resources toward the conduct of specified research or development efforts which are consistent with the missions of the laboratory; except that such term does not include a procurement contract or cooperative agreement as those terms are used in sections 6303, 6304, and 6305 of Title 31.

15 U.S.C. § 3710a(d)(1) (2006).

Demodulation's microwire was suitable for the "detection of 'gas, pressure, temperature, [and] humidity,'" as well as other applications. Sec. Am. Compl. ¶ 21. DOE also conducted additional research, the results of which are in a classified DOE Report. Sec. Am. Compl. ¶ 22.

In the fall of 2008, Demodulation representatives were invited to meet with DOE's Under Secretary to "disclose the 'subject inventions' developed pursuant to the CRADA and to discuss the federal government's potential purchase or license of Demodulation's "technology, intellectual property and various applications." Sec. Am. Compl. ¶ 26. But, the Under Secretary advised Demodulation that DOE concluded there were "no applications" for Demodulation's technology, contrary to prior communications with the same Under Secretary and NNSA officials. Sec. Am. Compl. ¶ 26; *see also* Sec. Am. Compl. ¶¶ 11, 20.

On or about February 10, 2009, the Section Manager of the Y-12 Complex wrote to Demodulation, expressing concern about DOE's potential development of microwire applications after the CRADA expired and observing that NNSA would have "to deal with an enormous license fee that would shoot the practicality of the application out of the water. I guess we will just deal with that issue at the appropriate time." Sec. Am. Compl. ¶ 24.

On February 12, 2009, the March 23, 2007 CRADA expired, without DOE agreeing to purchase or license Demodulation's microwire technology. Sec. Am. Compl. ¶ 23.[5] On March 1, 2009, however, a company known as Thermal Solutions, Inc., received a federal grant to develop "a temperature sensing system comprised of a wireless reader capable of remote interrogation of amorphous microwire temperature sensors." Sec. Am. Compl. ¶ 27. The next day, on March 2, 2009, BWXT, acting on behalf of NNSA, offered Demodulation an opportunity to secure a small sub-contract in fiscal year 2010 to provide consulting services on a "feasibility project," estimated to involve "20 employee-days at $1,000 per employee-day plus travel and per diem expenses" and a not-to-exceed project total of $30,000. Sec. Am. Compl. ¶ 25. Demodulation did not accept the offer. Sec. Am. Compl. ¶ 25.

Thereafter, on information and belief, DOE allegedly disclosed Demodulation's proprietary technology and trade secrets to Government agencies and private entities, without Demodulation's authorization, including: Mentai Fong of the Intelligence Advanced Research Projects Agency; Zach Nienstedt, a graduate student at the North Carolina State University; Cubic Corporation, which passed off the information as its own to Raytheon; and Sekuworks, LLC. Sec. Am. Compl. ¶¶ 28-32. In addition, Demodulation's trade secrets also allegedly were disclosed to: the United States Army's Operation Guardrail; the Aerial Common Sensor Program; the Defense Advanced Research Projects Agency; and Sandia National Laboratory. Sec. Am. Compl. ¶ 36. In addition, the United States Army's Small Business Innovation Research Program, the United States Navy's Underwater Warfare Center, and the Naval Surface

---

[5] The expiration date listed in the May 4, 2012 Second Amended Complaint appears inconsistent with the language of the CRADA. *See* Gov't Mot. Dismiss Ex. 1 at GA3 (CRADA art. III, para. A (stating that the term of the CRADA was twenty-four months from the effective date, defined as "the latter date of (1) the date on which it is signed by the last of the Parties or (2) the date on which it is approved by DOE")), GA15 (showing that James E. O'Keefe, Jr. signed the CRADA on March 23, 2007).

Warfare Center, Carderock Division allegedly have infringed Demodulation's patents. Sec. Am. Compl. ¶¶ 59-60.

On January 26, 2010, Demodulation filed a petition with DOE, requesting an administrative dispute resolution be initiated, pursuant to 10 C.F.R. § 782.[6]  Sec. Am. Compl. ¶ 37.  DOE accepted and acknowledged Demodulation's petition, but did not otherwise respond. Sec. Am. Compl. ¶ 37.[7]  Sometime in 2010, DOE also received and/or provided funding for the production of a product that used Demodulation's proprietary microwire technology, intellectual property, and trade secrets.  Sec. Am. Compl. ¶ 33.  But, DOE failed to disclose that infringing activity to Demodulation, despite a requirement in the March 23, 2007 CRADA that it must do so.  Sec. Am. Compl. ¶ 34.

On July 4, 2010, however, Demodulation's '417 patent expired for nonpayment of maintenance fees.  Gov't PSJ Mot., App. at A2.  On July 9, 2010, the '771 patent also expired for nonpayment of maintenance fees.  Gov't PSJ Mot., App. at A1.  And, on July 11, 2010, the '439 patent expired for nonpayment of maintenance fees.  Gov't PSJ Mot., App. at A3.

## II. PROCEDURAL HISTORY.

Since Demodulation received no response to its January 26, 2010 Petition, on April 14, 2011, Demodulation filed a Complaint in the United States Court of Federal Claims, against the United States.  At the time the Complaint was filed, Demodulation's '417, '439, and '771 patents had expired for nonpayment of maintenance fees, but the '166, '249, and '645 patents were viable.

On June 10, 2011, the Government filed an Unopposed Motion For Extension Of Time To File Answer.  On June 13, 2011, the court granted that motion.  On August 12, 2011, the Government filed a Motion To Dismiss.

On June 19, 2011, Demodulation's '249 patent expired for nonpayment of maintenance fees.  Gov't PSJ Mot., App. at A4.  On April 8, 2012, the '645 patent also expired for nonpayment of maintenance fees.  Gov't PSJ Mot., App. at A5.  And, on May 7, 2012, the '166 patent expired for nonpayment of maintenance fees.  Gov't PSJ Mot., App. at A6.

On September 1, 2011, Demodulation filed a First Amended Complaint with exhibits. On September 16, 2011, the Government filed a superseding Motion To Dismiss Counts I, II, IV,

---

[6] 10 C.F.R. § 782 "set[s] forth policies and procedures for the filing and disposition of claims asserted against the Department of Energy of infringement of privately owned rights in patented inventions or copyrighted works." 10 C.F.R. § 782.1; *see also* 10 C.F.R. § 782.5 (listing the required contents for a communication initiating an infringement claim).

[7] The March 23, 2007 CRADA required that, if the parties were unable to resolve a dispute, the DOE Contracting Officer decide the dispute and "reduce his/her decision to writing within 60 days of receiving in writing the request for a decision by either Party[.]" Gov't Mot. Dismiss Ex. 1 at GA13-14 (Article XXVIII of the 3/23/07 CRADA).

And V Of The First Amended Complaint, for lack of jurisdiction under RCFC 12(b)(1). In the alternative, the Government argued that certain portions of Count I, as well as Count IV, also should be dismissed for failure to state a claim, pursuant to RCFC 12(b)(6). On October 31, 2011, Demodulation filed a Response. On November 17, 2011, the Government filed a Reply.

On February 29, 2012, the court issued a Memorandum Opinion And Order granting-in-part and denying-in-part the Government's September 16, 2011 Motion To Dismiss. *See Demodulation, Inc. v. United States*, 103 Fed. Cl. 794 (2012). Therein, the court stayed the Government's Motion To Dismiss Counts I and II to allow Plaintiff the opportunity to further amend the April 14, 2011 Complaint to establish compliance with the jurisdictional requirements of the Contract Disputes Act by submitting its claims to the contracting officer. *Id*. at 807-08. The court, however, granted the Government's Motion To Dismiss Count IV, insofar as it alleges that patent infringement is a violation of the Takings Clause of the Fifth Amendment, but denied the Government's Motion to Dismiss Demodulation's allegation that the taking of trade secrets was a violation of the Takings Clause. *Id*. at 810-11. The court also granted the Government's Motion to Dismiss Demodulation's allegation that the Government's actions violated the Due Process Clause. *Id*. at 812. But the court denied the Government's Motion to Dismiss Count V, because the court has jurisdiction to adjudicate claims of misappropriation of trade secrets when they arise out of a contract or agreement with the Government. *Id*. at 812-14.

On April 30, 2012, Demodulation filed a Motion To Amend, to which the Government did not object. On May 2, 2012, the court granted the Motion To Amend, but instructed Demodulation to delete from its Proposed Second Amended Complaint certain claims dismissed in the court's February 29, 2012 Memorandum Opinion And Order. On May 4, 2012, Demodulation filed a Second Amended Complaint with five Counts: Count One – Breach of Express Contract (Sec. Am. Compl. ¶¶ 38-50); Count Two – Breach of Implied-In-Fact Contract (Sec. Am. Compl. ¶¶ 51-54); Count Three – Patent Infringement (Sec. Am. Comp. ¶¶ 55-64); Count Four – Violation of the Takings Clause of the Fifth Amendment as to Demodulation's trade secrets and other intellectual property (Sec. Am. Compl. ¶¶ 65-74); and Count Five – Misappropriation of Trade Secrets (Sec. Am. Compl. ¶¶ 68-72).[8]

On September 10, 2012, the Government filed an Answer and a Motion For Partial Summary Judgment Relating To The Plaintiff's Ability To Recover For Expired Patents and the '591 patent, together with exhibits. On October 26, 2012, Demodulation filed a Response, Cross-Motion, and Contingent Cross-Motion, and additional exhibits. Demodulation's October 26, 2012 Cross-Motions request the court to deny or defer consideration of the Government's September 10, 2012 Motion. In Demodulation's Cross-Motions, it asserted that it needs to know

---

[8] Plaintiff violated the court's May 2, 2012 Order by persisting in asserting claims that the court ordered dismissed, pursuant to RCFC 12(b)(1). 5/2/2012 Order at 1 ("Plaintiff is instructed to delete these portions of the Proposed Second Amended Complaint prior to filing the Second Amended Complaint."). Pursuant to RCFC 12(f)(1), the court strikes paragraphs 67-73 from the May 4, 2012 Second Amended Complaint. RCFC 12(f)(1) ("The court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter. The court may act: on its own[.]") In addition, the court strikes from paragraph 66 of the May 4, 2012 Second Amended Complaint the words "and its infringement of Demodulation's patents[.]"

"the specific scope and timing" of the Government's alleged infringement and whether the Government owed Demodulation payment prior to the expiration of the patents-in-suit. Pl. Resp. at 12. For the reasons stated herein, that information is not relevant to the issues raised by the Government's September 10, 2012 Motion. Accordingly, Demodulation's October 26, 2012 Cross-Motions are denied.

On November 9, 2012, the Government filed a Reply ("Gov't Reply").

### III. ISSUES RAISED BY THE GOVERNMENT'S SEPTEMBER 10, 2012 MOTION FOR PARTIAL SUMMARY JUDGMENT.

#### A. Whether Plaintiff Can Recover For Infringement That Occurred After Expiration Of Its Patents.

##### 1. The Government's Argument.

The Government argues that, because the '166, '249, '417, '439, '645, and '771 patents have expired for nonpayment of maintenance fees, the court should grant the Government summary judgment for any alleged use that occurred after the expiration of those patents. Gov't PSJ Mot. at 6. The Government adds that since Demodulation made a conscious decision to allow its patents to expire, they cannot be reinstated. Gov't PSJ Mot. at 11. The Government, however, does not challenge Demodulation's standing to seek an adjudication of claims for pre-expiration infringement. Gov't PSJ Mot. at *v*-6 (stating that "summary judgment is appropriate with respect to any alleged use occurring *after* the expiration of these patents" (emphasis added)).

##### 2. The Plaintiff's Response.

Demodulation concedes that the '166, '249, '417, '439, '645, and '771 patents expired for nonpayment of maintenance fees, but responds that the fees would have been paid, if Demodulation was aware that the Government was using its patents. Pl. Resp. at 3, 6. Therefore, under these circumstances, the court should apply equitable principles to allow Demodulation to recover for the Government's post-expiration use of Demodulation's patents. Pl. Resp. at 5-6 (citing *Tektronix, Inc. v. United States*, 552 F.2d 343, 351 (Ct. Cl.) ("When determining just compensation for any type of eminent domain action, including the unlicensed use of a patent, equitable principles of fairness control."), *modified on other grounds*, 557 F.2d 265 (Ct. Cl. 1977)). To deny Demodulation recovery for the Government's use of its patents after they expired would allow the Government to benefit from failing to notify Demodulation of its pre-expiration use of the patents. Pl. Resp. at 6. In any event, Demodulation should be afforded discovery, because "[i]f [it] reveals that the Government simply chose to ignore Demodulation's patents and has concealed its use of microwire, equity will require damages to extend beyond the termination of the patents for failure to pay maintenance fees." Pl. Resp. at 6-

7.  In addition, the '166, '249, and '645 patents are subject to reinstatement by the United States Patent and Trademark Office ("USPTO").  Pl. Resp. at 5 (citing 35 U.S.C. § 41(c)(1)).[9]

### 3. The Government's Reply.

The Government replies that 28 U.S.C. § 1498(a) precludes recovery for post-expiration use of a patent, because "one does not need a license to make or use a patented invention after the patent expires."  Gov't Reply at 7-8 (citing *Bendix Corp. v. United States*, 676 F.2d 606, 609-10 (Ct. Cl. 1982) (holding that "there could be no recovery under any circumstances" for post-expiration infringement)).  Moreover, Demodulation cannot reinstate the '166, '249, and '645 patents, because the USPTO only can accept late maintenance fee payments, if the failure to pay was unintentional or unavoidable.  Gov't Reply at 8-11 (citing 35 U.S.C. § 41(c)(1)).  To establish that the delay in payment was "unavoidable," the owner must show that "'reasonable care was taken to ensure that the maintenance fee would be paid timely and that the petition for reinstatement was filed promptly after the patentee was notified of, or otherwise became aware of, the expiration of the patent.'"  Gov't Reply at 9 (quoting 37 C.F.R. § 1.378(b)).  Since Demodulation's CEO has stated that the reason for Demodulation's failure to pay the maintenance fees was financial hardship, Demodulation is not eligible for reinstatement of its patents.  Gov't Reply at 10 (citing Pl. Resp. Ex. 3 (Decl. of James O'Keefe, Jr.) ¶ 8).

### 4. The Court's Resolution.

The Government's Motion For Partial Summary Judgment states that "the United States cannot be held liable for any alleged manufacture or use of the inventions claimed [under the '166, '249, '417, '439, '645, and '771 patents] after the expiration of those patents[.]"  Gov't PSJ Mot. at *v*.  The ambiguity of the Government's pleading requires that the court's ruling be specific, because of the interrelated factual basis of Demodulation's patent and breach of contract claims.

On April 14, 2011, when the initial Complaint in this case was filed, Demodulation's '166, '249, and '645 patents were viable and Demodulation had standing to seek an adjudication of past and ongoing infringement claims as to those patents under 28 U.S.C. § 1498(a).  Subsequently, however, Demodulation failed to pay the maintenance fees on the '166, '249, and '645 patents.  In doing so, Demodulation voluntarily relinquished its right to sue for post-expiration infringement.  *See Pequignot v. Solo Cup Co.*, 608 F.3d 1361 (Fed. Cir. 2010) (holding that "an article that was once protected by a now-expired patent is no different from an

---

[9] Section 41(c)(1) of the Patent Act provides:

> The Director may accept the payment of any maintenance fee . . . which is made within twenty-four months after the six-month grace period if the delay is shown to the satisfaction of the Director to have been unintentional, *or at any time after the six-month grace period if the delay is shown to the satisfaction of the Director to have been unavoidable*.

35 U.S.C. § 41(c)(1) (emphasis added).

article that has never received protection from a patent. Both are in the public domain."); *see also Bendix Corp. v. United States*, 676 F.2d 606, 609-10 (Fed. Cir. 1982), (holding that "there could be no recovery under any circumstances" for post-expiration infringement)). Demodulation, however, retains standing to seek an adjudication of pre-expiration infringement claims as to the '166, '249, and '645 patents. *Cf. Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1372 (Fed. Cir. 2008) ("Title to a patent – even an expired patent – includes more than merely the right to recover damages for past infringement."); *see also, e.g.*, *Phonometrics, Inc. v. Hospitality Int'l, Inc.*, 120 F. App'x 341, 342 (Fed. Cir. 2005) (unpublished) (holding that a plaintiff that sued four years after its patent expired could recover for infringement for the two year period prior to expiration and within the statute of limitations); *Mabbett v. Tandy Corp.*, 847 F.2d 841 (Fed. Cir. 1988) (unpublished table decision) ("The legal owner of a patent may still file suit after the patent's expiration to recover damages for alleged infringements occurring before the expiration of the patent[.]"). Likewise, Demodulation also has standing to seek adjudication of pre-expiration infringement as to the '417, '439, and '771 patents that expired before the April 14, 2011 Complaint was filed.

Accordingly, the court grants the Government's Motion for Partial Summary Judgment, solely as to the post-expiration infringement claims as to the '166, '249, '417, '439, '645, and '771 patents, as alleged in Count III of the Second Amended Complaint. *See Lane v. Pena*, 518 U.S. 187, 192 (1996) (holding that Section 1498 is a waiver of sovereign immunity that should "be strictly construed, in terms of its scope, in favor of the sovereign"). As previously stated, Demodulation retains standing to seek an adjudication of pre-expiration infringement as to the '166, '249, '417, '439, '645, and '771 patents, and it may eventually be able to seek damages for ongoing infringement of the '417, '439, and '771 patents. Discovery, specifically as to Counts I, II, IV, and V, will reveal whether the Government engaged in affirmative "misconduct" and made a misrepresentation of fact, on which Demodulation relied in allowing the '417, '439, and '771 patents to expire. If so, Demodulation may be in a position to petition the USPTO for reinstatement. *See* 35 U.S.C. § 41(c)(1).[10] If the USPTO reinstates the '417, '439, and '771 patents before a Final Judgment is entered in this case, Demodulation can seek leave to amend the Second Amended Complaint to reassert claims for infringement of the '417, '439, and '771 patents. Since Demodulation was aware that the Government allegedly was infringing the '166, '249, and '645 patents on April 14, 2011, the date of Demodulation's initial Complaint, Demodulation's subsequent decision to allow these patents to expire bars reinstatement under 25 U.S.C. § 41(c)(1).

---

[10] 35 U.S.C. § 41(c)(1) provides:

> The Director [of the USPTO] may accept the payment of any maintenance fee . . . which is made within twenty-four months after the six-month grace period if the delay is shown to the satisfaction of the Director to have been unintentional, *or at any time* after the six-month grace period if the delay is shown to the satisfaction of the Director to have been *unavoidable*.

35 U.S.C. § 41(c)(1) (emphasis added).

> **B.     Whether Plaintiff Has Standing To Seek An Adjudication Of Infringement Claims Regarding The '591 Patent.**
>
> **1.     The Government's Argument.**

The Government argues that USPTO records indicate that the '591 patent is owned by the Institute and there is no recorded assignment of that patent to the Plaintiff. Gov't PSJ Mot. at 6-7, 15.

> **2.     The Plaintiff's Response.**

Demodulation responds that it is the exclusive licensee of the '591 patent. Pl. Resp. at 7. On April 10, 2002, Demodulation entered into an agreement with the Institute ("the Institute Agreement"), that granted Demodulation all of the significant rights under the patent. Pl. Resp. at 7; *see also* Pl. Resp. Ex. 3B (the Institute Agreement). The Government's September 10, 2012 Motion, however, did not challenge whether Demodulation had all significant rights under the '591 patent, and therefore the Government is barred from making that argument in its reply brief. Pl. Resp. at 8-9 (citing *Novosteel SA v. United States*, 284 F.3d, 1261, 1274 (Fed. Cir. 2002) (holding that an issue is waived if raised for the first time in a reply).

In the alternative, if the court determines that Demodulation did not obtain all substantial rights to the '591 patent, Demodulation is entitled to discovery and/or the Institute should be joined as an involuntary co-plaintiff. Pl. Resp. at 9-10 (citing *Brunswick Corp. v. United States*, 22 Cl. Ct. 278, 282 (1991) ("[I]f there is no other way of securing justice to the exclusive licensee, *the latter may make the owner without the jurisdiction a co-plaintiff without his consent*[.]")).

> **3.     The Government's Reply.**

The Government replies that Demodulation does not have all of the "significant rights" of the '591 patent, because "the right to make and use" the invention was retained by the Institute. Gov't Reply at 14-16. For example, the Institute Agreement provides that Demodulation can sublicense the '591 patent only to entities in which it owns or controls at least thirty percent of the outstanding shares, stock, or voting rights, but the Institute retained the right to license to others. Gov't Reply at 16 (citing Pl. Resp. Ex. 3B ¶ 12.1). The Institute Agreement is also subject to termination at any time by the Institute. Gov't Reply at 16-18 (citing Pl. Resp. Ex. 3B ¶¶ 9.5, 9.6. In addition, the Institute Agreement provides that the license can be terminated if Demodulation fails to reduce the invention to practical application and commercialize it twelve months after the license commences. Gov't Reply at 17 (citing Pl. Resp. Ex. 3B ¶ 9.5). To date, Demodulation has not utilized, commercialized, nor practiced the invention described in the '591 patent. Therefore, the Institute is entitled to terminate the Institute Agreement at any time. Gov't Reply at 18. In short, Demodulation only has a "bare" license to the '591 patent, and has no standing to sue for enforcement. Gov't Reply at 18.

The Government also opposes Demodulation's October 26, 2012 Cross-Motion to join the Institute as an involuntary plaintiff under RCFC 19(a). Gov't Reply at 21. A two-step test

governs the required joinder of a party. Gov't Reply at 22 (citing *United Keetoowah Band of Cherokee Indians of Okla. v. United States*, 480 F.3d 1318, 1324 (Fed. Cir. 2007) (interpreting RCFC 19)). First, the court must determine whether the absent party is "necessary," and second, if the party is "necessary" but cannot be joined, the court must determine whether it is appropriate to dismiss the case. Gov't Reply at 22. Demodulation has not demonstrated "why the Institute is necessary to 'accord complete relief between the [existing] parties.'" Gov't Reply at 21 (citing RCFC 19(a)(1)(A)). More importantly, the Institute has not expressed "an interest relating to the subject of [Demodulation's] action." Gov't Reply at 22 (quoting RCFC 19(a)(1)(B)). In addition, the Institute may be an entity of the Government of Romania and, therefore, immune from joinder under the Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified under scattered sections of 28 U.S.C). Gov't Reply at 24.[11] In any event, the court can adjudicate this case without the Institute, since the issue "is whether Demodulation has *any* right to recover for the '591 patent," which is purely a question of law. Gov't Reply at 22.

  **4.  The Court's Resolution.**

    **a.  The Institute Did Not Convey All Substantial Rights To The '591 Patent To Demodulation.**

As a matter of law, a license that conveys "all substantial rights in the patents-in-suit" is tantamount to an assignment of those patents to the exclusive licensee, conferring standing to sue solely on the license. *See Alfred E. Mann Found. for Scientific Res. v. Cochlear Corp.*, 604 F.3d 1354, 1358-59 (Fed. Cir. 2010). An exclusive licensee that has "less than 'all substantial rights'" also has standing to sue for infringement, but in such suits "the patent owner is an indispensable party who must be joined." *Id.* at 1359. Demodulation asserts that on April 10, 2002, the Institute entered into a license agreement that conferred to Demodulation "all significant rights" in the '591 patent. Pl. Resp. at 7-8.[12] Therefore, the court begins its analysis by determining whether the Institute Agreement "transfers 'all substantial rights' in a patent, [requiring the court to] ascertain the intention of the parties and examine the substance of what was granted by the agreement." *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001).[13]

---

[11] The Government does not cite a provision of the Foreign Sovereign Immunities Act that would afford the Institute immunity in this case.

[12] Demodulation's use of "all significant rights" rather than "all substantial rights" tracks the language in *Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1030 (Fed. Cir. 1995) ("When a patentee makes an assignment of all significant rights under the patent, such assignee may be deemed the effective 'patentee' under the statute and has standing to bring suit in his own name for infringement."). The court discerns no substantive difference between "all significant rights" and "all substantial rights."

[13] Demodulation incorrectly argues that the Government waived the issue of whether Demodulation obtained all of the substantial rights to the '591 patent. Pl. Resp. at 8-9. Since that issue concerns subject matter jurisdiction, it cannot be waived. *See Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) ("Subject-matter jurisdiction can never be waived or forfeited."). In

The United States Court of Appeals for the Federal Circuit has identified the following factors for the trial court to consider in determining whether a license confers "all substantial rights":

> [(1)] the scope of the licensee's right to sublicense, [(2)] the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement, . . . [(3)] the duration of the license rights granted to the licensee, [(4)] the ability of the licensor to supervise and control the licensee's activities . . . and [(5)] the nature of any limits on the licensee's right to assign its interests in the patent.

*Alfred E. Mann*, 604 F.3d at 1360-61.

In this case, as to the first factor, Article 12 of the Institute Agreement provides that Demodulation can transfer the invention covered by the '591 patent only to entities of which it "controls directly or indirectly at least 30% of the outstanding shares, stock, or voting rights," and any such transfers are subject to royalty payments to the Institute. Pl. Resp. Ex. 3B ¶ 12.1. This is a significant limitation on Demodulation's right to sublicense or assign its interests in the '591 patent and weighs against construing the Institute Agreement as conferring "all substantial rights."

As to the second factor, the reversionary rights of the licensor have not been held to be a barrier to the transfer of all the substantial rights to a patent. *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991) ("An assignment of a patent 'may be either absolute, or by way of mortgage and liable to be defeated by the non-performance of a condition subsequent[.]'" (quoting *Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891)). But, a provision that allows the termination of a licensing agreement, if the licensee does not meet certain benchmarks, has been recognized as the retention of a substantial right by the licensor. *See Propat Int'l. Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1191-92 (Fed. Cir. 2007) (holding that the right to terminate an agreement, if the licensee fails to "meet certain benchmarks in its efforts to exploit the patent," indicates that the licensee has retained a significant right in the patent). The Institute Agreement provides that Demodulation's license can be terminated, in the event of a breach of any one of the conditions provided therein. Pl. Resp. Ex. 3B ¶ 8.2 (providing that, on notice from the nonbreaching party, the breaching party has thirty days to cure the breach or show cause why the contract should not be terminated); ¶ 9.8 (allowing the Institute unilaterally to modify or terminate the licensing agreement, if it provides Demodulation notice of the reasons for modification or termination). Therefore, this

---

addition, Demodulation's reliance on *Novosteel* is inapposite, since the Government's Reply did not raise this issue for the first time; instead, the Government responded to an argument made by Demodulation in its Response. Pl. Resp. at 7-8 (arguing that the Institute assigned all of the significant rights of the '591 patent to Demodulation). Moreover, the Government discussed the law governing the assignment of patents in its initial motion. Gov't PSJ Mot. at 14. Therefore, the Government was not barred from arguing that Demodulation does not possess all of the substantial rights of the '591 patent.

factor weighs against construing the Institute Agreement as one that confers "all substantial rights" of the '591 patent to Demodulation.

The third factor, however, supports Demodulation's position that it has an exclusive license, because the term of the Institute Agreement is equal to the life of the '591 patent. Pl. Resp. Ex. 3B ¶ 3.1. *Cf. Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006) (holding that a license whose term was less than the life of the patent did not confer standing to sue for infringement).

But, the fourth factor cuts against Demodulation, because the Institute has the right to exercise significant supervision over the use of the '591 patent. For example, Articles 6.1 and 6.2 require that Demodulation provide the Institute with a written report every six months including: (1) "a narrative description of the steps being taken to reduce the [invention] to practice"; (2) "a narrative description of the steps being taken to create a market demand for the [invention]" and to commercialize it; (3) a description of the products offered by Demodulation that use the invention; (4) a list of locations where the invention is manufactured; (5) the number and type of products using the invention that are sold or disposed of by Demodulation; (6) Demodulation's gross sales and net sales; and (7) the amount of royalties that Demodulation is due. 4 Pl. Resp. Ex. 3B ¶¶ 6.1, 6.2. Although the Institute does not exercise control over Demodulation's activities, it does exercise significant supervision, suggesting that Demodulation does not have all significant rights under the '591 patent. *See Mentor H/S*, 240 F.3d at 1018 (holding that a patentee that supervised the licensee's product development retained a significant ownership right).

In addition to the *Alfred Mann* factors, our appellate court has held that "an important substantial right is the exclusive right to sue for patent infringement[.]" *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 979 (Fed. Cir. 2005); *see also AssymetRx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314, 1319 (Fed. Cir. 2009) ("[T]he exclusive right to sue is 'particularly dispositive' in cases where . . . we are deciding whether a patent owner must be joined as a party."). The Institute Agreement, significantly, does not provide Demodulation with the express right to sue for third-party infringement. Pl. Resp. Ex. 3B. The Institute Agreement, however, does contain an integration clause, whereby the Institute conveyed to Demodulation only those rights enumerated therein. Pl. Resp. Ex. 3B ¶ 17.1. As such, the right to sue was retained by the Institute. *See Textile Prod., Inc. v. Mead Corp.*, 134 F.3d 1481, 1485 (Fed. Cir. 1998) (holding that if a licensing agreement is silent on a right, the licensor is assumed to have retained that right).

On balance, the court has decided that together these factors weigh against determining that the Institute Agreement transferred to Demodulation "all substantial rights" or "all significant rights" under the '591 patent. As such, Demodulation does not have standing to sue for infringement of the '591 patent as the sole plaintiff.

> **b.** **The Institute Did Not Convey An Exclusive License To Demodulation.**

In the alternative, Demodulation argues that if it does not have standing to sue on its own, the Institute should be joined as an involuntary co-plaintiff. *See Intellectual Prop. Dev.,*

*Inc. v. TCI Cablevision of Calif.*, 248 F.3d 1333, 1347 (Fed. Cir. 2001) ("As a general rule . . . this court adheres to the principle that a patent owner should be joined, either voluntarily or involuntarily, in any patent infringement suit brought by an exclusive licensee having fewer than all substantial patent rights.") For joinder to be appropriate, Demodulation must have co-plaintiff standing as "an exclusive licensee." *See Ortho Pharm. Corp.*, 52 F.3d at 1032 (describing the basis for co-plaintiff standing). It is true that the Institute agreement explicitly states that the Institute conferred an exclusive license on Demodulation:

> 2.1 [Licensor] hereby grants to [Licensee] a terminable, royalty-bearing, exclusive license to practice, i.e., to make, have made, use, offer to sell, sell, transfer, or dispose of, the [licensed invention] as limited to the [licensed area] defined in [Article] 1.
>
> 2.2 [Licensor] reserves an irrevocable, royalty-free right to practice and have practiced the [licensed invention].

Pl. Resp. Ex. 3B ¶¶ 2.1, 2.2.

But simply using the word "exclusive" is not sufficient to confer standing to sue for infringement. *See Ortho Pharm. Corp.*, 52 F.3d at 1032 ("[I]t is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for co-plaintiff standing, not simply that the word 'exclusive' may or may not appear in the license."). The Institute Agreement does purport to give Demodulation the exclusive right to make, use, and sell the patent. Pl. Resp. Ex. 3B ¶ 2.1. As such, this case bears a resemblance to one where the licensor had the right to "make, *have made*, use and sell devices embodying or adapted to be installed in structures which embody some or all of the inventions covered by said patents." *See Wing Eng'g Corp. v United States*, 138 Ct. Cl. 260, 262 (1957) (emphasis added). The predecessor to the United States Court of Appeals for the Federal Circuit, however, held that the text of the license did not prevent the licensee from bringing a suit for patent infringement. *Id.* at 265. In this case, Article 2.2 of the Institute Agreement authorized Demodulation to "practice and have practiced the [licensed invention]." Pl. Resp. Ex. 3B ¶ 2.2. If "have practiced" is synonymous with "have made," then Demodulation has an exclusive license and standing to sue. "Practice," however, is defined more broadly in Article 2.1, *i.e.*, "to make, have made, use, offer to sell, sell, transfer, or dispose of." Pl. Resp. Ex. 3B ¶ 2.1. Under this definition, the Institute's right to "have practiced" the invention means that it can grant to others the same right the Institute granted Demodulation. This means that the Institute's right to "have practiced" the invention reserves it the right to license to others.

As a matter of law, the reservation of the right to license to others defeats any claim that Demodulation may have to being an exclusive licensee, because the Institute can grant to others the right to practice the patented invention. *See Ortho*, 52 F.3d at 1031 ("'[T]he patent owner may freely license others, or may tolerate infringers, and in either case no right of the patent licensee is violated. Practice of the invention by others may indeed cause him pecuniary loss, but it does him no legal injury.'" (quoting *Western Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 118 (2d Cir. 1930)). Since the Institute can license others to practice the '591 patent, Demodulation only has a "bare license" and does not have standing to sue. *See Rite-Hite*

14

*Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995) ("The grant of a bare license . . . , even if it is the only license granted by the patentee, does not provide standing without the right to exclude others.").

For these reasons, the court has determined that Demodulation does not have an exclusive license and therefore does not have standing to enforce the '591 patent. The Government's September 10, 2012 Motion For Partial Summary Judgment is granted with respect to Demodulation's claims regarding the '591 patent. Demodulation's October 26, 2012 Cross-Motion to join the Institute as an involuntary co-plaintiff is denied.

### IV. CONCLUSION.

For the reasons discussed herein, the Government's September 10, 2012 Motion For Partial Summary Judgment is granted regarding Demodulation's patent claims alleged in Count III of the Second Amended Complaint. Demodulation's October 26, 2012 Contingent Cross-Motion To Join The Institute As An Involuntary Co-Plaintiff is denied. Demodulation's October 26, 2012 Cross-Motion To Compel Discovery Under RCFC 56(d) is denied. The court strikes paragraphs 67-73 from the May 4, 2012 Second Amended Complaint, and the court strikes from paragraph 66 of the May 4, 2012 Second Amended Complaint the words "and its infringement of Demodulation's patents[.]"

Within 15 days, the court will convene a teleconference to schedule discovery on the remaining claims alleged in the May 4, 2012 Second Amended Complaint.

**IT IS SO ORDERED.**

s/Susan G. Braden_____
**SUSAN G. BRADEN**
**Judge**