## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DEMODULATION, INC.

V.                                      No.: 1:11-CV-236-SGB

THE UNITED STATES                       Judge Thomas C. Wheeler

OF AMERICA

### THIRD AMENDED COMPLAINT

### GENERAL BACKGROUND AND JURISDICTION

1.  Demodulation, Inc. ("Demodulation") is a corporation formed under the laws of the State of Delaware, with its principle place of business at 121 Goodwin Terrace, Westwood, New Jersey.

2.  At all relevant times, Demodulation possessed certain commercial and property rights to certain patented and unpatented inventions and related ideas arising from a highly specialized material consisting of a glass coated amorphous metal filament or wire, called microwire. The diameter of the microwire is thinner that of a human hair. The glass coating is applied to the magnetic core during the manufacturing process resulting in unique magnetic and other charcteristics. Microwire is a revolutionary platform technology with many applications in the government and private sectors. A few of these applications are covert self-powered sensors, data storage, communications encryption, radar stealth coating on ships and aircraft, electronic article surveillance and bio-monitoring. The Spanish Navy has announced that it was able to shield a ship from radar detection by applying microwire to its hull.

3.  This Complaint makes allegations that the United States of America, by and through the actions of its agencies, contractors, military forces, civilian employees, and other legally

authorized agents (collectively, the "Government"), violated Demodulation's constitutional rights, breached express and implied contracts with Demodulation, misappropriated Demodulation's patented technology and trade secrets, infringed patents held by Demodulation, interfered with Demodulation's business opportunities, intentionally deceived Demodulation and conspired with others to do so.

4.   This Complaint also makes allegations that several federal crimes were committed including theft of trade secrets and economic espionage for the benefit of a foreign government in violation 18 U.S.C. §§ 1831 and 1832.   The trade secrets of Demodulation mentioned herein and disclosed to the Government by Demodulation include, without limitation, the performance characteristics of the resultant product associated with the specific chemical and atomic composition of each batch of manufactured microwire.   This information is referred to as the microwire's "property sets."

5.   While this pleading alleges facts that may support causes of action beyond the jurisdiction of the United States Court of Federal Claims, only those causes of action over which the Court has jurisdiction are set forth herein as distinct, actionable Counts.   Demodulation specifically reserves its rights to pursue in another time and forum any claims beyond the jurisdiction of this Court.

6.   Jurisdiction is conferred upon the United States Court of Federal Claims by 28 U.S.C. § 1491, and 28 U.S.C. § 1498.

**THE GOVERNMENT'S INTEREST IN ADVANCED TECHNOLOGY**

7.   The Government has at all relevant times including through the present maintained as an important priority and policy the identification and acquisition of new technology.   One reason for this policy is the maintenance of the superiority of America's military and intelligence forces.

8.  To fulfill this priority, the Government has engaged and continues to engage in a systematic world-wide effort to monitor the activities of domestic and foreign laboratories, universities and other individuals and institutions engaged in research and development of material and technology of interest to the Government.   For example, the Office of Naval Research maintains offices around the world to conduct such monitoring and to ultimately collect such technology for Government use.

9.  In addition, the Government maintains its own research and development capability through the National Laboratories, military facilities, the National Institutes and the facilities of other government agencies.   As such, the Government is in direct competition at times with private industry engaged in the development of new technology.   It is the official practice and policy of the Government to push out to industry the commercial applications for technology the Government has developed, while retaining and protecting the national security applications for that same technology.   To fulfill this purpose, the Government passed legislation creating Cooperative Research and Development Agreements ("CRADA").   A CRADA is a contract between a Government agency, a military organization or federal laboratory, on the one hand, and a private company on the other, the purpose of which is to commercialize Government technology through the private company partner.   In other words, the purpose is to generate private economic activity by providing a private company with technology in the Government's possession that will enable the private company to monetize the Government technology.

10. Demodulation was a target of an information monitoring and collection process by the Government, as explained more fully below.   The Government systematically monitored, controlled and prevented Demodulation's attempts to commercialize microwire through fraudulent and criminal acts and omissions including theft of trade secrets and economic

espionage and the unlawful domestic collection of information prohibited by the Fourth Amendment to the United States Constitution and The Intelligence Reform and Terrorism Prevention Act of 2004 - Public Law 108–458.  Those agencies, agents, contractors or other entities or individuals who engaged in such activity on behalf of the Government or with the cooperation or direction of the Government include: Office of Naval Research, Naval Surface Warfare Center, Naval Underwater Warfare Center, Air Force, National Security Agency, Central Intelligence Agency, Defense Advanced Research Projects Agency, Department of Energy, Iowa State University, Picatinny Arsenal, BWXT Y-12, LLC, Bechtel BWXT, LLC, Bechtel BWXT Idaho, LLC, Battelle Energy Alliance, LLC, Battelle Memorial Institute, Brookhaven Science Associates, Department of Commerce, Department of Defense, In-Q-Tel and others. All of the actions and inactions of any these or other similar entities or individuals mentioned herein or those whose identities or actions are not yet known to Plaintiff are alleged to have occurred in the course of the execution of their duties as authorized Government agents or contractors and therefore as the equivalent of actions or inactions by the Government.

## THE GOVERNMENT'S INTEREST IN DEMODULATION AND ITS PROPRIETARY ADVANCED TECHNOLOGY

11. In sum, the Government fraudulently induced Demodulation to enter into a CRADA and other confidentiality agreements in order to obtain access to Demodulation's technology and trade secrets.  It then misappropriated that technology and those trade secrets by passing them off as its own and by creating and deploying classified and other applications utilizing microwire or related proprietary ideas.  Some examples of such microwire applications are the classified sensor used to monitor the condition of nuclear or other weapons developed by the Department of Energy, an artillery and munitions fuze jointly developed by the Army and Navy through a program managed, in part at Picatinny Arsenal and Fort Monmouth, and a cigar-sized

magnetometer developed by the Navy.   These actions of the Government damaged Demodulation in various ways, including but not limited to creating confusion and doubt as to the validity of the claims in its patents.

12. Another example of the Government's interest in Demodulation's technology and its misappropriation of Demodulation's trade secrets is United States Patent 7405559.  This patent assigned to the Navy was obtained with the benefit of trade secrets and other information revealed to the Government by Demodulation.  As such, this patent is invalid and is beneficially owned by Demodulation.

13. The Government has not only so stolen or misappropriated Demodulation's trade secrets and infringed its patents, it has also transmitted those trade secrets to third parties for their commercial gain such as Applied DNA Sciences, Inc., Milcom Technologies, Nanosteel Company, Inc. and Thermal Solutions, Inc.

14. For example, in 2005, pursuant to a written confidentiality agreement, Demodulation revealed its trade secrets to the Department of Energy ("DOE") concerning an application for the microwire that relied upon and incorporated DNA PCR technology (the "DNA Application").  The DNA Application was then revealed by the Department of Energy to Applied DNA Sciences, Inc., which at the time then a party to a CRADA at the Department of Energy's Idaho Falls Laboratory.  The Government, through Battelle Energy Alliance, LLC and Brookhaven Science Associates, LLC (of which Battelle Memorial Institute is a member) then arranged for Applied DNA Sciences to acquire infringing and inferior amorphous metal microwire from an Israeli corporation and to move its operations to a government-funded facility adjacent to Brookhaven National Laboratory in New York.  At the same time, Battelle Energy Alliance, LLC included Babcock & Wilcox, Inc., URS Corporation, Electric Power Research Institute and

Massachusetts Institute of technology as "integrated subcontractors." BWXT Y-12, LLC is a subsidiary of Babcock & Wilcox, Inc. and was the contracted operator of the Y-12 National Security Complex that entered a CRADA with Demodulation in 2007. This CRADA with Demodulation was entered into by the Department of Energy through BWXT Y-12, LLC in order to cover-up the theft of Demodulation's trade secrets and to obtain further access to Demodulation's microwire technology and trade secrets.

15. For further example, the Department of Energy, at its Ames Laboratory on the campus of Iowa State University, operated a program that manufactured an inferior type of amorphous metal wire through a non-proprietary process and which had no glass or other coating on the wire. Subsequent to the expiration of the CRADA with Demodulation, Daniel James Branagan and other former employees of the Ames Laboratory applied for a patent (application number 20110094700) on a method and system to form glass-coated amorphous metal microwire which patent application contains, relies upon or references ideas disclosed by Demodulation to the Department of Energy.

16. By way of further example, BWXT Y-12, LLC revealed Demodulation's trade secrets and confidential information to the United States Navy through a series of tests conducted at BWXT's Kansas City Plant. These tests determined that Demodulation's microwire has superior performance characteristics to the other amorphous metal wire tested, which is presently of unknown origin.

17. By way of further example, the United States Air Force has operated one or more programs utilizing amorphous metal microwire that have benefitted from the misappropriation of Demodulation's trade secrets or which infringed one or more patents owned or licensed by Demodulation. Brian Clothier, husband of retired Air Force Colonel Cathy Clothier, was and

remains the owner or CEO of Thermal Solutions, Inc. or its successor in interest which was awarded an SBIR Phase I grant from the National Science Foundation in 2008 for the "Validation of Remotely Powered and Interrogated Microwire" to serve as a temperature sensor embedded in advanced aircraft.  On information and belief, Cathy Clothier passed to Brian Clothier information concerning the aviation applications for microwire which became known to her in her capacity as an Air Force colonel.  Cathy Clothier then became employed by the Boeing corporation, which has filed a patent application disclosing a "System for Depositing Microwire."

18. In addition to promoting the interests of such private companies through illegal and wrongful acts and omissions, the Government also maintained one or more programs utilizing microwire for national security or defense purposes.  The programs have either benefitted from the Government's misappropriation of Demodulation's trade secrets by the Government or have infringed one or more patents owned or licensed by Demodulation.

19. One such program is operated by the Department of Energy and utilizes microwire as a remote sensing element to monitor the condition of nuclear material either in a weapon, reactor or spent fuel containment system.  This application and information related to it has been classified by the Government.  This application utilizes Demodulation's proprietary information which was revealed to the Department of Energy by Demodulation pursuant to one or more written confidentiality agreements or pursuant to confidentiality agreement implied-in-fact.

20. Another such Government program is the development of microwire as an element in the fuze mechanism utilized in projectiles fired by the Army and Navy.  Those fuzes were developed through a program administered by the Army at Picatinny Arsenal's Armament Research Development and Engineering Center ("ARDEC").  Specifically, the Army's Multi-Option Fuze

7

for Artillary ("MOFA") was "navalized" under the direction of the Navy's NAVSEA Warfare Centers as administered by Picatinny.   The only contract document pertaining to this program Demodulation has obtained to date has been heavily redacted and is a "Justification for Other Than Full and Open Competition."   See **Exhibit A.** Demodulation's proprietary information including its trade secrets were misappropriated by ARDEC and the Army and used in the development of these fuzes.   Demodulation had disclosed this information to Picatinny in 2003. See **Exhibit B**. and Picatinny representatives thereafter falsely informed Demodulation that the Army saw no use for the technology.

21. Demodulation also disclosed to NAVSEA-Crane as early as 2003 the information used by the Army and Navy in the fuze program.   In fact, NAVSEA performed testing which completely validated the performance superiority of microwire.   On information and belief, this testing was funded by the National Security Agency in order to obtain unlawful access to Demodulation's technology and trade secrets.

22. After the Army's misrepresentation described above, Daniel Gutierrez ("Gutierrez") of Picatinny Arsenal, while acting in his official capacity as either a civilian or military employee or soldier, directed and participated a campaign of espionage against Demodulation.   Specifically, Gutierrez arranged for and conspired with Curtis Birnbach, Hudson Research, Inc. and Cubic Corporation (or a corporation affiliated with the Cubic Corporation) to obtain access to Demodulation's trade secrets and classified information concerning defense technology and specifically artillery fuze technology.   Among other things, Gutierrez informed Birnbach that microwire was used in the fuzes.  This arrangement and conspiracy included the following acts: Gutierrez provided Birnbach with two 155 millimeter artillery rounds from Picatinny Arsenal; Birnbach, Hudson and Cubic entered non-disclosure agreements with Demodulation under false

pretenses to obtain access to microwire and related information, Cubic paid Birnbach over $300,000 for his role in the conspiracy.    In the course of this fraud and conspiracy, Birnbach sent the information concerning Demodulation and the fuze program to one or more official representatives of the government of Israel through the wires, i.e., over the internet.

23. The source of the information in the previous paragraph is the testimony of Anthony Catanese.  See **Exhibit C**.   Mr. Catanese discovered the artillery rounds in the warehouse he formerly rented to Birnbach and Hudson Research.  He reported them to the FBI and other law enforcement agencies and also reported Birnbach's communication with the government of Israel.  Despite numerous requests to have the FBI formally interview Mr. Catanese and take his complaint, including those made by himself, the FBI has never contacted Mr. Catanese other than to send the bomb squad to retrieve the artillery rounds.

24. Other than the Government's infringing uses of microwire and the wrongful misappropriation of Demodulation's trade secrets mentioned herein, Demodulation alleges, on information and belief, that the Government is engaged in other infringing uses of microwire or wrongful use or disclosure of Demodulation's trade secrets that Demodulation has not been able to discovery due to the Government's efforts to conceal them.  The basis for this allegation includes the Government's acknowledgement of the existence classified reports concerning microwire applications.  Further, based on its lower cost and the unique, superior capabilities of microwire for certain applications, such as electronic article surveillance, unattended ground sensors, MEMS engineering and production, long range detection of persons or objects, underwater detection and communication and other highly advanced and classified applications, it is simply not realistic to believe that the Government is not engaged in systematic and pervasive use of microwire and Demodulation's trade secrets.

25. In furtherance of the Government's actions described herein, there have been several violations of one or more of Executive Orders 12958, 13292 and 13526.  Specifically, the Department of Energy has classified certain information, documents and technology for the purpose of concealing violations of law, including the theft of trade secrets and other crimes described herein, and to restrain competition.   In addition, the inventions or applications described in the classified reports were required to have been disclosed to Demodulation pursuant to the terms of its CRADA and the United States Constitution's guarantee of compensation for a taking by the Government

26. In addition, the Government, while under the affirmative obligations to Demodulation described herein, was actually working to obtain its own patents based on the ideas and information disclosed to the Government by Demodulation.  All such inventions are beneficially owned, at least in part, by Demodulation.

## THE GOVERNMENT INDUCES DEMODULATION TO ENTER INTO EXPRESS CONTRACTS

27. On Easter Sunday 2005, Roger Lewis of the NNSA called the CEO of Demodulation to express the Government's intense interest in acquiring the rights to use Demodulation's patented technology and trade secrets.

28. After receiving Roger Lewis' invitation to present its technology to the Government, Demodulation executed two confidentiality agreements with the National Nuclear Security Agency ("NNSA") whereby NNSA agreed it would not "disclose, publish or otherwise reveal any of the Confidential Information received from Demodulation to any other party whatsoever." See **Exhibits D and E**.

29. Pursuant to the confidentiality agreements, Demodulation disclosed extensive proprietary information concerning its technology to NNSA and BWXT Y-12, LLC and others.  Among the

disclosures made was a presentation given in December 2005 by Demodulation at a wireless technologies workshop at the DOE's facility in Germantown, Maryland.  At this workshop were other agencies and agents of the Government who were all bound to maintain the confidentiality of the information presented by Demodulation and to not use that information for their own purposes.

30. At all times from Easter of 2005 forward, Mr. Lewis and other DOE, NNSA and BWXT personnel, including Dr. Glenn Allgood, told Demodulation that the purpose of Demodulation's disclosure of information was for Demodulation to obtain a contract to provide its technology and intellectual property to the United States government in exchange for payment to Demodulation and to help Demodulation commercialize its technology.

31. In fact, Dr. Allgood took the trade secrets provided to him by Demodulation in his capacity as a Government employee and used them to obtain United States Patent 8403223.  This patent was then assigned to an affiliate of the Battelle Memorial Institute and the contracted operator of the Oak Ridge National Laboratory.   This patent is accordingly unenforceable by the inventors and assignees and is beneficially owned by Demodulation.

32. Mr. Lewis and other NNSA personnel told Demodulation that there were a broad array of disruptive applications for Demodulation's technology and intellectual property within the government market including homeland security, intelligence, defense, logistics and anti-counterfeiting applications.

33. In 2006, NNSA personnel directed Demodulation to a potential opportunity to enter a CRADA at the Y-12 National Security Complex in Oak Ridge, Tennessee ("Y-12").

34. On or about February 12, 2007, Demodulation entered into a written Cooperative Research and Development Agreement ("CRADA") with the DOE through the contracted

operator of the Y-12 facility, BWXT Y-12, LLC.  See **Exhibit F**.  BWXT Y-12, LLC was a party to the contract only insofar as it was standing in the shoes of the United States Government and as such, its rights and obligations under the CRADA were those of the United States Government.  As explained above, legislation specifically governs and authorizes this CRADA relationship between a private company and the United States Government through the contracted operators of government owned facilities like the Y-12 National Security Complex.

35. During the course of the CRADA and after, DOE and BWXT Y-12, LLC disclosed Demodulation's proprietary information and trade secrets to one or more third parties without the permission of Demodulation.  The disclosures include but are not limited to the one DOE made to "another part of the government" in connection with a DOE proposal to get a fulfillment contract with "another part of the government" and the "classified" information DOE provided to Mentai Fong of the Intelligence Advanced Research Projects Agency ("IARPA").

36. DOE also disclosed Demodulation's proprietary information to Zach Nienstedt, a graduate student at the North Carolina State University.  After this disclosure was made, Mr. Nienstedt engaged in research concerning the proprietary information sponsored by North Carolina State University.

37. DOE violated its non-disclosure obligations by disclosing Demodulation's confidential information to Cubic Corporation.  Cubic Corporation later passed off the information as its own while presenting the information to Raytheon.  Cubic presented Raytheon with proposals for classified and non-classified applications including but not limited to tracking, anti-counterfeiting, tamper indication, space, homeland security, military, and long range detection between an aircraft and the ground.

12

38. DOE violated its non-disclosure obligations by providing Demodulation's intellectual property and trade secrets to Sekuworks for anti-tamper and anti-counterfeiting applications and to the persons who were present at or who otherwise received the information presented at the "Innovation Colloquium" presented by Chuck Agle, Jr.

39. The United States Government waived its rights to any inventions made or conceived by BWXT Y-12, LLC in the course of BWXT Y-12, LLC's operation of Y-12 and therefore any inventions made or conceived in the course of the CRADA with Demodulation. See **Exhibit G.** Accordingly, neither the United States Government nor BWXT Y-12, LLC could legally acquire any rights to any inventions or ideas created or conceived in the course of the performance of Demodulation's CRADA.

40. The Government induced Demodulation to enter the CRADA with specific promises that the CRADA was a stepping stone to a lucrative acquisition contract and that the Government had a legitimate need for Demodulation's technology and the intent to pay to acquire Demodulation's technology and ideas. Had such inducement not been made, Demodulation would not have entered the CRADA. Throughout the course of the performance of the CRADA, various Government agents or employees such as Neville Howell consistently re-affirmed that successful performance of Demodulation microwire system, including the encoding methods, under certain testing conditions and the creation of certain prototypes and demonstrations would lead to a lucrative acquisition contract. If not for this re-affirmation, Demodulation would have stopped performance of the CRADA before the end of the two year term.

41. The Government also induced Demodulation to enter the CRADA by specifically agreeing to recognize and be bound by its recognition of the validity of Demodulation's patents and the validity and enforceability of its exclusive license to other patents. This

acknowledgement and agreement by the Government is binding contractual term of the CRADA and of one or more contracts implied-in-fact between the Government and Demodulation as alleged herein.

42. The terms of any CRADA, including the one at issue here, must conform to the law governing CRADAs, including but not limited to the Wydler-Stevenson Technology Transfer Innovation Act and any amendments thereto, corresponding and related federal regulations, and the internal policies and procedures of the agency entering the CRADA.

43. The legislative purpose of a CRADA is to help private parties, like Demodulation, to commercialize government technologies that are being underutilized.  Demodulation expected that the Government had the same understanding of the purpose of the CRADA. However, the CRADA was used by the Government, through BWXT Y-12, LLC as an authorized agent acting within the scope of its authority as a contracted operator, and others, as a vehicle to wrongfully extract technology, intellectual property and trade secrets from Demodulation without having to pay for it.  As such, the Government has committed a taking without just compensation in addition to having committed several breaches of contract, theft of trade secrets, various torts and other wrongs.

44. The CRADA did not require the Government to purchase anything from Demodulation and Demodulation never received any monetary compensation whatsoever from the Government.

45. Demodulation's proprietary microwire technology platform consists of an amorphous metal, glass coated wire and electronic systems to detect the wire from distances up to and beyond twenty miles.  It also consists of means to encode the microwire with DNA and otherwise, and trade secrets concerning applications for the patented properties.

14

46. As a general description, a one inch strand of microwire is a fraction of the width of a human hair, may be covertly embedded, and may be remotely detected without the need for a source of power connected to the wire.   The microwire has applications beyond sensing capabilities, such as the ability to harvest energy from the ambient electromagnetic conditions in the atmosphere and to render objects invisible to radar.   Additionally, the microwire may be engineered to transmit digital information.

47. Pursuant to the CRADA, DOE thoroughly vetted and characterized the microwire and its myriad applications.   DOE concluded that the applications for this technology, as stated by Y-12 Section Manager L. Neville Howell, Jr., "are limited only by your imagination."   Mr. Howell was one of the DOE employees or agents primarily responsible for administering the CRADA on behalf of the Government.

48. The evaluation conducted pursuant to the CRADA concluded, among other things, that: the slightest tension on the microwire alters the response from the microwire making it suitable for "temperature, pressure, chemical and biological sensing;" the microwire's response is altered by its angular relation to an alternating magnetic field making it suitable for a "pitch, yaw and roll" sensor; a break in the microwire can be detected making it suitable for tamper indication; the microwire can detect tension when deployed in nonferrous material; "[m]icrowires appear to have unique signatures, similar to differences among fingerprints or snowflakes.   These signatures can be modified by incorporating minute magnetic material at different locations along the length of the microwire.   In addition, if localized stress variations along the length are incorporated, these, too, change the signature.   This experiment validated the belief that an encoding method is feasible and supports Demodulation's encoding patents. The unique signature and/or ability for encoding could have many benefits, including a defense for

counterfeiting;" the microwire was superior to magnetic strips found on credit cards and other items because microwire is practically invisible and never wears out, unlike the magnetic strips; the microwire was an "excellent candidate" for *in-situ* sensors and there is a robust market with "few competing products;" the microwire was well suited for detection of "gas, pressure, temperature, humidity;" if microwire were attached to a seal, a broken seal would be identified; the glass coating on a microwire may be "coated with a substance that will react when attacked by a chemical or biological agent;"

49. In addition to the conclusions reached by DOE recited above, DOE conducted additional research and reached additional conclusions concerning microwire which are contained in one or more reports which DOE has denoted as "classified" and has refused to provide to Demodulation.

50. The CRADA expired on or about February 12, 2009.

51. Two days prior to the expiration of the CRADA, Mr. Howell wrote to Demodulation: "I have stated this many times to my guys and to my senior managers – It will be disappointing for us (Y-12) to develop this application and then have to deal with an enormous license fee that would shoot the practicality of the application out of the water.  I guess we will just deal with that issue at the appropriate time."

52. On Monday March 2, 2009, Mr. Howell wrote to Demodulation that there was "a small sub-contract in FY10 for you (and Wes if available) providing consulting services to us on a feasibility project.  I'm thinking 20 employee-days at $1,000 per employee-day plus travel and per diem expenses.  The not-to-exceed total would be $30K.  The microwire used in the feasibility study would NOT be consumed.  The detection system will be RF.  I can share with you most of the details the next time I see you.  Are you interested?  If so, I need a reply.  The

proposal is due Wednesday and our chances of winning are at least 90%.  This will keep us going one more year."  Demodulation did not accept this offer and did not authorize the described feasibility project to proceed without its participation.

53.  In the fall of 2008, after DOE reached the conclusions mentioned above, representatives of Demodulation met with Mr. Bud Albright, Under Secretary of Energy, to finally disclose the "subject inventions" developed pursuant to the CRADA and to discuss the federal government's potential purchase or license of Demodulation's technology, intellectual property and various applications.   At this meeting, Mr. Albright stated that there was "no applications" for Demodulation's technology, and as such, no "subject inventions" to reveal.  In a prior meeting between Mr. Albright and Demodulation personnel, Mr. Albright had stated that there were numerous applications for the technology throughout the federal government and that he believed a large acquisition contract was forthcoming.

## THE GOVERNMENT'S CONTINUED USE AND DEVELOPMENT OF MICROWIRE TECHNOLOGY AFTER THE EXPIRATION OF THE CRADA

54. After the expiration of the CRADA, DOE and other branches of the federal government engaged in continuing development of applications for Demodulation's proprietary technology and ideas.  For example, on March 1, 2009, the Government gave a grant to Thermal Solutions, Inc. for the development of a temperature sensing system comprised of a wireless reader capable of remote interrogation of amorphous microwire temperature sensors.  The idea to use microwire as a temperature sensor was proprietary to Demodulation and the Government had no right to pay another company to develop Demodulation's idea.

55. In 2010, BWXT Y-12, LLC, as the contracted operator of Y-12, disclosed Demodulation's confidential information to the Navy.   In the report of these events, Demodulation's "RF-07" batch of microwire was determined to be the superior wire as

compared to the other microwire tested, which is of unknown origin but which was in the possession of the Navy. The same report indicates that the Navy has created and therefore presumable deployed "cigar-sized" magnetometers utilizing microwire.

56. After the expiration of the CRADA, DOE received and/or provided funding in the year 2010 for production of a product or system that included the use of microwire and Demodulation's intellectual property and trade secrets. Demodulation received no part of any such funding and did not authorize DOE to produce such a system or product.

57. DOE was obligated to disclose to Demodulation any "subject inventions" that arose from the research and development performed under the CRADA. Despite the overwhelmingly positive results of DOE's evaluation and its several statements that it was working on developing inventions through 2010, DOE has not disclosed any subject inventions to Demodulation.

58. Y-12 issued a "Final Report" concerning the CRADA. See **Exhibit H**. The first sentence of the Final Report states the "report was prepared as an account of work sponsored by an agency of the United States government."

59. Despite DOE's failure to disclose any inventions, DOE and other branches of the federal government continue to use microwire in various applications. Evidence of these applications include but is not limited to the following: The United States Army is using microwire and Demodulation's trade secrets in its mission to gather intelligence and track friendly soldiers through Operation Guardrail, the Aerial Common Sensor program and other similar programs; Frank Downs, a civilian employed by the Navy in Panama City, Florida, stated that Demodulation's technology had been tested by the government and had obtained a detection range of at least ten kilometers; in 2009, Dr. Steven Wax stated that the Defense Advanced Research Projects Agency ("DARPA") had been working on microwire for a long time, that the

Government had a right to take Demodulation's technology and that Demodulation would have to "catch us if you can;" Dr. Toni Marechaux stated that Sandia National Laboratory was developing microwire technology; representatives of Lockheed Martin advised Demodulation that the government had detected microwire from an Unmanned Aerial Vehicle using dual tone frequency radar; Rick Ward of the Appleton Paper Company advised Demodulation that the government had established a secure facility for the production of microwire; Chuck Loomis, formerly of Naval Intelligence and formerly of Science Applications International Corporation, informed Demodulation that microwire technology is being deployed by the government.

60. On January 26, 2010, Demodulation filed with DOE a formal request for dispute resolution pursuant to 10 C.F.R. §782.  DOE accepted and acknowledged the request, but has not otherwise responded.  On or about December 17, 2010, Demodulation wrote to DOE: "The CRADA entered into by DEMOD differs in material ways from the "model CRADA" published by the government.  All the differences are clearly explained by a motive to attempt to misappropriate DEMOD's patented technology and other IP.  One such clause purports to require resolution of CRADA disputes by the DOE Contracting Officer by way of a written decision and then judicial resolution in Tennessee.  While DEMOD does not admit the enforceability of this clause, please identify the DOE Contracting Officer in writing."  DOE never responded to this request.

61. Thereafter, by Order of this Court, the Contracting Officer accepted the request and denied all the claims.  Accordingly, the contractual claims asserted herein are ripe and within the jurisdiction of this Court.

## COUNT ONE

### Breach of Express Contract – Tucker Act, 28 U.S.C. 1491

62. Demodulation incorporates each of the foregoing paragraphs of this pleading complaint as if each were set forth at length herein.

63. Three express contracts were entered into between Demodulation and the Government, as described above.  All of these contracts were executed on behalf of the Government by persons with authority to bind the Government to the contracts.

64. The Government breached the express contracts, and the duty of good faith and fair dealing inherent in those contracts, by engaging in the actions and omissions described above. Other specific actions and omissions of the Government also constitute breaches of these express contracts but Demodulation is not required to set forth each and every breach herein.

65. One of the ways the Government breached the CRADA not mentioned above was by failing to fulfill its obligation to identify existing Government technology that could have helped commercialize Demodulation's technology.  Such Government technology existed at the time and included the hardware and software to detect and analyze the signals generated by the microwire in certain conditions.  The Government did not make this technology available to Demodulation in order to prevent Demodulation from realizing the fruits of the CRADA, i.e., the commercialization of the technology and the ultimate purchase of microwire technology and products by the Government and other parties.

66. The Government breached the terms of the CRADA and the implied covenant of good faith and fair dealing by failing to disclose any "subject inventions" to Demodulation, though the Government has in fact deployed Demodulation's technology, intellectual property and trade secrets in various applications and otherwise become aware of "subject inventions."

20

67. The Government breached the terms of the CRADA and the implied covenant of good faith and fair dealing by failing to perform the obligations which it agreed to perform under the CRADA and by performing research not permitted under the CRADA.

68. The Government, through BWXT Y-12, LLC breached the terms of the express contracts and the associated implied covenants of good faith and fair dealing by entering into a contract with the Joint Improvised Explosive Device Defeat Organization ("JIEDDO") for the application of microwire to JIEDDO's mission.

69. The Government breached the CRADA and the implied covenant of good faith and fair dealing by taking or failing to take the actions described herein and by misrepresenting to Demodulation that there was no government applications for Demodulation's technology.

70. The Government breached the CRADA and the implied covenant of good faith and fair dealing by failing to assist Demodulation in commercializing its technology and by in fact taking actions to prevent Demodulation from doing so.

71. The Government breached the terms of the CRADA and the implied covenant of good faith and fair dealing by failing to disclose the use of microwire by other agencies of the United States Government.

72. The Government breached the terms of the express confidentiality and non-disclosure agreements described herein by making the unauthorized disclosures described herein.

73. As a direct and proximate result of the Government's breaches of contract, the Government has irreparably harmed Demodulation and caused it severe financial damage. By way of example and not limitation, but for the Government's breaches of contract, Demodulation would have obtained a licensing fee from the United States Government and would have developed and sold commercial microwire products. The breaches of the non-disclosure and

confidentiality agreement has caused confusion in the marketplace concerning the ownership of the microwire technology actually owned by Demodulation.

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Fifty Million Dollars ($50,000,000) and to further award Plaintiff all costs, interest, fees, expenses and attorneys' fees as allowed by the Equal Access to Justice Act and other applicable law, and such other and further relief as the Court may deem appropriate.

## COUNT TWO

### Breach of Implied in Fact Contract - Tucker Act, 28 U.S.C. 1491

74. Demodulation incorporates each of the foregoing paragraphs of the complaint as if each were set forth at length herein.

75. An implied-in-fact contract was created when one or more authorized Government representatives requested that Demodulation reveal trade secrets to the Government and promised to maintain the confidentiality of Demodulation's trade secrets and to refrain from using the trade secrets for the Government's benefit without providing compensation to Demodulation.

76. One such implied-in-fact contract existed between Demodulation and NAVSEA-Crane. It was formed in 2003 when NAVSEA-Crane representatives approached Demodulation and requested that Demodulation disclose its trade secrets and permit NAVSEA-Crane to perform testing on Demodulation's microwire. Demodulation agreed, made the disclosures and brought its technology to the NAVSEA facility in Crane, Indiana. Testing was performed and a video was produced depicting the testing apparatus and collection of the test data. All of the testing methods and data constitute Demodulation's trade secrets.

77. The Government breached the implied-in-fact contracts described herein by failing to maintain Demodulation's trade secrets in confidence and by in fact utilizing those trade secrets to deploy Demodulation's technology in Government applications.   For example, the Navy has used the information gathered from Demodulation's trade secrets disclosed to NAVSEA-Crane for its own purposes and without compensation to Demodulation.  One such use is the cigar sized magnetometer developed by the Navy another is described in United States Patent 7405559, which patent Demodulation hereby seek to have assigned to it as a remedy for the breach alleged.

78. As a direct and proximate result of the Government's breaches of these implied-in-fact contracts, the Government has irreparably harmed Demodulation and caused it to suffer severe financial damage.

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Fifty Million Dollars ($50,000,000) and to further award Plaintiff all costs, interest, fees, expenses and attorneys' fees as allowed by the Equal Access to Justice Act and other applicable law, and such other and further relief as the Court may deem appropriate.

## COUNT THREE

### Patent Infringement – 28 U.S.C. §1498

79. Demodulation incorporates each of the foregoing paragraphs of the complaint as if each were set forth at length herein.

80. As recognized by the Government pursuant to the terms of the CRADA, Demodulation obtained or exclusively licensed numerous valid patents covering the manufacture, detection and manipulation of glass-coated amorphous metal microwire.   While Demodulation held these

patents, including through the present, the Government used or manufactured inventions covered by these patents without a license from Demodulation.  Due to the wrongful acts of the Defendant and others, Demodulation has not been able to pay the required registration fees required by the United States Patent and Trademark Office.  Those patents for which such fees have not been paid were infringed by the Government during the period while the fees had been paid.

81. The patents at issue are: US 6,270,591 B2 - Amorphous and Nanocrystalline Glass-Covered Wires; US 5,557,085 - Method and device for electronic identification; US 5,576,693 - Method and device for remote sensing of objects; US 6,018,297 - Method and device for coding electronic labels; US 6,137,411 - Article surveillance system; US 6,225,905 - Sensor for remote detection of objects; US 6,232,879 - Sensor and method for remote detection of objects; US 6,417,771 - Sensor, a method and a system for remote detection of objects; US 7,075,439 - Marker for remote detection of articles; US 7,071,417 B2 - Optically Encoded Glass-Coated Microwire; US 7,233,249 - Multi-Bit Encoded Glass-Coated Microwire and Articles Composed Thereof; US 7,354,645 - Engineered Glasses for Metallic Glass-Coated Wire; US 7,368,166 - Polymerase Chain Reaction Using Metallic Glass-Coated Microwire.

82. These patents have been infringed by the Government through the inventions and uses described herein including the Department of Energy's acknowledged classified applications utilizing microwire. These applications including a remote sensor to monitor the health of a nuclear or other weapon.  Other infringing uses include the artillery fuze application described herein.

83. The United States Army has infringed one or more of these patents by putting out a request for proposal to develop a system associated with the Army's program to track friendly

soldiers on the battlefield using "μ-fiber microwire." This request for proposal was issued in 2008 through the Army's small business innovation research ("SBIR") program under request number A08-087. This request indicates that the Army was and is running a program using technology that infringed one or more of the subject patents.

84. The Department of Homeland Security infringed the patents by running a program to track luggage employing infringing products at Logan International Airport in or near Boston.

85. Demodulation alleges that the Government is engaged in other infringing uses of which Demodulation is not specifically aware at this time because those uses have been concealed through the classification or other concealment of those uses.

86. As a direct and proximate result of the Government's patent infringement, the Government has irreparably harmed Demodulation and caused severe financial damage to Demodulation.

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Fifty Million Dollars ($50,000,000) and to further award Plaintiff all costs, interest, fees, expenses and attorneys' fees as allowed by the Equal Access to Justice Act and other applicable law, and such other and further relief as the Court may deem appropriate including but not limited to invalidation of any patents held by the United States or others which conflict with Plaintiff's patents and reinstatement of any patents that have expired due to the non-payment of registration fees.

## COUNT FOUR

### Violation of the Fifth Amendment

87. Demodulation incorporates each of the foregoing paragraphs of the complaint as if each were set forth at length herein.

88. The Government's misappropriation of Demodulation's trade secrets and other property described above and its infringement of Demodulation's patents constitutes a violation of the Constitutional guarantees of substantive and procedural due process provided by the Fifth Amendment and elsewhere in the Constitution.  These actions also constitute a taking by the Government for which Demodulation is entitled to just compensation.

89. As a direct and proximate result of the government's violation of Demodulation's constitutional rights, the Government has irreparably harmed Demodulation and caused severe financial damage to Demodulation.

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Fifty Million Dollars ($50,000,000) and to further award Plaintiff all costs, interest, fees, expenses and attorneys' fees as allowed by the Equal Access to Justice Act and other applicable law, and such other and further relief as the Court may deem appropriate.


## COUNT FIVE

### Misappropriation of Trade Secrets

90. Demodulation incorporates each of the foregoing paragraphs of the complaint as if each were set forth at length herein.

91. This action for misappropriation of trade secrets involves conduct of the Government arising out of and related to the express and implied contracts between Demodulation and the Government described herein.

92. Demodulation possessed trade secrets related to microwire.

93. The Government is using or has used those trade secrets in violation of its agreements with Demodulation.

94. As a direct and proximate result of the Government's misappropriation of trade secrets, the Government has irreparably harmed Demodulation and caused severe financial damage to Demodulation.

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Fifty Million Dollars ($50,000,000) and to further award Plaintiff all costs, interest, fees, expenses and attorneys' fees as allowed by the Equal Access to Justice Act and other applicable law, and such other and further relief as the Court may deem appropriate.

Dated: March 28, 2014

s/Benjamin Light

Benjamin D. Light, Esq.
CALLAGY LAW, LLC
Mack Center II
650 From Road, Suite 565
Paramus, NJ 07644
Telephone: (201) 261-1700
Facsimile: (201) 261-1775

# EXHIBIT A

Program/Item:
MK437 Multi-Option Fuze Navy
(MOFN)
Estimated Amount: ▮▮▮▮▮
Control No. ▮▮▮▮▮▮▮▮

## JUSTIFICATION AND APPROVAL
## FOR OTHER THAN FULL AND OPEN COMPETITION JUSTIFICATION

**1. Contracting Activity:** U.S. Army Contracting Command-New Jersey

**2. Description of Action:**

a. This Justification and Approval (J&A) is for the production of the MK437 Multi-Option Fuze Navy (MOFN). The MK437 MOFN fuzes are being procured for utilization by the US Navy. The projected award date for the basic contract is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
The total contract ordering period will cover ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

b. The proposed acquisition strategy will be to award a Firm-Fixed-Price (FFP), Indefinite Delivery/Indefinite Quantity (IDIQ) contract on an other than full and open competition basis, with competition being limited to the National Technology and Industrial Base (NTIB). Award will be made to the offeror deemed qualified utilizing the "Best Value" Source Selection Process. Technical, Past Performance, Price and Small Business Participation will be considered in the evaluation for award. Firm Fixed Pricing for all five years will also be evaluated at contract award and will be in effect for all resultant Delivery Orders. Delivery schedule will be determined for each individual Delivery Order based upon the Government's requirements.

c. The estimated value for this new production contract is ▮▮▮▮▮▮▮▮.

d. The Government anticipates that an IDIQ contract will be awarded to a single offeror with an estimated minimum amount of ▮▮▮▮▮▮▮▮ and a maximum ceiling amount of ▮▮▮▮▮▮▮▮ for the ▮▮▮▮▮▮. A certified Technical Data Package will be available at time of solicitation.

e. The type of funding that will be utilized for this action is Procurement of Ammunition, Navy/Marine Corps (PAN/MC) funding. Future delivery order requirements will be awarded based on the Program Budget and Accounting System and issued on installation PRONS by sub Budgeted Line Item Number (BLIN) (end item programs). Based upon continuing resolution authority, and budget processes, it is anticipated that funds will be issued on an annual basis.

f. In accordance with Defense Acquisition Regulation Supplement (DFARS) 207.103, an Acquisition Strategy/Acquisition Plan is appropriate for this procurement and is currently being processed for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

FOR OFFICIAL USE ONLY
COMPETITION SENSITIVE

Program/Item:
MK437 Multi-Option Fuze Navy
(MOFN)
Estimated Amount: ███████
Control No. ███████

## 3. Description of Supplies/Services:

a. This acquisition is for the production of the MK437 Multi Option Fuze Navy (MOFN).
The M437 MOFN fuze is designed to provide the Navy with a multi-option fuze,



The Contractor shall conduct a
review of the Technical Data Package (TDP) as part of a pre-production engineering effort
(PPE) and write a report recommending changes. The Contractor shall fabricate, test and
deliver the MK437 MOFN Fuzes in accordance ███████████████████████████
███████ inclusive of all approved Engineering Change Proposals (ECPs). The Contractor
shall set up the necessary facilities and provide Production, Engineering, and Quality
Assurance/Reliability personnel to actively participate in the facility/production plan. These
efforts shall include, but not be limited to, identifying quality control points, inspection stations,
process control or statistical process control, special screening or test required. The Contractor
shall conduct First Article Tests and deliver fuzes to the Government for ballistic testing of First
Articles and lot acceptance. In addition to the MK437 MOFN Fuze itself, ████████████
███████████████████████, a MOFN Fuze component, is also restricted to the NTIB.

b. The National Stock Number and DODIC for the MK437 is as follows:

c. The Government intends to award an IDIQ contract estimated at a total amount of ███████
for the MK437 MOFN Fuze for current and anticipated critical unfunded requirements for the
Navy's training and war reserves (UFRS). The estimated total value and quantities for
requirements are reflected below:

4

Program/Item:
MK437 Multi-Option Fuze Navy
(MOFN)
Estimated Amount: ████
Control No. ████████



d. The MK437 MOFN program is an ████ program managed by the ████████
████████

e. The requirements above are based upon mission needs of the Navy for this fuze, and the
current projected budget.

**4. Authority Cited:** 10 U.S.C. 2304(c)(3) as implemented by FAR 6.302-3(a)(2)(i), Industrial
mobilization; engineering, developmental, or research capability; or expert services, "to
maintain a facility, producer, manufacturer, or other supplier available for furnishing supplies or
services in case of national emergency or to achieve industrial mobilization."

**5. Reason for Authority Cited:**

a. As described in FAR 6.302-3(a)(2)(i), Industrial Mobilization; Engineering, Developmental,
or Research Capability; or Expert Services, and the application of the above authority,  FAR
6.302-3(b)(1)(v)(B) and 6.302-3(b)(1)(i), restriction limited to the U.S. and Canada is deemed
applicable to the MK437 Fuze itself and also the reserve battery, in order to maintain or create
the required domestic (U.S./Canada) capability for production of critical ammunition and to
make it available in the event of a national emergency. The Navy must ensure that there are
adequate and affordable industrial capabilities to meet current and future operations, training
and war reserve requirements for the MK437 MOFN fuzes.

b. Maintaining fuzing competencies for both production and R&D within the National
Technology and Industrial Base (NTIB) is critical to the Warfighter.  Fuzing systems determine
the level of safety for handling, shipment, in-theater use, and effectiveness.  A 2006 DoD Fuze
Integrated Product Team (IPT) study was sponsored by ████████████████████
████████████████████ The conclusions of this study emphasize the need to support
the current fuzing NTIB.

FOR OFFICIAL USE ONLY
COMPETITION SENSITIVE

Program/Item:
MK437 Multi-Option Fuze Navy
(MOFN)
Estimated Amount: ███████
Control No. █████████

████████████████████████████████████████████
████████████

c. Under the planned production procurement, it ██████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

d. The ability to readily manufacture fuzes within the NTIB ███████████████
█████████████ Current and future requirements indicate a continuing need for MK437
MOFN.  In addition, the Navy █████████████████████████████████████
                    The MK437 MOFN,
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

e. ██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

FOR OFFICIAL USE ONLY
COMPETITION SENSITIVE

Program/Item:
MK437 Multi-Option Fuze Navy (MOFN)
Estimated Amount: ███████
Control No. ███████████

f. U ███████████████████████████████████████████

g. ███████████████████████████████████████████

h. The Government fully considered alternative acquisition strategies to competitively acquire the MK437 MOFN. An analysis of alternatives was conducted to determine if other than full and open competition was an acceptable course of action for the MK437 MOFN. Full and open competition was considered for this procurement but was determined not to be practical. However, the Government fully intends to maximize competition to the fullest extent practicable by utilizing competition within the NTIB.

i. In accordance with paragraph 3-10b of AR 700-90, "Army Industrial Base Process," a cost and/or benefit was not necessary ████████████████████████████

FOR OFFICIAL USE ONLY
COMPETITION SENSITIVE

Program/Item:
MK437 Multi-Option Fuze Navy
(MOFN)
Estimated Amount: ███████
Control No. ████████████

██████████████████████████████████████████████████████████

Multi-option Fuze for the Navy (MOFN). It was determined that the only reasonable approach for this acquisition is to restrict competition to the U.S. and Canadian Industrial Base. ██████████████████████████████████████, the quantity is the minimum volume necessary to protect this segment of the mobilization industrial base.

j. In accordance with AR 700-90, the Army, as Single Manager for Conventional Ammunition (SMCA) is responsible for acquiring and maintaining the capability to replenish the family of ████████████████████ with Multi-Option Fuze for Navy (HE-MOFN). The SMCA has been designated by the ████████████████████████████████████ to prepare a conventional Ammunition End Item/Component Risk List to identify ammunition that qualifies for restricted competition. An industrial base analysis determined that the MK437 MOFN must be procured from companies within the NTIB in order to maintain or create the required domestic capability within the United States and Canada. If full and open competition is utilized, there is a substantial risk that the domestic capability to could be lost. The authority for this industrial base analysis is Section 806 of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999. In the case of the MK437 MOFN, █████████████████████████████████ by restricting competition to the NTIB.

k. The MK437 MOFN ████████████████████████████████████ The MOFN ████████████████████ within the MOFN fuze is also restricted to the NTIB. The MK437 MOFN Fuze Battery is ████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████ This item should be procured by competition within the National Technology and Industrial Base (NTIB) to protect and keep viable production capabilities needed to support the war fighter. ████████████████████████ is a known source of this fuze battery. ██████████████████████ is a potential producer. There are no known sources outside of the NTIB.

## 6. Efforts to Obtain Competition:

FOR OFFICIAL USE ONLY
COMPETITION SENSITIVE

Program/Item:
MK437 Multi-Option Fuze Navy
(MOFN)
Estimated Amount: ███
Control No. ████████

a.. In accordance with FAR 5.201, a Solicitation Notice will be published in the FedBizOpps with the appropriate rationale for Other than Full and Open Competition, with competition restricted to the National Technology and Industrial Base (NTIB) for the MK437 MOFN and the reserve cell battery, after approval of the J&A.  In addition, based on current market research, effective competition is anticipated.

b.  Subcontracting competition by the prime contractor will be maximized by the Procuring Contracting Officer as a function of discussions.

**7. Actions to Increase Competition:**

a. This contract will be awarded based on restricted competition within the NTIB.  For future acquisitions for this item, a Section 806 will be staffed through the Single Manager for Conventional Ammunition (SMCA) to determine if the MK437 MOFN and the reserve cell battery remain restricted to the NTIB.   Before any subsequent acquisitions are initiated, an analysis of the industrial base will be completed to determine if restriction to the NTIB is still necessary.  Due to the sensitive and strategically critical nature of the proximity fuze technology, expansion beyond the NTIB is not anticipated within the foreseeable future.

b. A Level III Technical Data Package for the MK437 MOFN will be utilized for the competition of this requirement and will be made available on or about ████████  The pre-solicitation notice will provide potential sources with the opportunity to obtain the Technical Data Package, subject to the regulations regarding drawings marked Distribution D and export of technical data.

**8. Market Research:**

a. A sources sought notice W15QKN-11-X-A014 was issued on 12 May 2011 for identifying potential sources to produce the MK437 MOFN Fuze.  The following companies expressed interest:



FOR OFFICIAL USE ONLY
COMPETITION SENSITIVE

Program/Item:
MK437 Multi-Option Fuze Navy
(MOFN)
Estimated Amount: ███████
Control No. ███████

Of the above respondents, ██████████████████ understanding of the MOFN/MOFA fuze and have been found to be acceptable and capable to support a production contract of this scale. ███████████████ with proximity fuzing, the MOFA/MOFN TDP in particular and the capacity to handle classified information at the ███████████. ██████ has previously manufactured mechanical fuzes on contracts of this scale, but has several deficiencies relevant to MOFN production that make it a high risk for technical and schedule factors.

b. The market survey analysis indicates the following results:



FOR OFFICIAL USE ONLY
COMPETITION SENSITIVE

Program/Item:
MK437 Multi-Option Fuze Navy
(MOFN)
Estimated Amount: ███████
Control No. ████████



c. Current market research conducted for the reserve battery demonstrates interest by ███████ ████ that possess the specialized capabilities, expertise and capital equipment necessary to produce reserve-cell batteries such as the reserve cell battery, as listed below:



Additionally, communications have been received recently from the above-listed battery manufacturers to indicate a demonstrated interest in participating and supporting production of reserve-cell batteries such as ███████████████

## 9. Interested Sources:

FOR OFFICIAL USE ONLY
COMPETITION SENSITIVE

Program/Item:
MK437 Multi-Option Fuze Navy
(MOFN)
Estimated Amount: ███████
Control No. ███████████

To date, no other sources other than the sources addressed above have written to express an interest in this procurement.  The notices required by FAR 5.201 shall be published in FEDBIZOPPS, and any proposals received shall be considered.

**10. Other Facts:**

a. Procurement History:



b. Acquisition Data Availability: A Level III Technical Data Package is available. However, maintaining a NTIB source in the U.S. and/or Canada for critical artillery ammunition in support of the program listed in paragraph 3 is vital and adequate competition for the MK437 MOFN Fuze requirements exists in the U.S. and Canada.

c. Unusual and Compelling Urgency: This is not applicable, as this effort is based on FAR 6.302-3(a)(2)(i), Industrial Mobilization.

d. Subcontractor Competition: Competition at the subcontractor level will be encouraged through publication of the synopsis required by FAR 5.201. The contract will also include FAR Clause 52.244-5, "Competition in Subcontracting", and FAR 52.219-9, "Small Business Subcontracting Plan".

**11. Technical Certification:** I certify that the supporting data under my cognizance which are included in the justification are accurate and complete to the best of my knowledge and belief.



**12. Requirements Certification:** I certify that the supporting data under my cognizance which are included in the justification are accurate and complete to the best of my knowledge and belief.

FOR OFFICIAL USE ONLY
COMPETITION SENSITIVE

Program/Item:
MK437 Multi-Option Fuze Navy
(MOFN)
Estimated Amount: ███
Control No. ████████

████████████████████████████████████████

**13. Fair and Reasonable Cost Determination: I hereby determine that the anticipated cost for this contract action will be fair and reasonable based upon a price analysis of competitive prices.** I hereby determine that the anticipated cost to the Government for this contract action will be fair and reasonable. The resulting proposal(s) will be subjected to a price analysis and the need for cost and pricing data is not anticipated in accordance with FAR 15.403-1(b)(1). In the event the price cannot be determined fair and reasonable based on a price analysis, cost and pricing data will be required.

████████████████████████████████████████

**14. Contracting Officer Certification**: I certify that this justification is accurate and complete to the best of my knowledge and belief.

████████████████████████████████████████

FOR OFFICIAL USE ONLY
COMPETITION SENSITIVE

Program/Item:
MK437 Multi-Option Fuze Navy
(MOFN)
Estimated Amount: ███████
Control No. ███████████

### APPROVAL

Based on the foregoing justification, I hereby approve the procurement of the MK437 Multi-Option Fuze (MOFN) and the reserve battery on an Other than Full and Open Competition basis pursuant to the authority of 10 U.S.C. 2304(c) (3), subject to the availability of funds, and provided that the services and property herein described have otherwise been authorized for acquisition.



14

# EXHIBIT B



REPLY TO
ATTENTION OF

**DEPARTMENT OF THE ARMY**

UNITED STATES ARMY TANK-AUTOMOTIVE AND ARMAMENTS COMMAND
ARMAMENT RESEARCH, DEVELOPMENT, AND ENGINEERING CENTER
PICATINNY ARSENAL, NJ 07806-5000

June 6, 2003

Advanced Systems Concepts Office

James E. O'Keefe, Jr.
President and CEO
Demodulation, LLC
121 Goodwin Terrace
Westwood, NJ 07675

Dear Mr. O'Keefe:

I am pleased with your decision to locate your company in Picatinny Arsenal's Technology Innovation Center, a high-tech business incubator. Your company's innovative, amorphous glass-coated micro wire technology shows potential in numerous military and defense-related applications, as well as Homeland Security.

The US Army Armament Research, Development and Engineering Center, located at Picatinny Arsenal, New Jersey, is the Army's premier center for research and development of advanced weapon systems. The Governor of New Jersey has also selected Picatinny as New Jersey's Center for Homeland Defense Technology and Security Readiness. Your technology has many potential uses which we would like to explore further:

O  Sensors for surveillance of munitions and munitions packaging
O  Logistics inventory control and tracking
O  Environmental stress and temperature sensing
O  Electronic shielding
O  Pulsed power
O  Safety mechanisms for small arms
O  Security and theft detection monitors

In addition to our on-site technology business incubator, Picatinny has dozens of unique laboratories, each with world-class scientists and engineers, to assist Demodulation. We are eager to pursue collaborative opportunities with Demodulation, and its partner Alfred University, to team with other government, industry and academic organizations to advance this technology.

Please feel free to contact me if I can be of further assistance at (973)724-7953 or tryan@pica.army.mil.

Sincerely,

Timothy S. Ryan
Chief, Technology Integration Division



*121 Goodwin Terrace*
*Westwood, NJ 07675*
*Phone (201) 522 – 4720*
*jamesokeefe@optonline.net*

Mr. John Phillips
Chief Scientist
Central Intelligence Agency
Washington D.C. 20505
*Via Mr. James Smythers – Senate Select Committee on Intelligence*

Dear Mr. Phillips,

As a follow-up to our recent conversations with Senator Thomas Coburn of Oklahoma, Senator Richard Burr of North Carolina and Mr. James Smythers of the Senate Select Committee on Intelligence and your conversation in September with Mr. Smythers, we wanted to provide you with a comprehensive package including a substantive white paper on Demodulation Inc.'s proprietary, glass-coated, amorphous ferromagnetic microwire (GCM) technology known as μ-Fiber. Per your request, the package also contains a significant amount of supporting scientific evidence including a recently completed report entitled, *Characterization and Testing of Amorphous Metal Microwire Using Magnetic and Radio Frequency Detection Schemes,* that was prepared by the Y-12 National Security Complex. Finally, we've included a myriad of letters of support to collaborate, validate or utilize our technology by many companies, defense contractors, research institutions and the Department of Defense. All of this information has created a curiously dichotomous situation that was the impetus for us having reached out to Senator Coburn originally.

While we have significant support from many entities described above, on many occasions over the last few years we have been repeatedly rebuffed by various governmental agencies including your own. In the majority of these instances we have been told that there are no applications for our technology. As we hope you will see from this package, this is not the case and Y-12's alone proves this point. Furthermore, we have documented in the package how many other nations (including many non-allies) have been trying to work on this technology and have gone as far as provide support to companies that we feel are violating our worldwide patent rights.

We feel that our technology has the potential to create significant jobs for our country, help protect commercial counterfeiting of U.S. goods, and most important, help protect the lives of this country's soldiers and intelligence operatives. We strongly believe that the myriad of applications contained herein and the scientific evidence backing it up warrants our company gaining the support of your agency.

Sincerely,

James O'Keefe

# EXHIBIT C

Page 1



UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Civil Action No. 2:11-cv-00296-WJM-MF


DEMODULATION, INC.,

        Plaintiff,        DEPOSITION OF:
                               ANTHONY CATANESE

    vs.

CORNING INCORPORATED, ET AL.,

        Defendants.
---------------------------X


DATE:          Monday, July 1, 2013
                Commencing at:  10:00 a.m.


BEFORE:        RONDA L. REINSTEIN, CCR,
                Certified Court Reporter of the
                State of New Jersey


LOCATION:      LAW OFFICES OF SEAN R. CALLAGY, LLC
                Mack-Cali Centre II
                650 From Road, Suite 565
                Paramus, New Jersey 07652


PURSUANT TO:   The Rules of Civil Practice
                and Procedure of the State
                of New Jersey


--------------------------------------------------

Metropolitan Court Reporting Service, Inc.
Certified Shorthand Reporters
P.O. Box 858
Maywood, New Jersey 07607
(201) 909-0666

## Page 2

APPEARANCES:

LAW OFFICES OF SEAN R. CALLAGY, LLC
BY: BENJAMIN D. LIGHT, ESQ.
  Mack-Cali Centre II
  650 From Road, Suite 565
  Paramus, New Jersey 07652
Attorneys for the Plaintiff

CONNELL FOLEY, LLP
BY: RUKHSANAH L. SINGH, ESQ.
  85 Livingston Avenue
  Roseland, New Jersey 07068
Attorneys for the Defendant Corning Incorporated

GARRITY, GRAHAM, MURPHY, GAROFALO & FLINN, ESQS.
BY: SARIT WEITZ, ESQ.
  72 Eagle Rock Avenue, Suite 350
  East Hanover, New Jersey 07936
Attorneys for the Defendant Alfred Technology

LAW OFFICE OF GREGORY J. BEVELOCK, LLC
BY: GREGORY J. BEVELOCK, ESQ.
  12 Main Street, Suite 2
  Madison, New Jersey 07940
Attorney for the Defendant

ALSO PRESENT:

  JAMES O'KEEFE

## Page 3

No copy of this transcript may be considered certified unless signed in ink by the Certified Court Reporter licensed by the State of New Jersey who recorded this matter. Any facsimile may have been altered by means of electronic media.

***Transcript prepared in accordance to Rule NJ ADC 13:43-5.9***

## Page 4

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ANTHONY CATANESE | | | | |
| BY MR. LIGHT | 5 | | | |
| BY MR. BEVELOCK | 46 | | | |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| P-1 | NAVSEA Test Report | 5 |
| P-2 | Photocopy of Photograph | 32 |
| P-3 | Photocopy of Photograph | 32 |
| P-4 | Photocopy of Photograph | 32 |
| P-5 | Subpoena | 46 |

## Page 5

(P-1, NAVSEA Test Report, marked for identification.)

ANTHONY CATANESE, 724-1st Street, Mamaroneck, New York 10543, having been duly sworn according to law, testifies as follows:

DIRECT EXAMINATION BY MR. LIGHT:

Q. Good morning, Mr. Catanese.

A. Good morning.

Q. We're here today to take your deposition. You received a subpoena for the deposition today; is that correct?

A. I did.

Q. You kindly accepted service of that subpoena, didn't you?

A. I did.

Q. You're here today voluntarily in response to that subpoena, I should say?

A. I am.

Q. Before we start, I'll just go over some rules with you.

A deposition is a question-and-answer period. I ask the questions and you answer them, hopefully, if you know. If you don't know the answer to a question, just please let us know. However, if you do answer a question, everyone in the room is going to assume that

## Page 6

1   you answered it based on knowledge that you actually
2   have. A lot of times in conversation we're estimating
3   or we're guessing, and that's totally fine. But just
4   let us know that that's what you're doing here today
5   before it gets on the transcript.
6           At some point one of the other lawyers in the
7   room may object to a question that I have. If that's
8   the case, just please let us work out. You'll be
9   instructed whether to answer or not.
10          By the same token, if you find any my questions
11  to be confusing, ambiguous, just please let me know
12  beforehand. I'm not trying to trick you. Specifically,
13  if you let me know exactly what's confusing about my
14  question, I'll rephrase it so we can agree that we have
15  a fairly lucid question on the table.
16          We're here today to talk about a company called
17  Demodulation. Are you familiar with that company?
18      A. I am.
19      Q. How did you first become familiar with it?
20      A. I believe it was around Christmastime of 2005,
21  right after Christmas. They were brought into a
22  facility where I was working by a gentleman called
23  Howard Seguine who was with Cubic Corporation. And they
24  were brought in. And I was asked to help build some
25  test equipment for them so we could test and evaluate

## Page 7

1   their material that they were bringing in for the
2   corporation.
3       Q. At the time you were employed by Hudson Research,
4   Inc.?
5       A. That's correct.
6       Q. What was position with that company?
7       A. Technically I was the Vice President of
8   Engineering.
9       Q. Where was that company located?
10      A. 115 Hoyt Avenue in Mamaroneck, New York 10543.
11      Q. So then is it accurate to say that all of your
12  work involving Demodulation was in your capacity as an
13  employee of Hudson Research?
14      A. Yes.
15      Q. So if you could specify what exactly it is you
16  did on behalf of Hudson Research with regard to the
17  Demodulation technology?
18      A. I was asked to build some test platforms for
19  testing Demodulation's capabilities. I was shown or
20  actually discussed with Dr. West King, with Mr. O'Keefe
21  and with my boss, Curtis Birnbach, on what he wanted
22  designed and how I was going to build it.
23  Then I physically built the equipment for the testing,
24  set it up in a special room, and got ready for the
25  testing forum.

## Page 8

1       Q. Could you describe your understanding of the
2   technology that Demod brought to Hudson Research for
3   this purpose?
4       A. It was my understanding that they had a material,
5   a very fine wire material, that a whole bunch of
6   information could be encoded on and could be read off
7   this material. And it had personal uses, as far as I
8   saw it, as just a mechanic, a simple mechanic, that
9   could be very, very useful in switching and for
10  vibration sensing, for a whole gamut of information. I
11  thought it was very stunning technology.
12  Again, my position was there to build some test
13  equipment to test the stuff.
14      Q. Was it your understanding that Hudson Research
15  and Demodulation had entered into some agreement to
16  allow this work to take place?
17      A. I would say yes, and with Cubic's blessing.
18      Q. Were you ever aware whether Hudson Research and
19  Demodulation entered into some sort of confidentiality
20  arrangement with regard to the technology and
21  information that was being exchanged?
22      A. I'm sure they did.
23      Q. Were you ever so instructed by Curtis Birnbach,
24  that is to say that you need to keep this information
25  confidential?

## Page 9

1       A. Absolutely.
2       Q. As far as you know, you did that to the best of
3   your ability?
4       A. I did.
5       Q. What sort of business was Hudson Research in when
6   you worked for the company?
7       A. They started out with a government contract to
8   produce a technically directed energy EMP weapon,
9   Electro-Magnetic Pulse weapon. And what it was
10  theoretically to do was almost if you can imagine a
11  lightning beam being directed at an area or electronic
12  device. And that lightning beam would physically
13  generate such -- induce such a magnetic field and a
14  pulse of electricity inside the device it would totally
15  just fry it and put it out of commission totally.
16  So if you can think of taking your cell phone and having
17  it struck with lightning to destroy it, this is what we
18  were contracted or contracted by the government to
19  produce.
20      Q. Did you ever see a physical copy of the contract
21  between Hudson Research and the government?
22      A. When Mr. Birnbach came into the facility he
23  showed me a contract from I believe it was the
24  Department of Army that said he was a prime contractor
25  on a device to do this type of weaponry. And he was

## Page 10

1  awarded -- I believe the contract was like for $290,000
2  or $260,000, somewhere in that amount of dollars.  This
3  was in October of 2004.
4      Q.  Was it at any point in time, as far as you know,
5  Hudson Research's intent to form a business venture with
6  Demodulation?
7      A.  I wouldn't have had that knowledge.  I don't
8  know.
9      Q.  As far as your understanding goes, is it accurate
10 to say that Demodulation and Hudson Research were
11 engaging Hudson Research to assist in testing
12 Demodulation's technology?
13      MR. BEVELOCK:  Objection to the form.
14      Q.  Was that confusing?
15      A.  Yeah.
16      Q.  Okay.  As far as you know, was the purpose of the
17 arrangement or relationship between Hudson and Demod to
18 test Demodulation's technology, or was it something
19 more; were they going to test it and then try to sell it
20 and market it?  Could you tell me please...
21      A.  My understanding was that my end of it was to
22 build the test equipment and get ready for a test
23 platform.
24      I believe that one of the things that Curtis said
25 he would do or part of what he would do would be some of

## Page 11

1  the programming to get the information from the test to
2  a workable set of parameters.  So we have the test
3  platform.  Then we have information from the test that
4  has to be coded and decoded.
5      There was a lot that Curtis proposed he could do
6  with Demodulation's equipment.  I believe that my part
7  was just to build the equipment, but the overall game
8  plan was for him to development and work with
9  Demodulation in developing out some further technology
10 on this aspect or testing the technology, taking it to a
11 further level.
12      Q.  Whatever became of the relationship between
13 Hudson Research and Demodulation, did they ever form a
14 further business venture?
15      A.  I don't believe so.
16      Q.  Are you aware whether Hudson Research
17 participated in any testing at a facility called Pax
18 River?
19      A.  Yes, I do.
20      Q.  Could you please tell us what you know about that
21 testing?
22      A.  Well, we built two pieces of equipment.  One was
23 called the Mark I and the second was a Mark II.
24 The first Mark I pulse generator was built in 2004 to
25 2005.  It was for the Army at Picatinny Arsenal.  We

## Page 12

1  took this piece of equipment up to Picatinny after its
2  completion and did some testing with it.  And it was an
3  absolute failure, without hesitation.
4      Q.  Could you please elaborate, why was it a failure,
5  what didn't work?
6      A.  Well, the reality of the thing was that Cubic
7  Defense -- let me bring you back a little bit further.
8  When we first started this project about two or three
9  weeks after Curtis and I became acquainted with each
10 other and we started -- he hired me and we started
11 working on this project, the Mark I, for the Army, Cubic
12 Defense sent Howard Seguine into our shop.  Howard was
13 like a third-party advisor to everybody.  And Howard was
14 a very nice man, very intelligent, knew his business.
15 He had great connections.  He was not a young man.  A
16 lot older than we were.  I had a lot of respect for
17 Howard.
18      It seemed to me that Howard and Curtis had a lot
19 of backroom discussions about what we were building, how
20 we were going to build it, and what we were going to do
21 with it after the testing.
22      The problem I had as having to build the
23 equipment is, very frankly, I was given a set of plans
24 and didn't have that kind of expertise to build this
25 equipment.  I could build anything, but I didn't have

## Page 13

1  the technical knowledge that they supposedly had.
2  Now, you have to imagine this piece of equipment as big
3  as this table.  It was
4  four-feet-by-eight-feet-by-four-feet high.  It weighed
5  about four tons.  Inside of it was -- if you can just
6  imagine this.  You plugged it into a wall socket on one
7  end and out the other side came out a lighting beam.  So
8  this was not a toy, without hesitation.  This was a
9  piece of high voltage equipment going up into the
10 140,000 volt range.  Extremely dangerous to work with.
11 It had huge capacitors in it that would kill you in an
12 instant, one of them.  And they had about six inside of
13 it.  This was not a toy.  This was a huge piece of
14 equipment.
15      Very frankly, I was way beyond my means.  I could
16 build the equipment to his specification to what we
17 thought was proper to do.  But the bottom line was we
18 didn't have the technical expertise.
19      The question I always had from day one was why
20 Cubic was involved with this and didn't bring this into
21 a further realm of it.  I'm not a stupid man.  I know
22 that the United States government had been working on
23 projects like this, directed energy, for years.  I
24 remember Flash Gordon in the '50s, that's all you saw.
25 If you're as old as I am or remember the comic strip,

(Pages 10 to 13)

## Page 14

1  Flash Gordon, where he had ray guns. And Superman would
2  have ray guns. You know, his eyes would penetrate walls
3  and stuff. This was the same technology. So this is
4  nothing knew.
5      So the question I had: Why did they bring it in
6  to a little shop like us that had really no expertise in
7  building this stuff?
8      Q. Well, why don't you describe Howard Seguine's
9  background and his experience?
10      A. What I learned about Howard just by talking with
11  him, he was a brilliant man, but he had spent a lot of
12  time in different areas of the world doing different
13  types of research. I'm not sure what his title was with
14  Cubic, but he was our project manager for Cubic Defense.
15      And when I ran into a problem I would say to
16  Howard "What are we doing here, Howard? I don't know
17  how to design this."
18      And he would say Oh, just make it work. Do it
19  like this, do it like that.
20      So it always seemed to me like there was another
21  reason for having us build this piece of equipment.
22  Because, very frankly, I can think of 50 different
23  government agencies who could do a 20 times better job
24  for half the money and make it work. Why us?
25      Q. Did Howard ever work for the government?

## Page 15

1      A. I don't know.
2      MR. BEVELOCK: Can I interrupt for one minute.
3  Howard, what is his last name?
4      THE WITNESS: Seguine, S-e-g-u-i-n-e, I believe.
5  He was -- I don't know what his title is now, but at the
6  time I think he was director of something for Cubic,
7  Cubic Defense, Cubic Defense Research or something, some
8  area.
9      Q. If you could, please describe, what do you know
10  about the Cubic Corporation and/or Cubic Defense?
11      A. Well, I did know a bit about them. They came
12  from California, their main office. Apparently they
13  were a Tier 2 contractor for the United States
14  government for weapons and other clandestine information
15  and stuff like that. So they came very highly regarded.
16  And I met with many of their people and they were just
17  top, top notch.
18      Q. Okay. Back to the testing at Pax River. Please
19  describe for us what you know about that, were you
20  present there, and what happened when you were there?
21      A. After the Mark I was a failure, we started
22  immediately on a Mark II project. I'm trying to think
23  of the -- I'm sorry, I'm a little shady with dates.
24  I think Mark I was tested sometime in summer or late
25  summer of 2005. We started right away on a Mark II

## Page 16

1  project. By the way, the Mark I project belonged to
2  the Army. We had to leave it at Picatinny. So we had
3  no test platform to do anything else with.
4      So we started on a Mark II project probably right
5  after that period of time. And the testing for that, I
6  believe, was almost about a year later or a little bit
7  less. I believe it took us almost a year to get that
8  perfected.
9      One of the other players in this project was a
10  guy by the name of Frank Downs who represented the Navy,
11  NAVSEA. And Frank was our project manager on this with
12  Cubic, together in conjunction with Cubic on this
13  project.
14      Again, we built this platform to make directed
15  energy. And during that point in time we had many,
16  many, many tens of guys come in from different agencies
17  and different organizations, Los Alamos, Ph.D.s right
18  across the board. And they would come into our shop
19  with Cubic evaluating the equipment that we're building.
20  And I had to say from the minute they walked in the
21  place, I would just sit there and shake my head not
22  understanding what the hell is going on. Because they
23  could really see that we were nothing more -- we were a
24  four-man shop. Curtis Birnbach was the president. His
25  wife Sandy, who was the secretary and receptionist, and

## Page 17

1  all she did was sleep at her desk all day because nobody
2  ever called except to collect bills. I had one
3  machinist under me by the name of Richard Hines.
4  Going too fast for you guys?
5      Q. No.
6      A. They take good notes.
7      Okay. Richard Hines was a machinist under me. I
8  had one college intern that would come in during his off
9  season and do some welding, and myself. That was it.
10  So we were a four-and-a-half man shop. And here we are
11  trying to develop something that I know the government
12  had been working on for years.
13      Frank Downs was a key player with this because he
14  would continually with Cubic tell me to continue on with
15  the work, that we have some very serious work doing
16  here, we have to test a lot of equipment, and please
17  stay with it all the way down the line.
18      If I may go back a little bit before that. In
19  December right after Christmas of 2005 is when Jim
20  O'Keefe and Wes was brought into our shop and we started
21  working on their stuff on a sideline. The facility had
22  about 18,000 square feet. There was a second floor area
23  that was about 6,000 square feet that had all of Jim's
24  and Wes's Demodulation equipment. And there was a room
25  set up there for all their test equipment on the second

Page 18

1  floor. So we were really running two projects at once.
2  We were building this one Mark II on the first floor,
3  and when Jim and Wes would come or when we needed to do
4  some work on their equipment, we would go to the second
5  floor and work on their equipment.
6  So it was quite a project. We were working seven
7  days a week without hesitation, ten-hour days. Curtis
8  would show up every morning at 10 o'clock. I opened up
9  at 7:30 with my machinist and my intern. And he and his
10  wife would show up at 10:00. The first thing he would
11  do is take me into his office, and we would have a
12  two-hour conversation about everything under the sun
13  because he loved to talk, including what we were going
14  to do today, what we were going to do tomorrow. We
15  would have conversations on religion, on politics, on
16  everything up and down the line. That was just Curtis.
17  He loved to talk. So we would sit there and have a
18  conversation. When we got all done, we'd go back into
19  the shop.
20  While we were working on Jim's equipment,
21  Demodulation equipment, I could see the potential for
22  the equipment, but knew that you had to be able to test
23  his equipment. And in order to test his equipment, you
24  had to have something like a pulse generator putting out
25  some kind of power so we could see what you're

Page 19

1  receiving. If you're going to test a receiver, you have
2  to have a transmitter of some sort.
3  The transmitter we built, the Mark II, was
4  probably about half the size of this table. And it had
5  one component in it that Curtis at Hudson Research
6  thought was a very impressive piece of equipment that
7  could be patented. It was called an ETC. It was an
8  electron II amplifier basically. What it was is it
9  looked like a piece -- actually, it was made from a
10  piece of three-inch PVC sewer pipe, seriously, a piece
11  of three-inch PVC sewer pipe with some stainless steel
12  on both ends. And inside of it was nothing more than a
13  design from the 1920s and to 1910, actually probably
14  before that, for an electron tube called a triode. It
15  had a cathode, an anode, and a discharge piece in the
16  center, a triode, three items.
17  What it was meant to do in a radio was amplify
18  the incoming weak signal to where it could produce some
19  electricity to drive a speaker. So nothing more than
20  just a big amplifier. It was probably four feet long.
21  A lot of machining had to go into it. It was put into a
22  vacuum that was sucked down to minus three or four
23  torque, which is a very high vacuum. Sealed and then
24  shot off in a big fancy thing. We made a big production
25  over this one piece of equipment, big production. It

Page 20

1  was supposed to the life blood of his design and all
2  sort of type that went with it.
3  The NAVSEA test, we took the Mark II -- if you
4  want to go to that.
5  Q. That's the Pax River test I referred to before?
6  A. Yeah, the Pax River test, right.
7  So Frank Downs comes to us and he says "We're going to
8  test your equipment at Pax River."
9  Again, a little bit for background. The problem you
10  have with designing, it's easy to design a power supply.
11  It's easy to design an amplifier. It's difficult to
12  design the antenna that's going to actually match
13  everything and put this amount of energy out. Because
14  if you can imagine, if you have something that's going
15  to produce this energy, it has to be capable of holding,
16  containing this energy, without burning itself up.
17  This was the black art area that we knew absolutely
18  nothing about, zero. Absolutely knew zero. Curtis
19  would read a book. He had an almost photographic
20  memory. He would pull up a page and say Build this.
21  And I would look at this thing, and if you can imagine a
22  big parabolic dish antenna, which is a like the antenna
23  for the TV on your roof, DIRECTV, producing something
24  like that to take a 140,000 volts at very high amperage,
25  produce it out and still hold up in one piece and have

Page 21

1  the impedance to match everything, it was just totally
2  unheard of.
3  Did I get off track? Where were we going?
4  Q. Were you present and did you participate in
5  testing at Pax River?
6  A. Okay. So we take all this stuff, this equipment,
7  down to Pax River.
8  Q. Well, first of all, what is Pax River?
9  A. Pax River is, I believe, a naval air station in
10  Virginia.
11  Q. In Maryland?
12  A. Maryland. I'm sorry. It's in Maryland, yeah. A
13  naval air station in Maryland run by the government. It
14  had a facility there for testing aircraft lighting
15  strikes. So they had a range where they could actually
16  put an aircraft underneath a large generator that's
17  making lightning and fire it off into the aircraft to
18  see if the lightning suppression would damage any of the
19  aircraft.
20  So Frank Downs contracted with us and with the
21  Navy to bring this piece of equipment down. Before we
22  went down the Navy came in. We all had to have security
23  clearances. It was quite a large project to get this
24  piece of equipment down there. It was not a small piece
25  of equipment. It had to be trucked down. We had to

(Pages 18 to 21)

Page 22

```
 1   rent the truck. It was a two-day trip to get down there
 2   and set it up.
 3        I went down with my intern, myself, and Curtis.
 4   Curtis drove his car. The intern and myself went in the
 5   truck with the equipment.
 6        We arrived at Pax River. The following morning
 7   we set up at 6:30 a.m. The testing was starting at
 8   8:00. It was quite a job get onto the base
 9   security-wise. When we were on the base we were told
10   where to set up. I started setting up the equipment.
11   And by about quarter to 8:00 the place was swarming with
12   people, swarming. There had to be at least three or
13   four that I did recognize and knew who they were, but
14   the rest I really didn't. But they were very, very
15   interested in what we were doing, or what I thought what
16   we were doing.
17        Q. Can you estimate or actually tell us the number
18   of people that were present?
19        A. Way over 20. Again, what they were doing there,
20   some were milling around. Some had specific test booths
21   where they were testing. And everybody had
22   oscilloscopes lined up. There were antennas all over
23   the place. What they were doing was again theoretically
24   trying to determine what the output of our equipment was
25   and whether we received or whatever.
```

Page 23

```
 1   We got into the testing and it was quite apparent that
 2   the equipment would not function as designed because of
 3   all of these issues that we all knew about.
 4        Q. What were some of these issues?
 5        A. The biggest issue, the biggest problem I had is
 6   that I did my own theoretical testing at the facility.
 7   And the way I tested our own equipment was I took some
 8   fluorescent light bulbs, eight-foot fluorescent light
 9   bulbs, and just took four or five and put them in a
10   corner. If you know anything about walking on static
11   electricity with your fingers, if you happen to walk
12   across the carpet and you touch your lamp, you're going
13   to get an instantaneous flicker of light, especially
14   from that fluorescent tube, because that's the static
15   electricity being discharged into the fixture. It just
16   sets off the light.
17        So on a larger scale, if I've got four or five
18   fluorescent tubes sitting in the corner and I'm firing
19   off something four feet away, four feet away, that's
20   theoretically going to produce 150,000 volts and can fry
21   all kinds of electronic equipment. And if those four
22   light bulbs sit there dark as shit -- pardon my
23   French -- I know damn well nothing is coming out of this
24   machine. It's all backing into it because we don't have
25   the right antenna and the impedance to throw it out.
```

Page 24

```
 1   It's just backing up. It's a failure.
 2        Q. Did Frank Downs know this before he arranged the
 3   Pax River testing?
 4        A. They all knew it, including Cubic. I couldn't
 5   understand why Cubic would have all these Ph.D.s in
 6   looking at all these test results. And we had
 7   oscilloscopes and test results. I mean, it put out a
 8   beautiful wave pattern, but no energy. Beautiful wave
 9   pattern. Everybody says textbook wave pattern, but no
10   energy. Because you can't get it out one end. They all
11   knew it.
12        So why did we go to Pax river? I don't know.
13        Q. What happened the rest of the day at Pax River?
14   I cut you off.
15        A. Okay. We started firing about 8 o'clock, 8 a.m.
16   By 9:30 everybody knew it was a failure. The equipment
17   was overheating. The booths that we were allowed to go
18   into -- the procedure was that I would set up for about
19   15 minutes, and equipment.
20        Again, my job was and the intern's job was to get
21   the equipment set up, ready to fire, on command fire it,
22   then reset it up for another test, and on command refire
23   it. So that was my job. It was pretty intense because
24   I had to hold all this equipment together in one piece.
25   And a lot of it failed and I had to make do with fixing
```

Page 25

```
 1   it on the job site. We had a ground wire that failed
 2   and a few other things that failed.
 3        But in between times we would take a break to let
 4   the equipment cool down, and I would walk over to the
 5   control booths just to see what's going on. Now, again
 6   everybody there had to have the same clearance, top or
 7   better, to go in and look. So nobody objected to me
 8   going in. I would go in and look at some of the
 9   screens. I would say the same thing to myself, you
10   know, okay, what the hell are we doing here?
11        Around noon we were going to break for lunch. And
12   Curtis by this time knows that this equipment is a
13   failure, and he's getting into heated arguments with a
14   lot of the people there. Not just one or two, but
15   several different people that were there to test. He's
16   getting into heated arguments with them. He has a
17   terrible temper. When he goes off he goes off like a
18   wild man. And he's just going wild.
19        He and Frank Downs -- Frank Downs again was a
20   test director. He was the guy calling the shots there.
21   So Frank would directly tell me when to set up, when to
22   fire, what my output was going to be, et cetera, et
23   cetera. And I would follow his test protocol. Whatever
24   he wanted done, I would follow. That was my job.
25   He and Curtis got into a terrible argument around noon.
```

(Pages 22 to 25)

Page 26

1   And Curtis slams down everything and tells me to put the
2   equipment back in the truck, pack up, we're leaving.
3   And Frank is screaming at him "You can't, you can't,
4   we're booked for the day.  You've got to finish testing.
5   We have a lot of testing yet to do."
6       I go on to all these little bunkers that I can
7   find and everybody is telling me the same story.  Why
8   are we wasting time here?  It's not working.
9   So I'm back up on this platform.  The platform was
10  elevated about ten feet in the air.  And my intern and I
11  are trying to patch up the equipment.  Frank comes up to
12  me and says "Whatever you do, you have to continue
13  testing.  Your system is not a failure for what we're
14  testing it for.  We need you to further stay here to
15  keep the equipment running.  Can you repair the
16  equipment and keep it running for me?"
17      And very frankly I looked at Frank and said
18  "Okay, will do."
19      I came down off the platform.  And I'm just
20  milling around the bottom, having a water or something
21  just to chill out a little bit, had a little lunch.
22  We're sitting there.  My intern and I are sitting there
23  together.  And two guys come walking from the other end
24  of the field.  Now, if you can think of this thing being
25  a football field in size, if not bigger, we're at one

Page 27

1   goal post, and way down past the other goal post I see
2   two guys in their little hut, almost like a little shed
3   down at the over end.  Of course there's a bunch of
4   antennas popping up all over the place.  The place
5   looked like a porcupine with the antennas.
6       These two younger guys come walking up to me.  I
7   say "Hey, how ya doing?"
8       "Okay.  How's testing going?"
9       I said "A little rough.  You know, we're cooking
10  the equipment here.  This is going bad there and bad
11  there.  You know, my boss wants to pull out.  Frank is
12  asking us to stay."
13      He looked at me and said "You've got to stay."
14      I said "What do you mean you've got to stay?"
15      "You've got to stay."  He said "We're getting
16  excellent test results for what we're doing.  You have
17  to stay."
18      I said "Who in the hell are you guys?"
19      He say "One of the alphabets."
20      I said "Which one specifically?"
21      He said "NSA."
22      I said "Okay.  Look, if you guys are getting good
23  test results on what you're doing, fine."  I said "But
24  my equipment is barely -- is failing.  It's getting very
25  little output."

Page 28

1       He says "No, no, please, you've got to stay."
2       So we ended up staying the day.  We got back.
3   Packed up about 4 or 5 o'clock.  Testing was done.  We
4   were finished.  And we went back to New York.  Curtis
5   was in an absolutely foul mood.  I believe this was
6   summer or late fall of 2006, but I'm not positive on the
7   date.  Again, I'm sorry about the dates.
8       We lasted perhaps a month and a half, two months
9   later, maybe a little bit more.  In the meantime
10  throughout all this time from 2004 to 2007 when Curtis
11  finally went bankrupt, very few people had gotten paid.
12  The rent had never been paid for almost two-and-a-half
13  years.  I had not collected a penny in salary for
14  two-and-a-half years.  The only anybody that had any
15  kind of money come out of the place was the machinist,
16  Curtis, and his wife, who took a continual salary.  They
17  bled the company dry.  They got an eviction notice.
18  ConEd turned them off in 2006, fall of 2006, for
19  nonpayment.  They had an eviction notice from the
20  landlord.  The place was going to be evicted.  Curtis
21  immediately took a -- went into bankruptcy and the
22  company was closed down.
23      Q.  You know, before we move off Pax River I just
24  want to show you what I've marked today as P-1.  If you
25  could please describe that for the record.

Page 29

1       A.  Are you ready?
2       MR. BEVELOCK:  Was this part of your document
3   production?
4       MR. LIGHT:  No.
5       MR. BEVELOCK:  Are there additional documents
6   you're producing?
7       MR. LIGHT:  This is one of them.
8       MR. BEVELOCK:  We can talk about it off the
9   record.
10      THE WITNESS:  Okay?
11      Q.  Yes.
12      A.  This is a test report from Frank Downs, the Naval
13  Surface Warfare Center in Panama City.  This was
14  physically given to me by Frank after the fiasco at Pax
15  River.  And generally it starts out as a general
16  description of the Mark I and Mark II units.
17  The first page discusses the Mark I in detail.  And as
18  you see in Paragraph 2, the difference between the Mark
19  I and the Mark II, the Mark II uses a four-foot long
20  backing tube amplifier designed by Curtis Birnbach
21  called an electronic coupled transformer.
22      Q.  Okay.  Those are all the questions I have about
23  that document.
24      MR. BEVELOCK:  You've produced documents, but you
25  haven't produced this one.  Was this a Demod document?

Page 30

```
 1      I think the subpoena -- I don't have it in front of me
 2   -- requested documents.  Is this a document that
 3   Mr. Catanese produced?
 4      MR. LIGHT:  You can follow up with him
 5   afterwards.  I'm sure he'll answer all your questions.
 6      MR. BEVELOCK:  Well, if he produced documents
 7   before the subpoena --
 8      MR. LIGHT:  No, he did not, not in response to
 9   the subpoena, no.  This was not produced in response to
10   the subpoena.
11      Q.  Okay.  So you were telling us that after Pax
12   River or some period of time after Curtis filed for
13   bankruptcy?
14      A.  Yes.
15      Q.  I should say the company, Hudson Research, Inc.
16   filed for bankruptcy, correct?
17      A.  That's correct.
18      Q.  As a result of that the bankruptcy was eventually
19   discharged, is that correct, or I should say a final
20   decree was entered in the bankruptcy case?
21      A.  I believe so.
22      Q.  Were you represented in that case?
23      A.  I was.
24      Q.  You made whatever claims you had against the
25   estate; is that correct?
```

Page 31

```
 1      A.  That's correct.
 2      Q.  As far as you know, after the bankruptcy was over
 3   Hudson Research no longer existed, correct?
 4      A.  I thought so.
 5      Q.  Through the course of the bankruptcy or through
 6   the course -- I guess we should back up.
 7      You owned 115 Hoyt Avenue in Mamaroneck, right?
 8      A.  I was a the partner in the LLC that owned the
 9   building.
10      Q.  So you leased that space to Hudson Research,
11   Inc., correct?
12      A.  That's correct.
13      Q.  At the time of the bankruptcy did Hudson Research
14   leave any property in the building?
15      A.  They abandoned a lot of stuff in the building.
16      Q.  Did you find anything interesting in that
17   property?
18      A.  Very much so.
19      Q.  What did you find?
20      A.  Well, specifically a couple of items that they
21   left that some of it belonged to Demod, what I thought
22   belonged to Demod.  Some wire samples and some other
23   pieces that I believe I gave back to Mr. O'Keefe.
24      Q.  We have to mark them first.
25      A.  Do you want to mark them first?
```

Page 32

```
 1      Q.  Yeah.
 2      (P-2, Photocopy of Photograph, marked for
 3   identification.)
 4      (P-3, Photocopy of Photograph, marked for
 5   identification.)
 6      (P-4, Photocopy of Photograph, marked for
 7   identification.)
 8      Q.  Mr. Catanese, I'm handing you what's been marked
 9   as 2, 3 and 4.
10      A.  Do you want to ask me specifically about each one
11   or...
12      Q.  Well, what did you find in the property at 115
13   Hoyt Avenue after the bankruptcy?
14      A.  On April 15th of 2007 we had a major flood in
15   Mamaroneck.  It was a hundred year flood.  And basically
16   115 Hoyt suffered some severe water damage about two
17   feet inside the building, which prompted Curtis to
18   remove all his equipment that he had been squatting in
19   for months.
20      A few of the things he left behind were three
21   pieces of equipment.  P-4 is a projectile from a 155
22   millimeter Howitzer shell.  P-3 is a nose cone detonator
23   for that shell.  P-2 is a second shell that remained in
24   the wooden box with its shipping label.  And the label
25   says "To Daniel Guitterez, U.S. Army, Tacom Ardec,
```

Page 33

```
 1   Picatinny Arsenal, New Jersey." I believe it's a FedEx
 2   label.  And it came from Red Stone Arsenal.
 3      Q.  So how did these items come to be in the
 4   possession of Hudson Research?
 5      A.  After Christmas of 2005 when Demod came into our
 6   building -- probably spring -- Curtis said to me "Come
 7   on, hop in the car.  We're going to take a ride out to
 8   Picatinny Arsenal.  We have to talk to Dan Guitterez and
 9   pick up some equipment."
10      So we went out to Picatinny.  And Curtis and Dan
11   were talking.  And as we got ready to leave, I get in.
12   Curtis is driving his car.  And we get in his car.  And
13   Curtis follows Dan to a secluded area of the base in
14   Picatinny where there is a storage warehouse.  Dan
15   Guitterez gets out of his car, opens up with a padlock
16   the security area, and tells Curtis to back up his car.
17   And in the trunk of his car he places two wooden boxes
18   identical to P-2.  He hands out of his hand P-3 to
19   Curtis Birnbach.  In front of me tells Curtis Birnbach
20   to put the nose cone and the shell, P-3, under the front
21   seat, obey the speed limit, drive off the base, and
22   whatever you do don't get stopped by base security.
23   You've got nothing to declare.
24      I'm looking at him like he has three heads.  This
25   is absolutely theft of government property off a
```

Page 34

1    military base. But I had no idea if Guitterez had the
2    paperwork filled out or anything else taken care of. So
3    I got back in the car. We did exactly that, drove off
4    the base.
5        On the way home Curtis tells me that he has the
6    following task for me to do. We have to figure out how
7    to put a power supply and an EMP weapon inside the hull
8    of the 155 millimeter Howitzer shell and make it capable
9    of withstanding the gravitational forces of being fired
10   out of a cannon.
11       When I asked about the nose cone he said he had
12   some very interesting work he wants to do with the nose
13   cone for development using the switching capability of
14   Demodulation's wire.
15       Q. At the time did you believe that the work using
16   Demodulation's wire was permitted pursuant to the
17   relationship between Demodulation and Hudson Research?
18       A. Absolutely.
19       Q. Then came a time after the bankruptcy that
20   you found yourself in possession of the items shown in
21   P-2, 3 and 4, right?
22       A. While I was cleaning out the building after the
23   flood Curtis call ed me and said "Do me a favor, I want
24   you to dispose -- I want you to junk the two shells and
25   the nose cone. Make sure that they're not put out in

Page 35

1    the garage, but disposed of properly." He almost
2    insinuated he wanted me to bury them somewhere, dig a
3    hole and bury them.
4        So I said "Yeah, sure, no problem."
5        He and I weren't getting along too well by then
6    obviously. So I stuck them in my garage and actually
7    forgot about them.
8        About a week later or two weeks later, I would
9    say maybe mid-summer, I get a call from Howard Seguine
10   from Cubic asking me if I still have those shells. I
11   said "Yeah, Howard. Why?"
12       He said "Well, I want them."
13       I said "Well, look, I'm not going to spend the
14   money to have them shipped." I said "If you want them,
15   come down and pick them up." That was the last I heard
16   from him.
17       So that was 2007. They sat in my garage in my
18   shop until 2012, until sometime in 2012. Jim O'Keefe
19   had come over to my house and we were talking. And he
20   wanted to bury a tool that I had in my shop. I said
21   "Sure."
22       So we go over to the shop. I open up the door.
23   And of course there's this one shell that you see in P-4
24   sitting on the floor of my shop. And he said "What the
25   hell is that for?"

Page 36

1        I said "You don't remember?" I said "That was to
2    test your stuff."
3        He said "You're kidding me?
4        I said "No." So I told him the story. He took
5    three photographs of these, and I believe contacted the
6    FBI to tell them we had these. It was in an afternoon.
7    At 1 o'clock in the morning I'm woken up by the dog
8    going crazy. Out in front of my house are two FBI
9    agents and a member of the Westchester County Police
10   bomb squad that want to pick up these three items.
11   So I didn't have a problem with that. I said "Come on,
12   you can have them." I said "I've been having them in my
13   garage now for four or five years. I've been trying to
14   get rid of them. I made several attempts to get rid of
15   them. Like I made several attempts to get somebody
16   involved in getting them out of here. Nobody wanted
17   them. Come on, take them away. Useless to me."
18       So at 1 o'clock in the morning we open up the
19   shop with the three things in it. They gave me a
20   receipt for them, but not once asked me how I got them.
21   Not once. None of the guys, the Westchester County bomb
22   squad nor the FBI said where the hell did you get these
23   things. Not one of them.
24       But it didn't surprise me. Because many years
25   later -- before, I'm sorry, in 2007, maybe late 2007,

Page 37

1    fall of 2007, I wanted to get rid of these things, too.
2    So I wrote a letter to the Westchester County District
3    Attorney and told her that I have three pieces of
4    equipment that I know were probably stolen Army
5    equipment off a military base. Will you do anything?
6        She sent me back a very nice reply saying Thank
7    you very much for your inquiry. No. Contact the FBI
8    and the Justice Department.
9        So I sent a letter to the FBI. This is late
10   2007. So I sent a letter to the FBI and the Justice
11   Department saying the same thing. I believe a crime has
12   been committed. These are three pieces of equipment
13   that were spirited off a military base. They're
14   government property. I don't believe there's any forms
15   or anything for them because of the way they were taken
16   out. Whether they be inert or not, the detonator itself
17   -- the detonator, which is P-3, has a lot of internal
18   circuitry that anybody would love to get their fingers
19   on.
20       Q. What -- sorry. Go ahead.
21       A. Go ahead.
22       Q. What sort of work did you do, or I should say did
23   Hudson do, with regard to trying to apply the microwire
24   to the cone assembly piece, I guess you would call it
25   the detonator?

## Page 38

1    A. I'm not positive because I wasn't really involved
2 in that end of it. Curtis was. But what I was trying
3 to do was figure out how to get our equipment inside it.
4 In fact, on P-4 you see a dummy nose cone that I put on
5 there which was machined out of aluminum from our shop
6 just so I'd have a reference for the dimension of the
7 actual nose cone so I could get everything to fit in.
8 I know he did work on it, considerably. And I'm not
9 sure if they made any progress. But it would have been
10 very logical, because the one thing I did learn in
11 working with Demodulation's microwire is it's an
12 extremely, extremely sensitive piece of equipment. So
13 if you can imagine the scenario where you have this
14 shell that's being fired out of a cannon, probably going
15 in the neighborhood of a little over the speed of sound
16 at sea level, probably close to 800 miles an hour
17 because you hear the crack from the shell, it was
18 designed to go over an electronic -- like a radar
19 facility or something. And the minute it is directly
20 overhead of this facility, it was supposed to release
21 its energy directed downward and fry the entire -- smoke
22 the entire radar area.
23    So if you can think how important that would be
24 in warfare where if you have a radar facility tracking
25 tanks, planes, munitions, everything else coming in, and

## Page 39

1 you could fry that, totally fry it instantaneously
2 without damaging it, without exploding it, by just
3 killing all the electronic equipment in there, you would
4 have two things. First you would knock out their
5 facility for test for finding you. And the second is
6 you would leave intact all the electronics so you could
7 go in and figure out what they were doing. Instead of
8 just blowing it up and having a bunch of rubble, you
9 could say oh, we just knocked it out. Okay, let's see
10 if we can rebuild your cell phone now and this is how it
11 works. So we know the capabilities of it.
12    So I knew that it was a very, very important
13 point to get the timing exactly precise to fire off this
14 device. Only a microwire would have done it. Because
15 you're talking about velocities and spinning at such a
16 speed. You're talking a spinning of maybe 16,000,
17 17,000 revolutions a minute as it comes out of the
18 barrel of a cannon. So you have all these gyroscopic
19 forces in place. And to have the timing to shoot that
20 thing off, it's the only thing that would make it work.
21    Q. Do you think that there was some other purpose
22 for the testing at Pax River?
23    A. I always questioned it at the time. And it
24 wasn't until maybe a couple of months ago when I
25 actually put all this together. And I think I sent you

## Page 40

1 an e-mail to that effect probably April of 2013 when I
2 actually reflected upon it.
3    You have to understand that after Hudson's demise
4 I lost an awful lot of money. I had loaned him about
5 $150,000 to buy equipment. I was given a promissory
6 note that claimed all this equipment belonged to me.
7 When it got into the bankruptcy court that promissory
8 note was voided. And it turned out that it belonged to
9 the court to dispose of it. So I lost $150,000 there,
10 probably $300,000 in salary, and about another $300,000
11 in rent for the building for that period of time.
12 So anything connected with with Curtis or Demod really
13 didn't have -- wasn't on the top of my agenda. I could
14 care less. I didn't care. I wanted to put it out of my
15 mind.
16    But in reflecting on it, in April -- Jim and I
17 had become friends since that period of time. And I
18 understood his trials and tribulations. And thinking
19 about it, it dawned on me that the real reason we were
20 there had nothing to do -- and the real reason Hudson
21 was even put in place had absolutely nothing to do with
22 a directed energy project. It had everything to do,
23 everything to do with Demodulation's technology. And I
24 believe it stemmed from, from where I sat, Cubic
25 Defense. Because Cubic might have known and might not

## Page 41

1 have known about Jim's technology before 2005. But if
2 they did, they would need some method of testing it
3 outside of the government.
4    And that's what I could never figure out. Why
5 were we there building something that the government
6 could build five times better, and quicker, and cheaper,
7 and make it work? Why did we get no support? Why did
8 all these Ph.D.s that came to this place -- and there's
9 a booklet with hundreds of them that I supplied you --
10 why did none of them when they looked at me and they
11 would ask me what did you make this out and I told them
12 a mixing bowl, and they say wait a minute, you have a
13 $500,000 contract to develop a directed energy weapon
14 and the antenna is a piece of mixing bowl that you
15 bought at Chef Central for $22? If you look at my
16 NAVSEA, P-1, I believe it's Paragraph 4, the bottom.
17 Read Paragraph 4.
18    Q. At some point in time did Mr. Birnbach advise you
19 that he was communicating overseas to a foreign
20 government?
21    A. In his many talks every morning he would go on
22 every subject under the sun. Every time we would talk I
23 would bring up the following subject: Curtis, we need
24 to pay the electric bill. We need to pay some rent. We
25 need to pay me. We need to pay the intern. We need to

Page 42

1    pay Richard Hines. Where are we going to get this money
2    from?
3         At one point in time in the spring 2006 he takes
4    -- we're in the office chatting. I'm saying we're
5    really running out of funds here. We've got to get
6    going. How are we going to do this? How are we going
7    to keep going? They're threatening to turn off the
8    electricity. Everybody is walking out. You've going to
9    get evicted. What's going on?
10        He said to me "Don't worry, funding is coming
11   instantaneously. Look at this." And he turns around
12   his computer. And his computer shows me the top of a
13   heading. Again, it's a letter in PDF or whatever. I
14   didn't scan -- my mind isn't that quick. I didn't
15   actually read the letter. But the top was from the
16   Minister of Defense for the State of Israel. It had the
17   Star of David up on top.
18        He scrolled down the letter. The last paragraph
19   is "Funding will be imminent." And it was signed by the
20   Minister of Defense, State of Israel.
21        He said to me "I have been in communication with
22   my friends in Israel. You're going to get your funding.
23   Not a problem."
24        Within weeks after that Cubic Defense -- I don't
25   know how, whether it's called a loan, a payment, or

Page 43

1    whatever they did, they gave Curtis a check for three
2    hundred and twenty-nine or twenty-six thousand dollars,
3    for which he paid all the electric bills and nothing
4    else, including no rent, no pay, no anything else. He
5    paid himself. He paid his wife. Didn't pay anybody
6    else.
7         About the same time Richard Hines quits, takes
8    him to court, gets a judgment for $46,000 against Hudson
9    Research and Curtis Birnbach.
10        Oh, as an aside to this, when Hudson signed a
11   lease, he signed it under "Hudson Research, Inc.," and
12   as a guarantor put himself down as the guarantor. And
13   he claimed he owned a big house on Pine Brook Boulevard
14   in New Rochelle worth $800,000, $900,000. So he was the
15   guarantor on the lease. As it turned out, he was
16   renting the house and being evicted from it.
17        We have just recently found out that the
18   viability and questionability of Hudson being an actual
19   corporation in New York state was questionable.
20   Q. Now, did you ever become aware whether Curtis or
21   Hudson Research had any contact with Alfred University?
22   A. Not specifically. But Curtis did take many, many
23   road trips. And he would tell me he's going to upstate
24   New York to talk with some very important people. Now,
25   whether it was for funding, which it probably was, or

Page 44

1    research or something else, I know he did go to Monroe,
2    New York several times to a friend of his that made
3    computer chips who was very big in -- they were all
4    Hasidic. Curtis was sort of an orthodox Jew. So he was
5    very religious.
6         So he made many trips up there. But he would
7    tell me he was always going up. He would say "I've got
8    to go to upstate New York tomorrow to look for funding."
9    Q. So you don't know specifically whether he
10   communicated with anyone at Alfred University?
11   A. That I wouldn't know.
12   Q. How about whether he was in contact with at
13   Corning, Inc.?
14   A. Again, that I wouldn't know specifically.
15   Q. But you never herd him talk about any sort of
16   contact like that?
17   A. Specifically, no. No, I can't say that I have.
18   Q. When did you first meet Frank Downs?
19   A. Right after Demod came in, probably in spring of
20   2006 Frank was brought in by Cubic Defense. And Frank
21   had some excellent credentials. He was a former Navy
22   SEAL. He was head of a research group for the Navy for
23   NAVSEA. Very nice man. He and I got along
24   tremendously.
25        By the way, if I may add. His purpose there was

Page 45

1    as project manager for the Mark II unit and for other
2    projects. I knew that he was very interested in Demod's
3    equipment and its capability. Because he asked us to do
4    a few things that were out of the norm for regular
5    operational stuff that we just weren't able to do.
6    One day he tells Curtis to go to Wal-Mart and buy
7    36-foot swimming pool, three feet deep, which he did.
8    And we set up inside the building. And when I asked
9    Frank what we're doing with it, he says he wanted to
10   test the receiving capability on low frequency pulses.
11   And that had absolutely nothing at all to do with
12   directed energy, but had everything to do with Demod's
13   equipment.
14        So it sort of dawned on me what he was -- you
15   know, what he was there to do actually, was to test
16   Demod's stuff, not really ours.
17   Q. As far as you know, was Mr. O'Keefe or anyone
18   else at Demodulation aware of the testing using the
19   pool?
20   A. I don't believe so. I think that was strictly
21   off on the side.
22   Q. Again, it wasn't your job to administer or comply
23   with any contracts between Hudson and Demod?
24   A. Absolutely not.
25   Q. You took your orders from Mr. Birnbach?

(Pages 42 to 45)

Page 46

1    A. From Hudson. And all I did was build what he
2  told me to build. And in cases took orders from Frank
3  Downs who told me the same thing, just build this or
4  make it work. Or from Howard Seguine, make it work.
5    MR. LIGHT: Thanks. I don't have any further
6  questions for Mr. Catanese. So thank you for your time.
7  The other lawyers in the room might.
8  CROSS-EXAMINATION BY MR. BEVELOCK:
9    Q. Just so we have it on the record. The subpoena
10 that was given to you.
11   A. Yes.
12   Q. It asked for certain documents. It's almost
13 halfway down the page.
14   A. All documents concerning -- this one?
15   MR. BEVELOCK: Yeah. Maybe we can mark the
16 subpoena for the record.
17   (P-5, Subpoena, marked for identification.)
18   Q. Did you produce any documents in response to or
19 give copies in response to that request to Mr. Light or
20 Mr. O'Keefe?
21   A. After this or before?
22   Q. Well, I was going to ask before if you said no.
23 But at either time?
24   A. Yeah. I've given them a lot of stuff, whatever I
25 had.

Page 47

1    Q. When did you do that; do you recall?
2    A. A couple months ago.
3    Q. P-1, the document that's been marked as P-1 --
4    A. Yes.
5    Q. -- is that a document that you gave to Mr. Light?
6    A. Yes. Yes, it is. That came from me, correct.
7    Q. Approximately what volume of documents would you
8  say you gave to Mr. Light?
9    A. Well, a lot of the stuff was redundant. A lot of
10 stuff was my notes, stuff like that. Probably pertinent
11 documents, maybe about an inch and a half, two inches
12 thick.
13   Q. Then nonpertinent documents were in addition to
14 that?
15   A. Hand notes, stuff of my stuff. The letters I had
16 sent to the Justice Department and stuff like that
17 claiming fraud on this guy's part. This guy was
18 frauding everybody.
19   Q. Okay. And then just I was a little bit confused
20 by the testimony.
21     Cubic Defense, that's a private company?
22   A. I think it's public.
23   Q. Or a public company?
24   A. Yes, a public company. Cubic Defense, I believe,
25 is a public second tier defense contractor.

Page 48

1  Lockheed-Boeing is first tier. Down to the second tier.
2    Q. That's a separate entity from Hudson Research?
3    A. That's correct.
4    Q. Mr. Birnbach is not an employee or officer or in
5  any way related with Cubic Defense?
6    A. I don't believe on paper, but the reality was
7  Cubic Defense was calling the shots. Cubic Defense,
8  Howard Seguine was in every other week or every week
9  continually. He would tell Curtis what to build and
10 what to concentrate on, and Curtis would concentrate on
11 that area.
12   Q. But Curtis or Mr. Birnbaum (sic) was not an
13 employee or an officer, to your knowledge?
14   A. I have no idea of their contractual relationship,
15 but I'm sure they had some kind of contractual
16 relationship.
17   MR. LIGHT: It's Birnbach.
18   MR. BEVELOCK: Birnbach, sure. I don't have any
19 further questions.
20   MS. Singh: I have no questions. But for the
21 record, to be clear, to the extent these documents that
22 were marked as exhibits, they have not been produced and
23 to the extent there are additional documents, I formally
24 request that they be produced.
25   MR. BEVELOCK: I join in that request.

Page 49

1    MR. LIGHT: Whatever you guys want. Do you want
2  me to copy them for you or do you want to come look at
3  everything?
4    MS. SINGH: Yeah, if you want to make a copy and
5  send it over, and Bates.
6    MR. LIGHT: I didn't get any documents in
7  response to the subpoena, but I absolutely did receive
8  documents beforehand, and I'll get them together and
9  make copies.
10   (Wherein the deposition is concluded at 11:33
11 a.m.)

Page 50

1         CERTIFICATE
2
3         I, RONDA L. REINSTEIN, a Certified Court Reporter
4    of the State of New Jersey, authorized to administer
5    oaths pursuant to R.S.41:2-2, do hereby certify that
6    prior to the commencement of the examination, ANTHONY
7    CATANESE, was sworn by me to testify to the truth, the
8    whole truth and nothing but the truth.
9         I DO FURTHER CERTIFY that the foregoing is a true
10   and accurate transcript of the testimony as taken
11   stenographically by and before me at the time, place and
12   on the date herein before set forth, to the best of my
13   ability.
14        I DO FURTHER CERTIFY that I am neither a relative
15   nor employee nor attorney nor counsel of any of the
16   parties to this action, and that I am neither a relative
17   nor employee of such attorney or counsel, and that I am
18   not financially interested in the action.
19
20
21
22
23   Ronda Reinstein
     RONDA L. REINSTEIN, CCR No. 30X100217800
24
25



## A

$150,000 40:5,9
$22 41:15
$260,000 10:2
$290,000 10:1
$300,000 40:10,10
$46,000 43:8
$500,000 41:13
$800,000 43:14
$900,000 43:14
a.m 1:10 22:7 24:15
   49:11
abandoned 31:15
ability 9:3 50:13
able 18:22 45:5
absolute 12:3
absolutely 9:1
   20:17,18 28:5
   33:25 34:18 40:21
   45:11,24 49:7
accepted 5:13
accurate 7:11 10:9
   50:10
acquainted 12:9
action 1:2 50:16,18
actual 38:7 43:18
ADC 3:8
add 44:25
addition 47:13
additional 29:5
   48:23
administer 45:22
   50:4
advise 41:18
advisor 12:13
afternoon 36:6
agencies 14:23
   16:16
agenda 40:13
agents 36:9
ago 39:24 47:2
agree 6:14
agreement 8:15
ahead 37:20,21
air 21:9,13 26:10
aircraft 21:14,16
   21:17,19
AL 1:6
Alamos 16:17

Alfred 2:12 43:21
   44:10
allow 8:16
allowed 24:17
alphabets 27:19
altered 3:5
aluminum 38:5
ambiguous 6:11
amount 10:2 20:13
amperage 20:24
amplifier 19:8,20
   20:11 29:20
amplify 19:17
and/or 15:10
anode 19:15
answer 5:22,23,24
   6:9 30:5
answered 6:1
antenna 20:12,22
   20:22 23:25 41:14
antennas 22:22
   27:4,5
ANTHONY 1:5 4:4
   50:6
anybody 28:14
   37:18 43:5
apparent 23:1
Apparently 15:12
apply 37:23
Approximately
   47:7
April 32:14 40:1,16
Ardec 32:25
area 9:11 15:8
   17:22 20:17 33:13
   33:16 38:22 48:11
areas 14:12
argument 25:25
arguments 25:13
   25:16
Army 9:24 11:25
   12:11 16:2 32:25
   37:4
arranged 24:2
arrangement 8:20
   10:17
arrived 22:6
Arsenal 11:25 33:1
   33:2,8

art 20:17
aside 43:10
asked 6:24 7:18
   34:11 36:20 45:3
   45:8 46:12
asking 27:12 35:10
aspect 11:10
assembly 37:24
assist 10:11
assume 5:25
attempts 36:14,15
attorney 2:16 37:3
   50:15,17
Attorneys 2:5,9,12
authorized 50:4
Avenue 2:8,11 7:10
   31:7 32:13
awarded 10:1
aware 8:18 11:16
   43:20 45:18
awful 40:4

## B

B 4:9
back 12:7 15:18
   17:18 18:18 26:2
   26:9 28:2,4 31:6
   31:23 33:16 34:3
   37:6
background 14:9
   20:9
backing 23:24 24:1
   29:20
backroom 12:19
bad 27:10,10
bankrupt 28:11
bankruptcy 28:21
   30:13,16,18,20
   31:2,5,13 32:13
   34:19 40:7
barely 27:24
barrel 39:18
base 22:8,9 33:13
   33:21,22 34:1,4
   37:5,13
based 6:1
basically 19:8
   32:15
Bates 49:5

beam 9:11,12 13:7
beautiful 24:8,8
behalf 7:16
believe 6:20 9:23
   10:1,24 11:6,15
   15:4 16:6,7 21:9
   28:5 30:21 31:23
   33:1 34:15 36:5
   37:11,14 40:24
   41:16 45:20 47:24
   48:6
belonged 16:1
   31:21,22 40:6,8
BENJAMIN 2:3
best 9:2 50:12
better 14:23 25:7
   41:6
BEVELOCK 2:14
   2:14 4:6 10:13
   15:2 29:2,5,8,24
   30:6 46:8,15
   48:18,25
beyond 13:15
big 13:2 19:20,24
   19:24,25 20:22
   43:13 44:3
bigger 26:25
biggest 23:5,5
bill 41:24
bills 17:2 43:3
Birnbach 7:21 8:23
   9:22 16:24 29:20
   33:19,19 41:18
   43:9 45:25 48:4
   48:17,18
Birnbaum 48:12
bit 12:7 15:11 16:6
   17:18 20:9 26:21
   28:9 47:19
black 20:17
bled 28:17
blessing 8:17
blood 20:1
blowing 39:8
board 16:18
bomb 36:10,21
book 20:19
booked 26:4
booklet 41:9

booths 22:20 24:17
   25:5
boss 7:21 27:11
bottom 13:17 26:20
   41:16
bought 41:15
Boulevard 43:13
bowl 41:12,14
box 1:24 32:24
boxes 33:17
break 25:3,11
brilliant 14:11
bring 12:7 13:20
   14:5 21:21 41:23
bringing 7:1
Brook 43:13
brought 6:21,24
   8:2 17:20 44:20
build 6:24 7:18,22
   8:12 10:22 11:7
   12:20,22,24,25
   13:16 14:21 20:20
   41:6 46:1,2,3 48:9
building 12:19 14:7
   16:19 18:2 31:9
   31:14,15 32:17
   33:6 34:22 40:11
   41:5 45:8
built 7:23 11:22,24
   16:14 19:3
bulbs 23:8,9,22
bunch 8:5 27:3
   39:8
bunkers 26:6
burning 20:16
bury 35:2,3,20
business 9:5 10:5
   11:14 12:14
buy 40:5 45:6

## C

C 2:1 5:3 50:1,1
California 15:12
call 34:23 35:9
   37:24
CALLAGY 1:14
   2:3
called 6:16,22
   11:17,23 17:2

19:7,14 29:21
42:25
**calling** 25:20 48:7
**cannon** 34:10 38:14
39:18
**capabilities** 7:19
39:11
**capability** 34:13
45:3,10
**capable** 20:15 34:8
**capacitors** 13:11
**capacity** 7:12
**car** 22:4 33:7,12,12
33:15,16,17 34:3
**care** 34:2 40:14,14
**carpet** 23:12
**case** 6:8 30:20,22
**cases** 46:2
**Catanese** 1:5 4:4
5:7 30:3 32:8
46:6 50:7
**cathode** 19:15
**CCR** 1:11 50:23
**cell** 9:16 39:10
**center** 19:16 29:13
**Central** 41:15
**Centre** 1:14 2:4
**certain** 46:12
**certified** 1:12,23
3:2,2 50:3
**certify** 50:5,9,14
**cetera** 25:22,23
**chatting** 42:4
**cheaper** 41:6
**check** 43:1
**Chef** 41:15
**chill** 26:21
**chips** 44:3
**Christmas** 6:21
17:19 33:5
**Christmastime**
6:20
**circuitry** 37:18
**City** 29:13
**Civil** 1:2,17
**claimed** 40:6 43:13
**claiming** 47:17
**claims** 30:24
**clandestine** 15:14

**cleaning** 34:22
**clear** 48:21
**clearance** 25:6
**clearances** 21:23
**close** 38:16
**closed** 28:22
**coded** 11:4
**collect** 17:2
**collected** 28:13
**college** 17:8
**come** 16:16,18 17:8
18:3 26:23 27:6
28:15 33:3,6
35:15,19 36:11,17
49:2
**comes** 20:7 26:11
39:17
**comic** 13:25
**coming** 23:23 38:25
42:10
**command** 24:21,22
**commencement**
50:6
**Commencing** 1:10
**commission** 9:15
**committed** 37:12
**communicated**
44:10
**communicating**
41:19
**communication**
42:21
**company** 6:16,17
7:6,9 9:6 28:17,22
30:15 47:21,23,24
**completion** 12:2
**comply** 45:22
**component** 19:5
**computer** 42:12,12
44:3
**concentrate** 48:10
48:10
**concerning** 46:14
**concluded** 49:10
**cone** 32:22 33:20
34:11,13,25 37:24
38:4,7
**ConEd** 28:18
**confidential** 8:25

**confidentiality**
8:19
**confused** 47:19
**confusing** 6:11,13
10:14
**conjunction** 16:12
**connected** 40:12
**connections** 12:15
**CONNELL** 2:7
**considerably** 38:8
**considered** 3:1
**contact** 37:7 43:21
44:12,16
**contacted** 36:5
**containing** 20:16
**continual** 28:16
**continually** 17:14
48:9
**continue** 17:14
26:12
**contract** 9:7,20,23
10:1 41:13
**contracted** 9:18,18
21:20
**contractor** 9:24
15:13 47:25
**contracts** 45:23
**contractual** 48:14
48:15
**control** 25:5
**conversation** 6:2
18:12,18
**conversations**
18:15
**cooking** 27:9
**cool** 25:4
**copies** 46:19 49:9
**copy** 3:1 9:20 49:2
49:4
**corner** 23:10,18
**Corning** 1:6 2:9
44:13
**corporation** 6:23
7:2 15:10 43:19
**correct** 5:11 7:5
30:16,17,19,25
31:1,3,11,12 47:6
48:3
**counsel** 50:15,17

**County** 36:9,21
37:2
**couple** 31:20 39:24
47:2
**coupled** 29:21
**course** 27:3 31:5,6
35:23
**court** 1:1,12,23 3:2
40:7,9 43:8 50:3
**crack** 38:17
**crazy** 36:8
**credentials** 44:21
**crime** 37:11
**CROSS** 4:3
**CROSS-EXAMI...**
46:8
**Cubic** 6:23 12:6,11
13:20 14:14,14
15:6,7,7,10,10
16:12,12,19 17:14
24:4,5 35:10
40:24,25 42:24
44:20 47:21,24
48:5,7,7
**Cubic's** 8:17
**Curtis** 7:21 8:23
10:24 11:5 12:9
12:18 16:24 18:7
18:16 19:5 20:18
22:3,4 25:12,25
26:1 28:4,10,16
28:20 29:20 30:12
32:17 33:6,10,12
33:13,16,19,19
34:5,23 38:2
40:12 41:23 43:1
43:9,20,22 44:4
45:6 48:9,10,12
**cut** 24:14

**D**

**D** 2:3 4:1
**damage** 21:18
32:16
**damaging** 39:2
**damn** 23:23
**Dan** 33:8,10,13,14
**dangerous** 13:10
**Daniel** 32:25

**dark** 23:22
**date** 1:9 28:7 50:12
**dates** 15:23 28:7
**David** 42:17
**dawned** 40:19
45:14
**day** 13:19 17:1
24:13 26:4 28:2
45:6
**days** 18:7,7
**December** 17:19
**declare** 33:23
**decoded** 11:4
**decree** 30:20
**deep** 45:7
**Defendant** 2:9,12
2:16
**Defendants** 1:7
**defense** 12:7,12
14:14 15:7,7,10
40:25 42:16,20,24
44:20 47:21,24,25
48:5,7,7
**demise** 40:3
**Demod** 8:2 10:17
29:25 31:21,22
33:5 40:12 44:19
45:23
**Demod's** 45:2,12
45:16
**Demodulation** 1:3
6:17 7:12,17 8:15
8:19 10:6,10 11:9
11:13 17:24 18:21
34:17 45:18
**Demodulation's**
7:19 10:12,18
11:6 34:14,16
38:11 40:23
**Department** 9:24
37:8,11 47:16
**deposition** 1:4 5:9
5:10,21 49:10
**describe** 8:1 14:8
15:9,19 28:25
**description** 4:10
29:16
**design** 14:17 19:13
20:1,10,11,12

designed 7:22 23:2
  29:20 38:18
designing 20:10
desk 17:1
destroy 9:17
detail 29:17
determine 22:24
detonator 32:22
  37:16,17,25
develop 17:11
  41:13
developing 11:9
development 11:8
  34:13
device 9:12,14,25
  39:14
difference 29:18
different 14:12,12
  14:22 16:16,17
  25:15
difficult 20:11
dig 35:2
dimension 38:6
DIRECT 4:3 5:6
directed 9:8,11
  13:23 16:14 38:21
  40:22 41:13 45:12
directly 25:21
  38:19
director 15:6 25:20
DIRECTV 20:23
discharge 19:15
discharged 23:15
  30:19
discussed 7:20
discusses 29:17
discussions 12:19
dish 20:22
dispose 34:24 40:9
disposed 35:1
District 1:1,1 37:2
document 29:2,23
  29:25 30:2 47:3,5
documents 29:5,24
  30:2,6 46:12,14
  46:18 47:7,11,13
  48:21,23 49:6,8
dog 36:7
doing 6:4 14:12,16

17:15 22:15,16,19
  22:23 25:10 27:7
  27:16,23 39:7
  45:9
dollars 10:2 43:2
door 35:22
Downs 16:10 17:13
  20:7 21:20 24:2
  25:19,19 29:12
  44:18 46:3
downward 38:21
Dr 7:20
drive 19:19 33:21
driving 33:12
drove 22:4 34:3
dry 28:17
duly 5:4
dummy 38:4

          E
E 2:1,1 4:1,9 5:3,3
  50:1,1
e-mail 40:1
Eagle 2:11
East 2:12
easy 20:10,11
ed 34:23
effect 40:1
eight-foot 23:8
either 46:23
elaborate 12:4
electric 41:24 43:3
electricity 9:14
  19:19 23:11,15
  42:8
Electro-Magnetic
  9:9
electron 19:8,14
electronic 3:5 9:11
  23:21 29:21 38:18
  39:3
electronics 39:6
elevated 26:10
EMP 9:8 34:7
employed 7:3
employee 7:13 48:4
  48:13 50:15,17
encoded 8:6
ended 28:2

ends 19:12
energy 9:8 13:23
  16:15 20:13,15,16
  24:8,10 38:21
  40:22 41:13 45:12
engaging 10:11
Engineering 7:8
entered 8:15,19
  30:20
entire 38:21,22
entity 48:2
equipment 6:25
  7:23 8:13 10:22
  11:6,7,22 12:1,23
  12:25 13:2,9,14
  13:16 14:21 16:19
  17:16,24,25 18:4
  18:5,20,21,22,23
  18:23 19:6,25
  20:8 21:6,21,24
  21:25 22:5,10,24
  23:2,7,21 24:16
  24:19,21,24 25:4
  25:12 26:2,11,15
  26:16 27:10,24
  32:18,21 33:9
  37:4,5,12 38:3,12
  39:3 40:5,6 45:3
  45:13
especially 23:13
ESQ 2:3,7,11,14
ESQS 2:10
estate 30:25
estimate 22:17
estimating 6:2
et 1:6 25:22,22
evaluate 6:25
evaluating 16:19
eventually 30:18
everybody 12:13
  22:21 24:9,16
  25:6 26:7 42:8
  47:18
evicted 28:20 42:9
  43:16
eviction 28:17,19
exactly 6:13 7:15
  34:3 39:13
examination 5:6

50:6
excellent 27:16
  44:21
exchanged 8:21
exhibits 48:22
existed 31:3
experience 14:9
expertise 12:24
  13:18 14:6
exploding 39:2
extent 48:21,23
extremely 13:10
  38:12,12
eyes 14:2

          F
F 50:1
facility 6:22 9:22
  11:17 17:21 21:14
  23:6 38:19,20,24
  39:5
facsimile 3:4
fact 38:4
failed 24:25 25:1,2
failing 27:24
failure 12:3,4 15:21
  24:1,16 25:13
  26:13
fairly 6:15
fall 28:6,18 37:1
familiar 6:17,19
fancy 19:24
far 8:7 9:2 10:4,9
  10:16 31:2 45:17
fast 17:4
favor 34:23
FBI 36:6,8,22 37:7
  37:9,10
FedEx 33:1
feet 17:22,23 19:20
  23:19,19 26:10
  32:17 45:7
fiasco 29:14
field 9:13 26:24,25
figure 34:6 38:3
  39:7 41:4
filed 30:12,16
filled 34:2
final 30:19

finally 28:11
financially 50:18
find 6:10 26:7
  31:16,19 32:12
finding 39:5
fine 6:3 8:5 27:23
fingers 23:11 37:18
finish 26:4
finished 28:4
fire 24:17 24:21,21
  25:22 39:13
fired 34:9 38:14
firing 23:18 24:15
first 6:19 11:24
  12:8 18:2,10 21:8
  29:17 31:24,25
  39:4 44:18 48:1
fit 38:7
five 23:9,17 36:13
  41:6
fixing 24:25
fixture 23:15
Flash 13:24 14:1
flicker 23:13
FLINN 2:10
flood 32:14,15
  34:23
floor 17:22 18:1,2,5
  35:24
fluorescent 23:8,8
  23:14,18
FOLEY 2:7
follow 25:23,24
  30:4
following 22:6 34:6
  41:23
follows 5:5 33:13
football 26:25
forces 34:9 39:19
foregoing 50:9
foreign 41:19
forgot 35:7
form 10:5,13 11:13
formally 48:23
former 44:21
forms 37:14
forth 50:12
forum 7:25
foul 28:5

**found** 34:20 43:17
**four** 13:5 19:20,22
    22:13 23:9,17,19
    23:19,21 36:13
**four-and-a-half**
    17:10
**four-feet-by-eigh...**
    13:4
**four-foot** 29:19
**four-man** 16:24
**Frank** 16:10,11
    17:13 20:7 21:20
    24:2 25:19,19,21
    26:3,11,17 27:11
    29:12,14 44:18,20
    44:20 45:9 46:2
**frankly** 12:23
    13:15 14:22 26:17
**fraud** 47:17
**frauding** 47:18
**French** 23:23
**frequency** 45:10
**friend** 44:2
**friends** 40:17 42:22
**front** 30:1 33:19,20
    36:8
**fry** 9:15 23:20
    38:21 39:1,1
**function** 23:2
**funding** 42:10,19
    42:22 43:25 44:8
**funds** 42:5
**further** 11:9,11,14
    12:7 13:21 26:14
    46:5 48:19 50:9
    50:14

**G**
**game** 11:7
**gamut** 8:10
**garage** 35:1,6,17
    36:13
**GAROFALO** 2:10
**GARRITY** 2:10
**general** 29:15
**generally** 29:15
**generate** 9:13
**generator** 11:24
    18:24 21:16

**gentleman** 6:22
**getting** 25:13,16
    27:15,22,24 35:5
    36:16
**give** 46:19
**given** 12:23 29:14
    40:5 46:10,24
**go** 5:19 17:18 18:4
    18:18 19:21 20:4
    24:12,17 25:7,8
    26:6 35:22 37:20
    37:21 38:18 39:7
    41:21 44:1,8 45:6
**goal** 27:1,1
**goes** 10:9 25:17,17
**going** 5:25 7:22
    10:19 12:20,20
    13:9 16:22 17:4
    18:13,14 19:1
    20:7,12,14 21:3
    23:12,20 25:5,8
    25:11,18,22 27:8
    27:10 28:20 33:7
    35:13 36:8 38:14
    42:1,6,6,6,7,8,9
    42:22 43:23 44:7
    46:22
**good** 5:7,8 17:6
    27:22
**Gordon** 13:24 14:1
**gotten** 28:11
**government** 9:7,18
    9:21 13:22 14:23
    14:25 15:14 17:11
    21:13 33:25 37:14
    41:3,5,20
**GRAHAM** 2:10
**gravitational** 34:9
**great** 12:15
**GREGORY** 2:14
    2:14
**ground** 25:1
**group** 44:22
**guarantor** 43:12,12
    43:15
**guess** 31:6 37:24
**guessing** 6:3
**Guitterez** 32:25
    33:8,15 34:1

**guns** 14:1,2
**guy** 16:10 25:20
    47:17
**guy's** 47:17
**guys** 16:16 17:4
    26:23 27:2,6,18
    27:22 36:21 49:1
**gyroscopic** 39:18

**H**
**H** 4:9 5:3
**half** 14:24 19:4
    28:8 47:11
**halfway** 46:13
**hand** 33:18 47:15
**handing** 32:8
**hands** 33:18
**Hanover** 2:12
**happen** 23:11
**happened** 15:20
    24:13
**Hasidic** 44:4
**he'll** 30:5
**head** 16:21 44:22
**heading** 42:13
**heads** 33:24
**hear** 38:17
**heard** 35:15
**heated** 25:13,16
**hell** 16:22 25:10
    27:18 35:25 36:22
**help** 6:24
**herd** 44:15
**hesitation** 12:3
    13:8 18:7
**Hey** 27:7
**high** 13:4,9 19:23
    20:24
**highly** 15:15
**Hines** 17:3,7 42:1
    43:7
**hired** 12:10
**hold** 20:25 24:24
**holding** 20:15
**hole** 35:3
**home** 34:5
**hop** 33:7
**hopefully** 5:22
**hour** 38:16

**house** 35:19 36:8
    43:13,16
**How's** 27:8
**Howard** 6:23 12:12
    12:12,13,17,18
    14:8,10,16,16,25
    15:3 35:9,11 46:4
    48:8
**Howitzer** 32:22
    34:8
**Hoyt** 7:10 31:7
    32:13,16
**Hudson** 7:3,13,16
    8:2,14,18 9:5,21
    10:5,10,11,17
    11:13,16 19:5
    30:15 31:3,10,13
    33:4 34:17 37:23
    40:20 43:8,10,11
    43:18,21 45:23
    46:1 48:2
**Hudson's** 40:3
**huge** 13:11,13
**hull** 34:7
**hundred** 32:15
    43:2
**hundreds** 41:9
**hut** 27:2

**I**
**idea** 34:1 48:14
**identical** 33:18
**identification** 5:2
    32:3,5,7 46:17
**II** 1:14 2:4 11:23
    15:22,25 16:4
    18:2 19:3,8 20:3
    29:16,19,19 45:1
**imagine** 9:10 13:2
    13:6 20:14,21
    38:13
**immediately** 15:22
    28:21
**imminent** 42:19
**impedance** 21:1
    23:25
**important** 38:23
    39:12 43:24
**impressive** 19:6

**inch** 47:11
**inches** 47:11
**including** 18:13
    24:4 43:4
**incoming** 19:18
**Incorporated** 1:6
    2:9
**induce** 9:13
**inert** 37:16
**information** 8:6,10
    8:21,24 11:1,3
    15:14
**ink** 3:2
**inquiry** 37:7
**inside** 9:14 13:5,12
    19:12 32:17 34:7
    38:3 45:8
**insinuated** 35:2
**instant** 13:12
**instantaneous**
    23:13
**instantaneously**
    39:1 42:11
**instructed** 6:9 8:23
**intact** 39:6
**intelligent** 12:14
**intense** 24:23
**intent** 10:5
**interested** 22:15
    45:2 50:18
**interesting** 31:16
    34:12
**intern** 17:8 18:9
    22:3,4 26:10,22
    41:25
**intern's** 24:20
**internal** 37:17
**interrupt** 15:2
**involved** 13:20
    36:16 38:1
**involving** 7:12
**Israel** 42:16,20,22
**issue** 23:5
**issues** 23:3,4
**items** 19:16 31:20
    33:3 34:20 36:10

**J**
**J** 2:14,14

**JAMES** 2:18
**Jersey** 1:1,12,15,18
  1:24 2:5,8,12,15
  3:3 33:1 50:4
**Jew** 44:4
**Jim** 17:19 18:3
  35:18 40:16
**Jim's** 17:23 18:20
  41:1
**job** 14:23 22:8
  24:20,20,23 25:1
  25:24 45:22
**join** 48:25
**judgment** 43:8
**July** 1:9
**junk** 34:24
**Justice** 37:8,10
  47:16

**K**

**keep** 8:24 26:15,16
  42:7
**key** 17:13
**kidding** 36:3
**kill** 13:11
**killing** 39:3
**kind** 12:24 18:25
  28:15 48:15
**kindly** 5:13
**kinds** 23:21
**King** 7:20
**knew** 12:14 14:4
  18:22 20:17,18
  22:13 23:3 24:4
  24:11,16 39:12
  45:2
**knock** 39:4
**knocked** 39:9
**know** 5:23,23,24
  6:4,11,13 9:2 10:4
  10:8,16 11:20
  13:21 14:2,16
  15:1,5,9,11,19
  17:11 23:10,23
  24:2,12 25:10
  27:9,11 28:23
  31:2 37:4 38:8
  39:11 42:25 44:1
  44:9,11,14 45:15

45:17
**knowledge** 6:1 10:7
  13:1 48:13
**known** 40:25 41:1
**knows** 25:12

**L**

**L** 1:11 2:7 50:3,23
**label** 32:24,24 33:2
**lamp** 23:12
**landlord** 28:20
**large** 21:16,23
**larger** 23:17
**lasted** 28:8
**late** 15:24 28:6
  36:25 37:9
**law** 1:14 2:3,14 5:5
**lawyers** 6:6 46:7
**learn** 38:10
**learned** 14:10
**lease** 43:11,15
**leased** 31:10
**leave** 16:2 31:14
  33:11 39:6
**leaving** 26:2
**left** 31:21 32:20
**let's** 39:9
**letter** 37:2,9,10
  42:13,15,18
**letters** 47:15
**level** 11:11 38:16
**licensed** 3:3
**life** 20:1
**light** 2:3 4:5 5:6
  23:8,8,13,16,22
  29:4,7 30:4,8 46:5
  46:19 47:5,8
  48:17 49:1,6
**lighting** 13:7 21:14
**lightning** 9:11,12
  9:17 21:17,18
**limit** 33:21
**line** 13:17 17:17
  18:16
**lined** 22:22
**little** 12:7 14:6
  15:23 16:6 17:18
  20:9 26:6,21,21
  27:2,2,9,25 28:9

38:15 47:19
**Livingston** 2:8
**LLC** 1:14 2:3,14
  31:8
**LLP** 2:7
**loan** 42:25
**loaned** 40:4
**located** 7:9
**LOCATION** 1:14
**Lockheed-Boeing**
  48:1
**logical** 38:10
**long** 19:20 29:19
**longer** 31:3
**look** 20:21 25:7,8
  27:22 35:13 41:15
  42:11 44:8 49:2
**looked** 19:9 26:17
  27:5,13 41:10
**looking** 24:6 33:24
**Los** 16:17
**lost** 40:4,9
**lot** 6:2 11:5 12:16
  12:16,18 14:11
  17:16 19:21 24:25
  25:14 26:5 31:15
  37:17 40:4 46:24
  47:9,9
**love** 37:18
**loved** 18:13,17
**low** 45:10
**lucid** 6:15
**lunch** 25:11 26:21

**M**

**machine** 23:24
**machined** 38:5
**machining** 19:21
**machinist** 17:3,7
  18:9 28:15
**Mack-Cali** 1:14 2:4
**Madison** 2:15
**magnetic** 9:13
**main** 2:15 15:12
**major** 32:14
**making** 21:17
**Mamaroneck** 5:4
  7:10 31:7 32:15
**man** 12:14,15

13:21 14:11 17:10
  25:18 44:23
**manager** 14:14
  16:11 45:1
**mark** 11:23,23,24
  12:11 15:21,22,24
  15:25 16:1,4 18:2
  19:3 20:3 29:16
  29:16,17,18,19,19
  31:24,25 45:1
  46:15
**marked** 5:1 28:24
  32:2,4,6,8 46:17
  47:3 48:22
**market** 10:20
**Maryland** 21:11,12
  21:12,13
**match** 20:12 21:1
**material** 7:1 8:4,5,7
**matter** 3:4
**Maywood** 1:24
**mean** 24:7 27:14
**means** 3:5 13:15
**meant** 19:17
**mechanic** 8:8,8
**media** 3:5
**meet** 44:18
**member** 36:9
**memory** 20:20
**met** 15:16
**method** 41:2
**Metropolitan** 1:23
**microwire** 37:23
  38:11 39:14
**mid-summer** 35:9
**miles** 38:16
**military** 34:1 37:5
  37:13
**millimeter** 32:22
  34:8
**milling** 22:20 26:20
**mind** 40:15 42:14
**Minister** 42:16,20
**minus** 19:22
**minute** 15:2 16:20
  38:19 39:17 41:12
**minutes** 24:19
**mixing** 41:12,14
**Monday** 1:9

**money** 14:24 28:15
  35:14 40:4 42:1
**Monroe** 44:1
**month** 28:8
**months** 28:8 32:19
  39:24 47:2
**mood** 28:5
**morning** 5:7,8 18:8
  22:6 36:7,18
  41:21
**move** 28:23
**munitions** 38:25
**MURPHY** 2:10

**N**

**N** 2:1 4:1 5:3,3,3
**name** 15:3 16:10
  17:3
**naval** 21:9,13 29:12
**NAVSEA** 4:11 5:1
  16:11 20:3 41:16
  44:23
**Navy** 16:10 21:21
  21:22 44:21,22
**need** 8:24 26:14
  41:2,23,24,25,25
  41:25
**needed** 18:3
**neighborhood**
  38:15
**neither** 50:14,16
**never** 28:12 41:4
  44:15
**New** 1:1,12,15,18
  1:24 2:5,8,12,15
  3:3 5:4 7:10 28:4
  33:1 43:14,19,24
  44:2,8 50:4
**nice** 12:14 37:6
  44:23
**NJ** 3:7
**nonpayment** 28:19
**nonpertinent** 47:13
**noon** 25:11,25
**norm** 45:4
**nose** 32:22 33:20
  34:11,12,25 38:4
  38:7
**notch** 15:17

note 40:6,8
notes 17:6 47:10,15
notice 28:17,19
NSA 27:21
number 4:10 22:17

**O**

O 5:3
o'clock 18:8 24:15
  28:3 36:7,18
O'Keefe 2:18 7:20
  17:20 31:23 35:18
  45:17 46:20
oaths 50:5
obey 33:21
object 6:7
objected 25:7
Objection 10:13
obviously 35:6
October 10:3
office 2:14 15:12
  18:11 42:4
officer 48:4,13
OFFICES 1:14 2:3
oh 14:18 39:9 43:10
okay 10:16 15:18
  17:7 21:6 24:15
  25:10 26:18 27:8
  27:22 29:10,22
  30:11 39:9 47:19
old 13:25
older 12:16
once 18:1 36:20,21
open 35:22 36:18
opened 18:8
opens 33:15
operational 45:5
order 18:23
orders 45:25 46:2
organizations
  16:17
orthodox 44:4
oscilloscopes 22:22
  24:7
output 22:24 25:22
  27:25
outside 41:3
overall 11:7
overhead 38:20

overheating 24:17
overseas 41:19
owned 31:7,8 43:13

**P**

P 2:1,1
P-1 4:11 5:1 28:24
  41:16 47:3,3
P-2 4:12 32:2,23
  33:18 34:21
P-3 4:13 32:4,22
  33:18,20 37:17
P-4 4:14 32:6,21
  35:23 38:4
P-5 4:15 46:17
P.O 1:24
pack 26:2
Packed 28:3
padlock 33:15
page 4:10 20:20
  29:17 46:13
paid 28:11,12 43:3
  43:5,5
Panama 29:13
paper 48:6
paperwork 34:2
parabolic 20:22
paragraph 29:18
  41:16,17 42:18
parameters 11:2
Paramus 1:15 2:5
pardon 23:22
part 10:25 11:6
  29:2 47:17
participate 21:4
participated 11:17
parties 50:16
partner 31:8
patch 26:11
patented 19:7
pattern 24:8,9,9
Pax 11:17 15:18
  20:5,6,8 21:5,7,8
  21:9 22:6 24:3,12
  24:13 28:23 29:14
  30:11 39:22
pay 41:24,24,25,25
  42:1 43:4,5
payment 42:25

PDF 42:13
penetrate 14:2
penny 28:13
people 15:16 22:12
  22:18 25:14,15
  28:11 43:24
perfected 16:8
period 5:21 16:5
  30:12 40:11,17
permitted 34:16
personal 8:7
pertinent 47:10
Ph.D.s 16:17 24:5
  41:8
phone 9:16 39:10
Photocopy 4:12,13
  4:14 32:2,4,6
Photograph 4:12
  4:13,14 32:2,4,6
photographic
  20:19
photographs 36:5
physical 9:20
physically 7:23
  9:12 29:14
Picatinny 11:25
  12:1 16:2 33:1,8
  33:10,14
pick 33:9 35:15
  36:10
piece 12:1 13:2,9
  13:13 14:21 19:6
  19:9,10,10,15,25
  20:25 21:21,24,24
  24:24 37:24 38:12
  41:14
pieces 11:22 31:23
  32:21 37:3,12
Pine 43:13
pipe 19:10,11
place 8:16 16:21
  22:11,23 27:4,4
  28:15,20 39:19
  40:21 41:8 50:11
places 33:17
Plaintiff 1:4 2:5
plan 11:8
planes 38:25
plans 12:23

platform 10:23
  11:3 16:3,14 26:9
  26:9,19
platforms 7:18
player 17:13
players 16:9
please 5:24 6:8,11
  10:20 11:20 12:4
  15:9,18 17:16
  28:1,25
plugged 13:6
point 6:6 10:4
  16:15 39:13 41:18
  42:3
Police 36:9
politics 18:15
pool 45:7,19
popping 27:4
porcupine 27:5
position 7:6 8:12
positive 28:6 38:1
possession 33:4
  34:20
post 27:1,1
potential 18:21
power 18:25 20:10
  34:7
Practice 1:17
precise 39:13
prepared 3:7
present 2:17 15:20
  21:4 22:18
president 7:7 16:24
pretty 24:23
prime 9:24
prior 50:6
private 47:21
probably 16:4 19:4
  19:13,20 33:6
  37:4 38:14,16
  40:1,10 43:25
  44:19 47:10
problem 12:22
  14:15 20:9 23:5
  35:4 36:11 42:23
procedure 1:17
  24:18
produce 9:8,19
  19:18 20:15,25

23:20 46:18
produced 29:24,25
  30:3,6,9 48:22,24
producing 20:23
  29:6
production 19:24
  19:25 29:3
programming 11:1
progress 38:9
project 12:8,11
  14:14 15:22 16:1
  16:1,4,9,11,13
  18:6 21:23 40:22
  45:1
projectile 32:21
projects 13:23 18:1
  45:2
promissory 40:5,7
prompted 32:17
proper 13:17
properly 35:1
property 31:14,17
  32:12 33:25 37:14
proposed 11:5
protocol 25:23
public 47:22,23,24
  47:25
pull 20:20 27:11
pulse 9:9,14 11:24
  18:24
pulses 45:10
purpose 8:3 10:16
  39:21 44:25
pursuant 1:17
  34:16 50:5
put 9:15 19:21
  20:13 21:16 23:9
  24:7 26:1 33:20
  34:7,25 38:4
  39:25 40:14,21
  43:12
putting 18:24
PVC 19:10,11

**Q**

quarter 22:11
question 5:23,25
  6:7,14,15 13:19
  14:5

| | | | | |
|---|---|---|---|---|
| question-and-ans... 5:21 | **Red** 33:2 | 43:11,21 44:1,22 48:2 | **samples** 31:22 | 24:18,21 25:21 45:8 50:12 |
| **questionability** 43:18 | **REDIRECT** 4:3 | **Research's** 10:5 | **Sandy** 16:25 | **sets** 23:16 |
| **questionable** 43:19 | redundant 47:9 | reset 24:22 | **SARIT** 2:11 | **setting** 22:10 |
| **questioned** 39:23 | reference 38:6 | respect 12:16 | sat 35:17 40:24 | **seven** 18:6 |
| **questions** 5:22 6:10 | referred 20:5 | **response** 5:16 30:8 | saw 8:8 13:24 | **severe** 32:16 |
| 29:22 30:5 46:6 | refire 24:22 | 30:9 46:18,19 | saying 37:6,11 42:4 | **sewer** 19:10,11 |
| 48:19,20 | reflected 40:2 | 49:7 | says 20:7 24:9 | **shady** 15:23 |
| **quick** 42:14 | reflecting 40:16 | rest 22:14 24:13 | 26:12 28:1 32:25 | **shake** 16:21 |
| **quicker** 41:6 | regard 7:16 8:20 | result 30:18 | 45:9 | **shed** 27:2 |
| **quite** 18:6 21:23 | 37:23 | results 24:6,7 27:16 | scale 23:17 | **shell** 32:22,23,23 |
| 22:8 23:1 | regarded 15:15 | 27:23 | scan 42:14 | 33:20 34:8 35:23 |
| **quits** 43:7 | regular 45:4 | revolutions 39:17 | scenario 38:13 | 38:14,17 |
| | **REINSTEIN** 1:11 | **Richard** 17:3,7 | screaming 26:3 | **shells** 34:24 35:10 |
| **R** | 50:3,23 | 42:1 43:7 | screens 25:9 | **shipped** 35:14 |
| **R** 1:14 2:1,3 50:1 | related 48:5 | rid 36:14,14 37:1 | scrolled 42:18 | **shipping** 32:24 |
| **R.S.41:2-2** 50:5 | relationship 10:17 | ride 33:7 | sea 38:16 | **shit** 23:22 |
| **radar** 38:18,22,24 | 11:12 34:17 48:14 | right 6:21 15:25 | **SEAL** 44:22 | **shoot** 39:19 |
| **radio** 19:17 | 48:16 | 16:4,17 17:19 | Sealed 19:23 | **shop** 12:12 14:6 |
| **ran** 14:15 | relative 50:14,16 | 20:6 23:25 31:7 | **SEAN** 1:14 2:3 | 16:18,24 17:10,20 |
| **range** 13:10 21:15 | release 38:20 | 34:21 44:19 | season 17:9 | 18:19 35:18,20,22 |
| **ray** 14:1,2 | religion 18:15 | river 11:18 15:18 | seat 33:21 | 35:24 36:19 38:5 |
| **read** 8:6 20:19 | religious 44:5 | 20:5,6,8 21:5,7,8 | secluded 33:13 | **Shorthand** 1:23 |
| 41:17 42:15 | remained 32:23 | 21:9 22:6 24:3,12 | second 11:23 17:22 | **shot** 19:24 |
| **ready** 7:24 10:22 | remember 13:24,25 | 24:13 28:23 29:15 | 17:25 18:4 32:23 | **shots** 25:20 48:7 |
| 24:21 29:1 33:11 | 36:1 | 30:12 39:22 | 39:5 47:25 48:1 | **show** 18:8,10 28:24 |
| **real** 40:19,20 | remove 32:18 | road 1:15 2:4 43:23 | secretary 16:25 | **showed** 9:23 |
| **reality** 12:6 48:6 | rent 22:1 28:12 | Rochelle 43:14 | security 21:22 | **shown** 7:19 34:20 |
| **really** 14:6 16:23 | 40:11 41:24 43:4 | Rock 2:11 | 33:16,22 | **shows** 42:12 |
| 18:1 22:14 38:1 | renting 43:16 | **RONDA** 1:11 50:3 | security-wise 22:9 | **sic** 48:12 |
| 40:12 42:5 45:16 | repair 26:15 | 50:23 | see 9:20 16:23 | **side** 13:7 45:21 |
| **realm** 13:21 | rephrase 6:14 | roof 20:23 | 18:21,25 21:18 | **sideline** 17:21 |
| **reason** 14:21 40:19 | reply 37:6 | room 5:25 6:7 7:24 | 25:5 27:1 29:18 | **signal** 19:18 |
| 40:20 | report 4:11 5:1 | 17:24 46:7 | 35:23 38:4 39:9 | **signed** 3:2 42:19 |
| **rebuild** 39:10 | 29:12 | Roseland 2:8 | Seguine 6:23 12:12 | 43:10,11 |
| **recall** 47:1 | Reporter 1:12 3:3 | rough 27:9 | 15:4 35:9 46:4 | **simple** 8:8 |
| **receipt** 36:20 | 50:3 | rubble 39:8 | 48:8 | **Singh** 2:7 48:20 |
| **receive** 49:7 | Reporters 1:23 | **RUKHSANAH** 2:7 | Seguine's 14:8 | 49:4 |
| **received** 5:10 22:25 | Reporting 1:23 | **Rule** 3:7 | sell 10:19 | **sit** 16:21 18:17 |
| **receiver** 19:1 | represented 16:10 | rules 1:17 5:19 | send 49:5 | 23:22 |
| **receiving** 19:1 | 30:22 | run 21:13 | sensing 8:10 | **site** 25:1 |
| 45:10 | request 46:19 | running 18:1 26:15 | sensitive 38:12 | **sitting** 23:18 26:22 |
| **receptionist** 16:25 | 48:24,25 | 26:16 42:5 | sent 12:12 37:6,9 | 26:22 35:24 |
| **recognize** 22:13 | requested 30:2 | | 37:10 39:25 47:16 | **six** 13:12 |
| **record** 28:25 29:9 | research 7:3,13,16 | **S** | separate 48:2 | **size** 19:4 26:25 |
| 46:9,16 48:21 | 8:2,14,18 9:5,21 | **S** 2:1 4:9 5:3 | serious 17:15 | **slams** 26:1 |
| **recorded** 3:4 | 10:10,11 11:13,16 | S-e-g-u-i-n-e 15:4 | seriously 19:10 | **sleep** 17:1 |
| **RECROSS** 4:3 | 14:13 15:7 19:5 | salary 28:13,16 | service 1:23 5:13 | **small** 21:24 |
| | 30:15 31:3,10,13 | 40:10 | set 7:24 11:2 12:23 | **smoke** 38:21 |
| | 33:4 34:17 43:9 | | 17:25 22:2,7,10 | |

socket 13:6
somebody 36:15
sorry 15:23 21:12
    28:7 36:25 37:20
sort 8:19 9:5 19:2
    20:2 37:22 44:4
    44:15 45:14
sound 38:15
space 31:10
speaker 19:19
special 7:24
specific 22:20
specifically 6:12
    27:20 31:20 32:10
    43:22 44:9,14,17
specification 13:16
specify 7:15
speed 33:21 38:15
    39:16
spend 35:13
spent 14:11
spinning 39:15,16
spirited 37:13
spring 33:6 42:3
    44:19
squad 36:10,22
square 17:22,23
squatting 32:18
stainless 19:11
Star 42:17
start 5:19
started 9:7 12:8,10
    12:10 15:21,25
    16:4 17:20 22:10
    24:15
starting 22:7
starts 29:15
state 1:12,17 3:3
    42:16,20 43:19
    50:4
States 1:1 13:22
    15:13
static 23:10,14
station 21:9,13
stay 17:17 26:14
    27:12,13,14,15,17
    28:1
staying 28:2
steel 19:11

stemmed 40:24
stenographically
    50:11
stolen 37:4
Stone 33:2
stopped 33:22
storage 33:14
story 26:7 36:4
Street 2:15 5:3
strictly 45:20
strikes 21:15
strip 13:25
struck 9:17
stuck 35:6
stuff 8:13 14:3,7
    15:15 17:21 21:6
    31:15 36:2 45:5
    45:16 46:24 47:9
    47:10,10,15,15,16
stunning 8:11
stupid 13:21
subject 41:22,23
subpoena 4:15 5:10
    5:13,17 30:1,7,9
    30:10 46:9,16,17
    49:7
sucked 19:22
suffered 32:16
Suite 1:15 2:4,11
    2:15
summer 15:24,25
    28:6
sun 18:12 41:22
Superman 14:1
supplied 41:9
supply 20:10 34:7
support 41:7
supposed 20:1
    38:20
supposedly 13:1
suppression 21:18
sure 8:22 14:13
    30:5 34:25 35:4
    35:21 38:9 48:15
    48:18
Surface 29:13
surprise 36:24
swarming 22:11,12
swimming 45:7

switching 8:9 34:13
sworn 5:4 50:7
system 26:13

——————————
                 T
——————————
T 4:9 5:3,3 50:1,1
table 6:15 13:3
    19:4
Tacom 32:25
take 5:9 8:16 17:6
    18:11 20:24 21:6
    25:3 33:7 36:17
    43:22
taken 34:2 37:15
    50:10
takes 42:3 43:7
talk 6:16 18:13,17
    29:8 33:8 41:22
    43:24 44:15
talking 14:10 33:11
    35:19 39:15,16
talks 41:21
tanks 38:25
task 34:6
technical 13:1,18
technically 7:7 9:8
technology 2:12
    7:17 8:2,11,20
    10:12,18 11:9,10
    14:3 40:23 41:1
tell 10:20 11:20
    17:14 22:17 25:21
    36:6 43:23 44:7
    48:9
telling 26:7 30:11
tells 26:1 33:16,19
    34:5 45:6
temper 25:17
ten 26:10
ten-hour 18:7
tens 16:16
terrible 25:17,25
test 4:11 5:1 6:25
    6:25 7:18 8:12,13
    10:18,19,22,22
    11:1,2,3 16:3
    17:16,25 18:22,23
    19:1 20:3,5,6,8
    22:20 24:6,7,22

25:15,20,23 27:16
    27:23 29:12 36:2
    39:5 45:10,15
tested 15:24 23:7
testifies 5:5
testify 50:7
testimony 47:20
    50:10
testing 7:19,23,25
    10:11 11:10,17,21
    12:2,21 15:18
    16:5 21:5,14 22:7
    22:21 23:1,6 24:3
    26:4,5,13,14 27:8
    28:3 39:22 41:2
    45:18
textbook 24:9
thank 37:6 46:6
Thanks 46:5
theft 33:25
theoretical 23:6
theoretically 9:10
    22:23 23:20
thick 47:12
thing 12:6 18:10
    19:24 20:21 25:9
    26:24 37:11 38:10
    39:20,20 46:3
things 10:24 25:2
    32:20 36:19,23
    37:1 39:4 45:4
think 9:16 14:22
    15:6,22,24 26:24
    30:1 38:23 39:21
    39:25 45:20 47:22
thinking 40:18
third-party 12:13
thought 8:11 13:17
    19:6 22:15 31:4
    31:21
thousand 43:2
threatening 42:7
three 12:8 19:16,22
    22:12 32:20 33:24
    36:5,10,19 37:3
    37:12 43:1 45:7
three-inch 19:10,11
throw 23:25
tier 15:13 47:25

48:1,1
time 7:3 10:4 14:12
    15:6 16:5,15
    25:12 26:8 28:10
    30:12 31:13 34:15
    34:19 39:23 40:11
    40:17 41:18,22
    42:3 43:7 46:6,23
    50:11
times 6:2 14:23
    25:3 41:6 44:2
timing 39:13,19
title 14:13 15:5
today 5:9,10,16 6:4
    6:16 18:14 28:24
token 6:10
told 22:9 36:4 37:3
    41:11 46:2,3
tomorrow 18:14
    44:8
tons 13:5
tool 35:20
top 15:17,17 25:6
    40:13 42:12,15,17
torque 19:23
totally 6:3 9:14,15
    21:1 39:1
touch 23:12
toy 13:8,13
track 21:3
tracking 38:24
transcript 3:1,7 6:5
    50:10
transformer 29:21
transmitter 19:2,3
tremendously
    44:24
trials 40:18
tribulations 40:18
trick 6:12
triode 19:14,16
trip 22:1
trips 43:23 44:6
truck 22:1,5 26:2
trucked 21:25
true 50:9
trunk 33:17
truth 50:7,8,8
try 10:19

trying 6:12 15:22
    17:11 22:24 26:11
    36:13 37:23 38:2
tube 19:14 23:14
    29:20
tubes 23:18
turn 42:7
turned 28:18 40:8
    43:15
turns 42:11
TV 20:23
twenty-nine 43:2
twenty-six 43:2
two 11:22 12:8 18:1
    25:14 26:23 27:2
    27:6 28:8 32:16
    33:17 34:24 35:8
    36:8 39:4 47:11
two-and-a-half
    28:12,14
two-day 22:1
two-hour 18:12
type 9:25 20:2
types 14:13

U
U.S 32:25
underneath 21:16
understand 24:5
    40:3
understanding 8:1
    8:4,14 10:9,21
    16:22
understood 40:18
unheard 21:2
unit 45:1
United 1:1 13:22
    15:13
units 29:16
University 43:21
    44:10
upstate 43:23 44:8
useful 8:9
Useless 36:17
uses 8:7 29:19

V
vacuum 19:22,23
velocities 39:15
venture 10:5 11:14

viability 43:18
vibration 8:10
Vice 7:7
Virginia 21:10
voided 40:8
volt 13:10
voltage 13:9
volts 20:24 23:20
volume 47:7
voluntarily 5:16
vs 1:5

W
wait 41:12
Wal-Mart 45:6
walk 23:11 25:4
walked 16:20
walking 23:10
    26:23 27:6 42:8
wall 13:6
walls 14:2
want 20:4 28:24
    31:25 32:10 34:23
    34:24 35:12,14
    36:10 49:1,1,2,4
wanted 7:21 25:24
    35:2,20 36:16
    37:1 40:14 45:9
wants 27:11 34:12
warehouse 33:14
warfare 29:13
    38:24
wasn't 38:1 39:24
    40:13 45:22
wasting 26:8
water 26:20 32:16
wave 24:8,8,9
way 13:15 16:1
    17:17 22:19 23:7
    27:1 34:5 37:15
    44:25 48:5
we're 5:9 6:2,3,16
    16:19 20:7 26:2,4
    26:13,22,25 27:9
    27:15,16 33:7
    42:4,4 45:9
We've 42:5
weak 19:18
weapon 9:8,9 34:7

41:13
weaponry 9:25
weapons 15:14
week 18:7 35:8
    48:8,8
weeks 12:9 35:8
    42:24
weighed 13:4
WEITZ 2:11
welding 17:9
went 20:2 21:22
    22:3,4 28:4,11,21
    33:10
weren't 35:5 45:5
Wes 17:20 18:3
Wes's 17:24
West 7:20
Westchester 36:9
    36:21 37:2
wife 16:25 18:10
    28:16 43:5
wild 25:18,18
wire 8:5 25:1 31:22
    34:14,16
withstanding 34:9
WITNESS 4:3 15:4
    29:10
woken 36:7
wooden 32:24
    33:17
work 6:8 7:12 8:16
    11:8 12:5 13:10
    14:18,24,25 17:15
    17:15 18:4,5
    34:12,15 37:22
    38:8 39:20 41:7
    46:4,4
workable 11:2
worked 9:6
working 6:22 12:11
    13:22 17:12,21
    18:6,20 26:8
    38:11
works 39:11
world 14:12
worry 42:10
worth 43:14
wouldn't 10:7
    44:11,14

wrote 37:2

X
X 1:8 4:1,9

Y
Y 5:3
ya 27:7
yeah 10:15 20:6
    21:12 32:1 35:4
    35:11 46:15,24
    49:4
year 16:6,7 32:15
years 13:23 17:12
    28:13,14 36:13,24
York 5:4 7:10 28:4
    43:19,24 44:2,8
young 12:15
younger 27:6

Z
zero 20:18,18

0
07068 2:8
07607 1:24
07652 1:15 2:5
07936 2:12
07940 2:15

1
1 1:9 36:7,18
10 18:8
10:00 1:10 18:10
10543 5:4 7:10
11:33 49:10
115 7:10 31:7 32:12
    32:16
12 2:15
13:43-5.9 3:8
140,000 13:10
    20:24
15 24:19
150,000 23:20
155 32:21 34:8
15th 32:14
16,000 39:16
17,000 39:17
18,000 17:22
1910 19:13

1920s 19:13

2
2 2:15 15:13 29:18
    32:9
2:11-cv-00296-W...
    1:2
20 14:23 22:19
2004 10:3 11:24
    28:10
2005 6:20 11:25
    15:25 17:19 33:5
    41:1
2006 28:6,18,18
    42:3 44:20
2007 28:10 32:14
    35:17 36:25,25
    37:1,10
201 1:25
2012 35:18,18
2013 1:9 40:1

3
3 32:9 34:21
30X100217800
    50:23
32 4:12,13,14
350 2:11
36-foot 45:7

4
4 28:3 32:9 34:21
    41:16,17
46 4:6,15

5
5 4:5,11 28:3
50 14:22
50s 13:24
565 1:15 2:4

6
6,000 17:23
6:30 22:7
650 1:15 2:4

7
7:30 18:9
72 2:11
724-1st 5:3

| 8 | | | | |
|---|---|---|---|---|
| **8** 24:15,15 | | | | |
| **8:00** 22:8,11 | | | | |
| **800** 38:16 | | | | |
| **85** 2:8 | | | | |
| **858** 1:24 | | | | |
| **9** | | | | |
| **9:30** 24:16 | | | | |
| **909-0666** 1:25 | | | | |



FOR OFFICIAL USE ONLY

**Panama City**

### PPS- 750 and MK II Problems

Frank Downs, Code S11
Naval Surface Warfare Center, Panama City
Edward.downs@navy.mil

The test of the Hudson MK II system at Patuxent River EMP facility revealed some of the shortcomings of the PPS-750 and the MK II Ultrawide Band RF emitters. The following is a description of both systems and what was learned from this test. The information contained in this paper was gathered from observations during the Patuxent River test and discussions with Mr. Curtis Birnbach and Mr. Tony Catanese, Hudson mechanical engineer.

### General Description of PPS- 750 and MK II:

The PPS-750 also called the MK I differs from the MK II in the following areas.

1. The primary power supply of the MK I contains two 7 KiloJoule capacitors as opposed to one in the MK II.

2. The second stage power amplifier of the MK I uses a commercially off the shelf pulse transformer. The MK II uses a 4 foot long vacuum tube amplifier designed by Curtis Birnbach called the Electron Coupled Transformer (ECT).

3. The output of the MK I pulse transformer is fed into a TEM parabolic horn antenna. The MK II ECT was fed into either a Virtual Cathode Oscillator or Milotron vacuum tube. The antenna for the MK II was a Cassegrain.

4. The MK I was designed to be immersed in oil where the MK II was designed for use without immersion in oil. Using the MK I as an initial test platform will be difficult since the oil must be drained every time a change is made. If further tests were to be conducted using the Hudson technology, it would be advisable to begin with the MK II. Immersion in oil may be needed later if grounding issues occur.

FOR OFFICIAL USE ONLY



FOR OFFICIAL USE ONLY

**MK I and MK II Design Issues**

Figures 1; 2 are block diagrams of the MK I and MK II system. The LV (low voltage) switch circuit depicted in Figure 1 is the same system as the Pulsatron switching circuit depicted in Figure 2. Figure 3 shows a schematic layout of the MK II system. What is not depicted in the MK II block diagram or schematic is:

1. A step up transformer that steps up 110VAC to 220VAC.

2. A ground wire running from the base of the capacitive voltage divider (green wire described in the Pax River trip report). This wire was a 12 gauge stranded wire that shorted to ground during the test. Hudson claims this wire has been replaced with a wide copper strap.

3. A ground wire running from the case of the 110VAC transformer to ground (the second green wire described in Pax River trip report).

**MK I System**

1. The primary transformer (0-220 VAC) was not constructed properly. The transformer company did not use the correct wire size and the windings were not tightly wound. This will result in a failure of the transformer, which occurred in the MK II.

2. The primary power supply section will not discharge all of the energy stored in the two capacitors. This problem was identified in the MK II. The proper solution is unknown as this time. Hudson's solution is to place a bleed resistor on the C1 capacitor to ground. Hudson believes the problem was due to the fact that C1 does not fully bleed down to zero volts after firing. This fix will need to be studied.

3. The pulse transformer will go into saturation when the system is fired. This will not allow the primary HV increase much above 50K VAC. The design goal of the pulse transformer was to provide a gain or 8 to 10, which would result in pulses of 400 to 500 KVAC According to Curtis Birnbach, the fault lies with the company who manufactured the pulse transformer. It is suggested that this issue is investigated to determine whether the problem is improper design, improper design specifications, impedance mismatch or a combination thereof.

4. Curtis Birnbach designed the antenna of the MK I. His experience in antenna design is limited. The antenna he designed is called a TEM horn. It is driven by the pulse transformer. The antenna was tested by Dr. Mark Litz at ARL and found to have a -14 dB gain. ARL observed a significantly large side lobe during the test. Curtis believes the problem was due to the fact that the antenna was knocked out of alignment during shipping. The sub reflector of the antenna was a copper bowl obtained from a kitchen supply store. It is questionable whether or not there

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

was significant engineering addressing impedance matching of the antenna to a high power UWB pulse; it is unknown whether this antenna will work in its current configuration. Dr. Mark Litz may be able to assess the antenna to determine whether the TEM horn is the proper antenna for this application. He can also determine what needs to be done to properly match the antenna to the MK I.

## Power Flow Block Diagram: PPS-750



Figure 1. PPS-750 ( MK I)

## MK II System

1. MK II primary transformer has been replaced with the transformer that is tightly wound and has the correct wire gauge

2. Primary voltage supply will not fully discharge energy from capacitor C1 for same reason indicated in item 2 in MK I section

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

3. ECT is a large vacuum tube amplifier.  Curtis believes the ECT is unique but he has not revealed information to anyone describing what makes this tube so unique that it can be patented. Tony Catanese, Hudson mechanical engineer built the ECT and states; there is nothing unique with this design. Tony states it is nothing more than a simple triode tube, which was designed, in the early 1900's. After discussing the issue of high power vacuum tubes with retired engineers who worked on vacuum tubes during the 40's and 50's there are numerous issues that must be addressed: timing, impedance within the tube, standing waves, materials used etc. The ECT should be considered as an R&D effort. Designing a vacuum tube of this size to handle ultrawide band pulses at high energy levels is challenging.  These problems may not be impossible to overcome, but this is not a trivial issue either. It is suggested the ECT be investigated separately from the MK II effort. It is also suggested that Curtis provide a detailed description of the unique aspects of the ECT to determine how it works and what makes it a device that is, according to our Navy patent attorney, "Not intuitively obvious to one skilled in the arts".  Another aspect of the ECT that must be addressed is impedance matching between the primary power supply and the antenna or tube driven by the ECT.

4. RF emitters in the MK II are: Virtual Cathode Oscillator (VIRCATOR/Vircatron), Virtual Cathode Oscillator with a Milo (MILOTRON). These RF tubes will generate a damped sine wave. This wave has unique characteristics, which cannot be addressed in an unclassified paper. The VIRCATOR and Milo are well known tubes. These tubes have potential uses as RF emitters. It is unknown whether Hudson ever got the VIRCATOR to work because it is unknown whether Hudson ever obtained high voltage and current levels during testing in their facility. It is questionable whether Curtis properly impedance matched the tubes to the ECT. Incorrect impedance matching of the ECT to the RF tubes and the primary power supply may have caused reflection of the energy back into the MK II power supply. Milo tubes have been used successfully tested by the U.S. Air Force. It would be advisable to further study the VIRCATOR and MILOTRON tubes.

5. The MK II antenna is a 6-foot Cassegrain. Hudson took a standard parabolic antenna and converted it into a Cassegrain by making a sub reflector. It is questionable whether this sub reflector was designed properly since Hudson has little experience in antenna design and production.  It is unknown whether this antenna will efficiently work with the VIRCATOR and MILOTRON tubes at UWB frequencies since the antenna was never tested outside Hudson to determine its gain or efficiency. It is suggested that a qualified UWB antenna engineer is tasked to assess the antenna for use with RF tubes.

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY



Figure 2. MK II



Figure 3 MK II Schematic

FOR OFFICIAL USE ONLY

**Conclusion and Recommendations**

There have been many problems testing the MK I and MK II systems. Hudson's relationship with DoD agencies has been tumultuous.  The task at hand is to separate the personality issues from the technology issues. The information above describes all of the known issues with both the MK I and MK II systems but the real question is whether there is technology worth pursuing. This question was posed to Dr. Larry Altgilbers at Space Missile Defense Command, Captain Karl Young, China Lake, Ken Runyon, Patuxent River Naval Air Warfare Center, and Dr. Mark Rader, NRL. The conclusion is unanimous. There appears to be useful technology within the MK I and MK II. Vacuum tube technology has potential for use in the generation and radiation of high power RF energy and should be further studied. There are many issues with the MK I and MK II systems so a simple approach to this problem is to begin by testing the MK II primary power supply. If the primary supply can transfer the power into a voltage divider there will be reason to further investigate the other aspects of MK I and MK II. The suggested approach is:  Obtain a recognized high power UWB RF expert to examine the MK II primary power supply fault and repair it. Hire a recognized HPM expert test fire the primary power supply into a voltage divider. If the MK II can repeatedly fire 6 to 7 KiloJoules of energy into the voltage divider, assemble a team of government and nongovernmental experts to plan a strategy for the future efforts. These efforts should address:

1.  Uses and improvements of the primary power supply.

2.  Examine commercial high power pulse transformers for use as a second stage voltage amplifier.

3.  Examine whether or not the ECT can perform as a voltage amplifier.

4.  Examine VIRCATOR and MILO RF tubes and discuss whether they should be further studied and tested.

5.  Discuss whether the Hudson antennas can efficiently radiate UWB RF energy.

6.  Examine Hudson antennas to determine their usefulness. If not acceptable, examine replacement antennas.

FOR OFFICIAL USE ONLY







G73

AO 88A  (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of New Jersey

| | | |
|---|---|---|
| DEMODULATION, INC. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   11-296 |
| CORNING, INC., et al. | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Anthony Catanese, 724 First St., Mamaroneck, NY 10543

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

Your involvement with Demodulaton or its technology, Hudson Research, Inc., Curtis Birnbach, Picatinny Arsenal, Cubic Corporation, Frank Downs and related matters

| Place: Law Office of Sean Callagy, Esq.<br>650 From Rd., Paramus, NJ | Date and Time:<br><br>07/01/2013 10:00 am |
|---|---|

The deposition will be recorded by this method:   transcription by court reporter

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

All documents concerning Demodulation or its technology, Hudson Research, Inc., Picatinny Arsenal, Curtis Birnbach, Cubic Corporation, or Frank Downs.

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   06/18/2013

| CLERK OF COURT | | OR | |
|---|---|---|---|
| _____ | | | _____ |
| *Signature of Clerk or Deputy Clerk* | | | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Demodulation
_____ , who issues or requests this subpoena, are:
Benjamin D. Light, Esq.; 650 From Rd., Paramus, NJ; blight@callagylaw.com; 201-261-1700



EXHIBIT
P-5
7-1-13

AO 88A  (Rev.  06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   11-296

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

    ☐  I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

    ☐  I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

                                    _____
                                                  *Server's signature*

                                    _____
                                                  *Printed name and title*

                                    _____
                                                  *Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# EXHIBIT D

# CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is made and effective on the ~~4/5/05 by~~
day of *4/7/05* by and between Demodulation Inc. ("Demodulation") and
_Loren D. Sivils_____ ("Recipient").


1.  **Confidential Information.**
Demodulation proposes to disclose certain of its confidential and proprietary information
which is related to a glass fiber containing a metallic alloy core that is possibly
amorphous in microstructure, and which can provide acoustic or magnetic signature for
use in a variety of security applications (the "Confidential Information") to Recipient.
Confidential Information shall include all data, technology, computer programs,
specifications, manuals, business plans, software, marketing plans, financial information,
and other information disclosed or submitted, orally, in writing, or by any other recording
media, to Recipient by Demodulation, provided such "Confidential Information" is
marked as "Confidential Information. Confidential Information disclosed orally shall be
identified as such in writing within five (5) days of disclosure. Nothing herein shall
require Demodulation to disclose any of its information. For the avoidance of doubt,
other than the specific glass fibers mentioned hereinabove, Demodulation shall not
disclose to Recipient any information deemed confidential by Demodulation relating to
the composition, design, and performance characteristics of the glass fibers and coatings
therefor, processes for manufacturing such fibers and applying such coatings and the
ultimate use of such fibers and coatings in particular applications. For example,
Demodulation shall not disclose any information deemed confidential related to
telecommunications optical fiber.


2. **Recipient's Obligations.**
A.  Recipient agrees that the Confidential Information is to be considered confidential
    and proprietary to Demodulation and Recipient shall hold the same in confidence,
    shall not use the Confidential Information other than for the purposes of its business
    with Demodulation, and shall disclose it only to its officers, directors, or employees
    with a specific need to know. and to its contractors with a specific need to know, for
    similar purposes, who are subject to the obligations of 48 CFR 52.227-14(d)(2).
    Recipient, will not disclose, publish or otherwise reveal any of the Confidential
    Information received from Demodulation to any other party whatsoever, except to its
    contractors as specified above, except with the specific prior written authorization of
    Demodulation.

B.  Confidential Information furnished in recorded form shall not be duplicated by
    Recipient except for purposes of this Agreement. Upon the request of Demodulation,
    Recipient shall return all Confidential Information received in written or other
    recorded form, including copies, or reproductions or other recording media containing
    such Confidential Information, within ten (10) days of such request. At Recipient's
    option, any documents or other media developed by the Recipient containing
    Confidential Information may be destroyed by Recipient. Recipient shall provide a

written certificate to Demodulation regarding destruction within ten (10) days thereafter.

3. **Term.**
The obligations of Recipient herein shall be effective 5 years from the date Demodulation last discloses any Confidential Information to Recipient pursuant to this Agreement.

4. **Other Information.**
Recipient shall have no obligation under this Agreement with respect to Confidential Information which is or becomes publicly available without breach of this Agreement by Recipient; is or was rightfully received by Recipient without obligations of confidentiality; or is or was developed by Recipient without breach of this Agreement.

5. **Governing Law and Equitable Relief.**
This Agreement shall be governed and construed in accordance with the laws of a court of competent jurisdiction.

6. **Final Agreement.**
This Agreement terminates and supersedes all prior understanding or agreements on the subject matter hereof.  This Agreement may be modified only by a further writing that is duly executed by both parties.

7. **No Assignment.**
Recipient may not assign this Agreement or any interest herein, without Demodulation's express prior written consent.

8. **Severability.**
If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable terms had never been included.

9. **Notices.**
Any notice required by this Agreement or given in connection with it, shall be in writing and shall be given to the appropriate party by personal delivery or by certified mail, postage prepaid, or recognized overnight delivery services.

> If to Demodulation:
> **Demodulation Inc.**
> **James E. O'Keefe, Jr.**
> **121 Goodwin Terrace**
> **Westwood, NJ 07675**
>
> If to Recipient:
> **Insert Contractor Name**
> **National Nuclear Security Administration**
> **Contractor Address**

**10.  No Implied Waiver.**
Either party's failure to insist in any one or more instances upon strict performance by the other party of any of the terms of this Agreement shall not be construed as a waiver of any continuing or subsequent failure to perform or delay in performance of any term hereof.

**11. Headings.**
Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

*Insert Contractor Name here*          **DEMODULATION INC.**

By: _Loren D. Sivils_                    By: _____
                                              James E. O'Keefe, Jr.

Title: _Senior Science + Technology Advisor_    Title: President & CEO _____

Date: _6-17-05_                          Date: _____

# EXHIBIT E

**CONFIDENTIALITY AGREEMENT**

This Confidentiality Agreement ("Agreement") is made and effective on the ~~4/5/05 by~~ day of _____ by and between Demodulation Inc. ("Demodulation") and _Nathalie Lemmer_ ("Recipient").

## 1.  Confidential Information.

Demodulation proposes to disclose certain of its confidential and proprietary information which is related to a glass fiber containing a metallic alloy core that is possibly amorphous in microstructure, and which can provide acoustic or magnetic signature for use in a variety of security applications (the "Confidential Information") to Recipient. Confidential Information shall include all data, technology, computer programs, specifications, manuals, business plans, software, marketing plans, financial information, and other information disclosed or submitted, orally, in writing, or by any other recording media, to Recipient by Demodulation, provided such "Confidential Information" is marked as "Confidential Information. Confidential Information disclosed orally shall be identified as such in writing within five (5) days of disclosure. Nothing herein shall require Demodulation to disclose any of its information. For the avoidance of doubt, other than the specific glass fibers mentioned hereinabove, Demodulation shall not disclose to Recipient any information deemed confidential by Demodulation relating to the composition, design, and performance characteristics of the glass fibers and coatings therefor, processes for manufacturing such fibers and applying such coatings and the ultimate use of such fibers and coatings in particular applications. For example, Demodulation shall not disclose any information deemed confidential related to telecommunications optical fiber.

## 2. Recipient's Obligations.

A.  Recipient agrees that the Confidential Information is to be considered confidential and proprietary to Demodulation and Recipient shall hold the same in confidence, shall not use the Confidential Information other than for the purposes of its business with Demodulation, and shall disclose it only to its officers, directors, or employees with a specific need to know. and to its contractors with a specific need to know, for similar purposes, who are subject to the obligations of 48 CFR 52.227-14(d)(2). Recipient, will not disclose, publish or otherwise reveal any of the Confidential Information received from Demodulation to any other party whatsoever, except to its contractors as specified above, except with the specific prior written authorization of Demodulation.

B.  Confidential Information furnished in recorded form shall not be duplicated by Recipient except for purposes of this Agreement. Upon the request of Demodulation, Recipient shall return all Confidential Information received in written or other recorded form, including copies, or reproductions or other recording media containing such Confidential Information, within ten (10) days of such request. At Recipient's option, any documents or other media developed by the Recipient containing Confidential Information may be destroyed by Recipient. Recipient shall provide a

written certificate to Demodulation regarding destruction within ten (10) days thereafter.

3. **Term.**
The obligations of Recipient herein shall be effective 5 years from the date Demodulation last discloses any Confidential Information to Recipient pursuant to this Agreement.

4. **Other Information.**
Recipient shall have no obligation under this Agreement with respect to Confidential Information which is or becomes publicly available without breach of this Agreement by Recipient; is or was rightfully received by Recipient without obligations of confidentiality; or is or was developed by Recipient without breach of this Agreement.

5. **Governing Law and Equitable Relief.**
This Agreement shall be governed and construed in accordance with the laws of a court of competent jurisdiction.

6. **Final Agreement.**
This Agreement terminates and supersedes all prior understanding or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

7. **No Assignment.**
Recipient may not assign this Agreement or any interest herein, without Demodulation's express prior written consent.

8. **Severability.**
If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable terms had never been included.

9. **Notices.**
Any notice required by this Agreement or given in connection with it, shall be in writing and shall be given to the appropriate party by personal delivery or by certified mail, postage prepaid, or recognized overnight delivery services.

       If to Demodulation:
            **Demodulation Inc.**
            **James E. O'Keefe, Jr.**
            **121 Goodwin Terrace**
            **Westwood, NJ  07675**

       If to Recipient:
            **Insert Contractor Name**
            **National Nuclear Security Administration**
            **Contractor Address**

10.  **No Implied Waiver.**

Either party's failure to insist in any one or more instances upon strict performance by the other party of any of the terms of this Agreement shall not be construed as a waiver of any continuing or subsequent failure to perform or delay in performance of any term hereof.

11. **Headings.**

Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

| *Insert Contractor Name here* | **DEMODULATION INC.** |
|---|---|
| By: _Nathalie Lemarion_ | By: _James E. O'Keefe_ |
| | James E. O'Keefe, Jr. |
| Title: _Program Manager II_ | Title:  President & CEO _____ |
| Date: _6/16/05_ | Date: _6/16/05_ |

EXHIBIT F

CRADA Number Y-1207-0104

## STEVENSON-WYDLER (15 USC 3710)
## COOPERATIVE RESEARCH AND DEVELOPMENT
## AGREEMENT (hereinafter "CRADA") No. Y-1207-0104

between

### BWXT Y-12, L.L.C.
under its U.S. Department of Energy Contract No. DE-AC05-00OR22800
(hereinafter "Contractor")

and

### DEMODULATION, INC.
(hereinafter "Participant"),

both being hereinafter jointly referred to as the "Parties"

for

## TARGETED ASSESSMENT DETECTION AND MONITORING (TADAM)

## ARTICLE I: DEFINITIONS

A.   "Government" means the United States of America and agencies thereof.

B.   "DOE" means the Department of Energy, an agency of the United States of America.

C.   "Contracting Officer" means the DOE employee administering the Contractor's DOE contract.

D.   "Generated Information" means information produced in the performance of this CRADA.

E.   "Proprietary Information" means information which embodies (i) trade secrets or (ii) commercial or financial information which is privileged or confidential under the Freedom of Information Act (5 USC 552 (b)(4)), either of which is developed at private expense outside of this CRADA and which is marked as Proprietary Information.

F.   "Protected CRADA Information" means Generated Information which is marked as being Protected CRADA Information by a Party to this CRADA and which would have been Proprietary Information had it been obtained from a non-federal entity.

G.   Subject Invention means any invention of the Contractor or Participant conceived or first actually reduced to practice in the performance of work under this CRADA.

H.   "Intellectual Property" means Patents, Trademarks, Copyrights, Mask Works, Protected

1

January 25, 2007

CRADA Number Y-1207-0104

CRADA Information and other forms of comparable property rights protected by Federal Law and other foreign counterparts.

I.    "Trademark" means a distinctive mark, symbol or emblem used in commerce by a producer or manufacturer to identify and distinguish its goods or services from those of others.

J.    "Service Mark" means a distinctive word, slogan, design, picture, symbol or any combination thereof, used in commerce by a person to identify and distinguish its services from those of others.

K.    "Mask Work" means a series of related images, however fixed or encoded, having or representing the predetermined, three-dimensional pattern of metallic, insulating or semiconductor material present or removed from the layers of a semiconductor product; and in which series the relation of the images to one another is that each image has the pattern of the surface of one form of the semiconductor chip product. (17 USC 901(a)(2)).

L.    "RD&D" means research, development and demonstration performed by the Contractor and the Participant under this CRADA, including works performed by consultants or other contractors and subcontractors under this CRADA.

M.    "Background Intellectual Property" means the Intellectual Property rights in the items identified by the Parties in Appendix C, Background Intellectual Property, which were in existence prior to or are first produced outside of this CRADA, except that in the case of inventions in those identified items, the inventions must have been conceived outside of this CRADA and not first actually reduced to practice under this CRADA to qualify as Background Intellectual Property.   Licensing of Background Intellectual Property, if agreed to by the Parties, shall be the subject of separate licensing agreements between the Parties. Background Inventions are not Subject Inventions.

N.    Foreign Interest is defined as any of the following:

(1)    A foreign government or foreign government agency;

(2)    Any form of business enterprise organized under the laws of any country other than the United States or its possessions;

(3)    Any form of business enterprise organized or incorporated under the laws of the United States, or a State or other jurisdiction within the United States, which is owned, controlled, or influenced by a foreign government, agency, firm, corporation or person; or

(4)    Any person who is not a U. S. citizen.

O.    Foreign ownership, control, or influence (FOCI) means the situation where the degree of ownership, control, or influence over a participant by a foreign interest is such that a reasonable basis exists for concluding that compromise of classified information or

2

CRADA Number Y-1207-0104

special nuclear material, as defined in 10 CFR Part 710, may result.

## ARTICLE II:  STATEMENT OF WORK

Appendix A, Statement of Work, is hereby incorporated into this CRADA by reference.

## ARTICLE III:  TERM, FUNDING AND COSTS

A.   The effective date of this CRADA shall be the latter date of (1) the date on which it is signed by the last of the Parties or (2) the date on which it is approved by DOE.  The work to be performed under this CRADA shall be completed within twenty-four (24) months from the effective date.

B.   The Participant's estimated contribution is ▮▮▮▮  The Government's estimated contribution, which is provided through the Contractor's contract with DOE, is ▮▮▮▮ subject to available funding.

C.   Neither Party shall have an obligation to continue or complete performance of its work at a contribution in excess of its estimated contribution as contained in Article III B above, including any subsequent amendment.

D.   Each Party agrees to provide at least 60 days' notice to the other Party if the actual cost to complete performance will exceed its estimated cost.

## ARTICLE IV:  PERSONAL PROPERTY

All tangible personal property produced or acquired under this CRADA (specifically excluding Intellectual Property rights, Background Intellectual Property, and Proprietary Information) shall become the property of the Participant or the Government, depending upon whose funds were used to obtain it.  Such property is identified in Appendix A, Statement of Work.  Personal property shall be disposed of as directed by the owner at the owner's expense.  There shall not be any jointly funded property under this CRADA except by the mutual agreement of the Parties.

## ARTICLE V:  DISCLAIMER

THE GOVERNMENT, THE PARTICIPANT, AND THE CONTRACTOR MAKE NO EXPRESS OR IMPLIED WARRANTY AS TO THE CONDITIONS OF THE RESEARCH OR ANY INTELLECTUAL PROPERTY, GENERATED INFORMATION, OR PRODUCT MADE, OR DEVELOPED UNDER THIS CRADA, OR THE OWNERSHIP, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE RESEARCH OR RESULTING PRODUCT. NEITHER THE GOVERNMENT, THE PARTICIPANT, NOR THE CONTRACTOR SHALL BE LIABLE FOR SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES ATTRIBUTED TO SUCH RESEARCH OR RESULTING PRODUCT, INTELLECTUAL PROPERTY, GENERATED INFORMATION, OR PRODUCT

January 25, 2007

CRADA Number Y-1207-0104

MADE OR DEVELOPED UNDER THIS CRADA.

## ARTICLE VI:  PRODUCT LIABILITY

Except for any liability resulting from any negligent acts or omissions of Contractor, Participant indemnifies the Government and the Contractor for all damages, costs and expenses, including attorney's fees, arising from personal injury or property damage occurring as a result of the making, using or selling of a product, process or service by or on behalf of the Participant, its assignees or licensees, which was derived from the work performed under this CRADA.  In respect to this Article, neither the Government nor the Contractor shall be considered assignees or licensees of the Participant, as a result of reserved Government and Contractor rights.  The indemnity set forth in this paragraph shall apply only if Participant shall have been informed as soon and as completely as practical by the Contractor and/or the Government of the action alleging such claim and shall have been given an opportunity, to the maximum extent afforded by applicable laws, rules, or regulations, to participate in and control its defense, and the Contractor and/or Government shall have provided all reasonably available information and reasonable assistance requested by Participant.  No settlement for which Participant would be responsible shall be made without Participant's consent unless required by final decree of a court of competent jurisdiction.

## ARTICLE VII:  OBLIGATIONS AS TO PROPRIETARY INFORMATION

A.  If Proprietary Information is orally disclosed to a Party, it shall be identified as such, orally, at the time of disclosure and confirmed in a written summary thereof, appropriately marked by the disclosing party, within ten (10) working days as being Proprietary Information.

B.  Each Party agrees to not disclose Proprietary Information provided by another Party to anyone other than the CRADA Participant and Contractor without written approval of the providing Party, except to Government employees who are subject to the statutory provisions against disclosure of confidential information set forth in the Trade Secrets Act (18USC 1905).

C.  All Proprietary Information shall be returned to the provider thereof at the conclusion of this CRADA at the provider's expense.

D.  All Proprietary Information shall be protected for a period of five (5) years from the date of execution of this CRADA, unless and until such Proprietary Information shall become publicly known without the fault of the recipient, shall come into recipient's possession without breach of any of the obligations set forth herein by the recipient, or shall be independently developed by recipient's employees who did not have access to such Proprietary Information.

E.  In no case shall the Contractor provide Proprietary Information of Participant to any person or entity for commercial purposes, unless otherwise agreed to in writing by such Participant.

4

January 25, 2007

CRADA Number Y-1207-0104

## ARTICLE VIII: OBLIGATIONS AS TO PROTECTED CRADA INFORMATION

A.   Each Party may designate as Protected CRADA Information, as defined in Article I, any Generated Information produced by its employees and, with the agreement of the other Party, designate any Generated Information produced by the other Party's employees. All such designated Protected CRADA Information shall be appropriately marked.

B.   For a period of five (5) years from the date Protected CRADA Information is produced, Parties agree not to further disclose such Information except:

   (1)   as necessary to perform this CRADA;

   (2)   as provided in Article XI [REPORTS AND ABSTRACTS];

   (3)   as requested by the DOE Contracting Officer to be provided to other DOE facilities for use only at those DOE facilities with the same protection in place; or

   (4)   as mutually agreed by the Parties in advance, to comply with the requirements of reporting and filing Subject Inventions under Articles XIV and XVI.

C.   The obligations of (B) above shall end sooner for any Protected CRADA Information which shall become publicly known without fault of either Party, shall come into a Party's possession without breach by that Party of the obligations of (B) above, or shall be independently developed by a Party's employees who did not have access to the Protected CRADA Information.

## ARTICLE IX: RIGHTS IN GENERATED INFORMATION

The Parties agree that they shall have no obligations of non-disclosure or limitations on their use of, and the Government shall have unlimited rights in, all Generated Information, after the expiration of the period set forth in Article VIII (B) above and Protected CRADA Information after the expiration of the period set forth in Article VIII (B) above and information provided to the Government or Contractor under this CRADA which is not marked as being copyrighted (subject to Article XIII) or as Protected CRADA Information (subject to Article VIII B) or Proprietary Information (subject to Article VII B), or which is an invention disclosure which may later be the subject of a U.S. or foreign patent application.

## ARTICLE X: EXPORT CONTROL

A.   THE PARTIES UNDERSTAND THAT MATERIALS AND INFORMATION RESULTING FROM THE PERFORMANCE OF THIS CRADA MAY BE SUBJECT TO EXPORT CONTROL LAWS AND THAT EACH PARTY IS RESPONSIBLE FOR ITS OWN COMPLIANCE WITH SUCH LAWS.

B.   The Participant has a continuing obligation to provide the Contractor written notice of any changes in the nature and extent of foreign ownership, control, or influence over the Participant which would affect the Participant's answers to the

January 25, 2007

CRADA Number Y-1207-0104

previously completed FOCI certification.

## ARTICLE XI: REPORTS AND ABSTRACTS

A.    The Parties agree to produce the following deliverables:

    (1)    an initial abstract suitable for public release at the time the CRADA is approved by DOE;

    (2)    other abstracts (final when work is complete, and others as substantial changes in scope and dollars occur);

    (3)    a final report, upon completion or termination of this CRADA, to include a list of subject inventions;

    (4)    a semi-annual signed financial report of the Participant's in-kind contributions to the project;

    (5)    other topical/periodic reports where the nature of research and magnitude of dollars justify; and

    (6)    computer software in source and executable object code format as defined within the Statement of Work or elsewhere within the CRADA documentation.

B.    It is understood that the Contractor has the responsibility to provide the above information at the time of its completion to the DOE Office of Scientific and Technical Information.

C.    Participant agrees to provide the above information to the Contractor to enable full compliance with paragraph B. of this Article.

D.    It is understood that the Contractor and the Department of Energy have a need to document the long-term economic benefit of the cooperative research being done under this agreement. Therefore, the Participant acknowledges a responsibility to respond to reasonable requests, during the term of this CRADA and for a period of two (2) years thereafter from the Contractor for pertinent information.

## ARTICLE XII: PRE-PUBLICATION REVIEW

A.    The Parties agree to secure pre-publication approval from each other which shall not be unreasonably withheld or denied beyond thirty (30) days.

B.    The Parties agree that neither will use the name of the other Party or its employees in any promotional activity, such as advertisements, with reference to any product or service resulting from this CRADA, without prior written approval of the other Party.

6

January 25, 2007

CRADA Number Y-1207-0104

## ARTICLE XIII:  COPYRIGHTS

A.   The Parties may assert copyright in any of their Generated Information.  Assertion of copyright generally means to enforce or give any indication of an intent or right to enforce such as by marking or securing Federal registration.

B.   Each Party shall have the first option to retain ownership of copyrights in works created as Generated Information by its employees.  Copyrights in jointly developed works shall be jointly owned.  If either Party decides not to retain ownership of copyright in a work created by its employee(s), that Party agrees to assign such copyright to the other Party, at the other Party's request.  Participant agrees to notify Contractor if it decides not to retain ownership of copyright in any work created by its employee(s); Contractor agrees to notify DOE if Participant or Contractor decide not to retain ownership of copyright in any work created by its employee(s).  The Parties agree to assign to DOE, upon request, copyrights not retained by either Party.

C.   For Generated Information, the Parties acknowledge that the Government has for itself and others acting on its behalf, a royalty-free, non-transferable, non-exclusive, irrevocable worldwide copyright license to reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, by or on behalf of the Government, all copyrightable works produced in the performance of this CRADA, subject to the restrictions this CRADA places on publication of Proprietary Information and Protected CRADA Information.

D.   For all copyrighted computer software produced in the performance of this CRADA, the Party owning the copyright will provide the source code, an expanded abstract as described in Appendix B, the executable object code and the minimum support documentation needed by a competent user to understand and use the software to DOE's Energy Science and Technology Software Center, P.O. Box 1020, Oak Ridge, TN 37831.  The expanded abstract will be treated in the same manner as Generated Information in paragraph C of this Article.

E.   The Contractor and the Participant agree that, with respect to any copyrighted computer software produced in the performance of this CRADA, DOE has the right, at the end of the period set forth in paragraph B of Article VIII hereof and at the end of each two-year interval thereafter, to request the Contractor and the Participant and any assignee or exclusive licensee of the copyrighted software to grant a non-exclusive, partially exclusive, or exclusive license to a responsible applicant upon terms that are reasonable under the circumstances, provided such grant does not cause a termination of any licensee's right to use the copyrighted computer software.  If the Contractor or the Participant or any assignee or exclusive licensee refuses such request, the Contractor and the Participant agree that DOE has the right to grant the license if DOE determines that the Contractor, the Participant, assignee, or licensee has not made a satisfactory demonstration that it is actively pursuing commercialization of the copyrighted computer software.

Before requiring licensing under this paragraph E, DOE shall furnish the Contractor/Participant written notice of its intentions to require the Contractor/Participant

7

CRADA Number Y-1207-0104

to grant the stated license, and the Contractor/Participant shall be allowed 30 days (or such longer period as may be authorized by the cognizant DOE Contracting Officer for good cause shown in writing by the Contractor/Participant) after such notice to show cause why the license should not be required to be granted.

The Contractor/Participant shall have the right to appeal the decision by the DOE to the grant of the stated license to the Invention Licensing Appeal Board as set forth in paragraphs (b)-(g) of 10 CFR 781.65, "Appeals".

F.     The Parties agree to place Copyright and other notices, as appropriate for the protection of Copyright, in human readable form onto all physical media, and in digitally encoded form in the header of machine readable information recorded on such media such that the notice will appear in human readable form when the digital data are off loaded or the data are accessed for display or printout.

## ARTICLE XIV: REPORTING SUBJECT INVENTIONS

A.     The Parties agree to disclose to each other each and maintain in confidence every Subject Invention, which may be patentable or otherwise protectable under the Patent Act sufficient to preserve U.S. and foreign filing rights as necessary.   The Parties acknowledge that the Contractor and Participant will disclose their respective Subject Inventions to the DOE within two (2) months after the inventor first discloses the Subject Invention in writing to the person(s) responsible for patent matters of the disclosing Party.

B.     These disclosures should be in sufficiently complete technical detail to convey a clear understanding, to the extent known at the time of the disclosure, of the nature, purpose and operation of the Subject Invention.   The disclosure shall also identify any known actual or potential statutory bars, i.e., printed publications describing the Subject Invention or the public use or on sale of the Subject Invention in this country. The Parties further agree to disclose to each other any subsequent known actual or potential statutory bar that occurs for a Subject Invention disclosed but for which a patent application has not been filed.  All Subject Invention disclosures shall be marked as confidential under 35 USC 205.

## ARTICLE XV:  TITLE TO SUBJECT INVENTIONS

Whereas the Participant and the Contractor have been granted the right to elect to retain title to Subject Inventions:

A.     Each Party shall have the first option to elect to retain title to any Subject Invention made by its employees.  If a Party elects not to retain title to any Subject Invention of its employees, then the other Party shall have the second option to obtain title by assignment of such Subject Invention.  The DOE shall retain title to any Subject Invention which is not retained by any Party.  Each Party shall have the option to elect to retain title to its undivided rights in any Subject Invention made jointly by employees of Contractor and employees of Participant.

8                                      January 25, 2007

CRADA Number Y-1207-0104

B.     The Parties acknowledge that the DOE may obtain title to each Subject Invention reported under Article XIV for which a patent application or applications are not filed pursuant to Article XVI and for which any issued patents are not maintained by any Party to this CRADA.

C.     The Parties acknowledge that the Government retains a nonexclusive, nontransferable, irrevocable, paid-up license to practice or to have practiced for or on behalf of the United States every Subject Invention throughout the world.

D.     For a period of 1) up to six (6) months from the date of filing of any patent applications by Contractor or 2) up to six (6) months from the date of completion or termination of the CRADA, whichever period expires first, Participant has an option to choose, for reasonable compensation, a Sole Commercial Patent License Agreement with Contractor for any patents or patent applications resulting from Subject Inventions made in whole or in part by employees of Contractor. Such Sole Commercial Patent License Agreement shall be in the field of use of "cell phone or critical asset class detection". The U. S Competitive Clause shall apply to all such agreements.

## ARTICLE XVI: FILING PATENT APPLICATIONS

A.     The Parties agree that the Party initially indicated as having an ownership interest in any Subject Inventions (Inventing Party) shall have the first opportunity to file U.S. and foreign patent applications. If the Contractor or Participant does not file such applications within one year after election, then the other Party to this CRADA exercising an option pursuant to Article XV may file patent applications on such Subject Inventions.  If a patent application is filed by the other party (Filing Party), the Inventing Party shall reasonably cooperate and assist the Filing Party, at the Filing Party's expense, in executing a written assignment of the Subject Invention to the Filing Party and in otherwise perfecting the patent application, and the Filing Party shall have the right to control the prosecution of the patent application.  The Parties shall agree between themselves as to who will file patent applications on any joint Subject Invention.  The Parties shall share equally in the costs for the prosecution, filing and maintenance of joint Subject Inventions where both Parties elect to retain title to their undivided rights.

B.     The Parties agree that DOE has the right to file patent applications in any country if neither Party desires to file a patent application for any Subject Invention. Notification of such negative intent shall be made in writing to the DOE Contracting Officer within three (3) months of the decision of the non-inventing party to not file a patent application for the Subject Invention pursuant to Article XV or not later than 60 days prior to the time when any statutory bar might foreclose filing of a U.S. patent application.

C.     A Party electing title or filing a patent application in the United States or in any foreign country shall advise the other Party and the DOE if it no longer desires to continue prosecution, pay maintenance fees, or retain title in the United States or any foreign country. The other Party and then the DOE will be afforded the opportunity to take title and retain the patent rights in the United States or in any such foreign country.

9

January 25, 2007

CRADA Number Y-1207-0104

D.     Each Party agrees to provide the Project Manager of the other Party with a copy of each patent application it files on any Subject Invention.

## ARTICLE XVII:  TRADEMARKS

The Parties may seek to obtain Trademark/Service Mark protection on products or services generated under this agreement in the United States or foreign countries. The Parties hereby acknowledge that the Government shall have the right to indicate on any similar goods or services produced by or for the Government that such goods or services were derived from and are a DOE version of the goods or services protected by such Trademark/Service Mark with the Trademark and the owner thereof being specifically identified.  In addition, the Government shall have the right to use such Trademark/Service Mark in print or communications media.

## ARTICLE XVIII:  MASK WORKS

The Parties may seek to obtain legal protection for Mask Works fixed in semiconductor products generated under this agreement as provided by Chapter 9 of Title 17 of the United States Code. The Parties hereby acknowledge that the Government or others acting on its behalf shall retain a non-exclusive, paid-up, worldwide, irrevocable, non-transferable license to reproduce, import, or distribute the covered semiconductor product by or on behalf of the Government, and to reproduce and use the Mask Work by or on behalf of the Government.

## ARTICLE XIX: COST OF INTELLECTUAL PROPERTY PROTECTION

Each Party shall be responsible for payment of all costs relating to Copyright, Trademark and Mask Work filing, U.S. and foreign patent application filing and prosecution, and all costs relating to maintenance fees for U.S. and foreign patents hereunder which are solely owned by that Party.  Government/DOE laboratory funds contributed as DOE's cost share to a CRADA cannot be given to Participant for payment of Participant's costs of filing and maintaining patents or filing for Copyrights, Trademarks and Mask Works.

## ARTICLE XX:  REPORTS OF INTELLECTUAL PROPERTY USE

Participant agrees to submit, for a period of two (2) years and upon request of DOE, a non-proprietary report no more frequently than annually on efforts to utilize any Intellectual Property arising under the CRADA.

## ARTICLE XXI: DOE MARCH-IN RIGHTS

The Parties acknowledge that the DOE has certain march-in rights to any Subject Inventions in accordance with 48 CFR 27.304-1(g).

January 25, 2007

CRADA Number Y-1207-0104

## ARTICLE XXII:  U.S. COMPETITIVENESS

The Parties agree that a purpose of this CRADA is to provide substantial benefit to the U.S. economy.

In exchange for the benefits received under this CRADA, the Participant therefore agrees to the following:

A.      Products embodying Intellectual Property developed under this CRADA shall be substantially manufactured in the United States;

B.      Processes, services, and improvements thereof which are covered by Intellectual Property developed under this CRADA shall be incorporated into the Participant's manufacturing facilities in the United States either prior to or simultaneously with implementation outside the United States.  Such processes, services, and improvements, when implemented outside the U.S., shall not result in reduction of the use of the same processes, services, or improvements in the United States; and

C.      The Contractor agrees to a U.S. Industrial Competitiveness clause in accordance with its prime contract with respect to any licensing and assignments of its intellectual property arising from this CRADA, except that any licensing or assignment of its intellectual property rights to the Participant shall be in accordance with the terms of Paragraphs A. and B. of this Article.

## ARTICLE XXIII:  ASSIGNMENT OF PERSONNEL

A.      It is contemplated that each Party may assign personnel to the other Party's facility as part of this CRADA to participate in or observe the research to be performed under this CRADA.  Such personnel assigned by the assigning Party shall not during the period of such assignments be considered employees of the receiving Party for any purposes.

B.      The receiving Party shall have the right to exercise routine administrative and technical supervisory control of the occupational activities of such personnel during the assignment period and shall have the right to approve the assignment of such personnel and/or to later request their removal by the assigning Party.

C.      The assigning Party shall bear any and all costs and expenses with regard to its personnel assigned to the receiving Party's facilities under this CRADA.  The receiving Party shall bear facility costs of such assignments.

## ARTICLE XXIV:  FORCE MAJEURE

No failure or omission by Contractor or Participant in the performance of any obligation under this CRADA shall be deemed a breach of this CRADA or create any liability if the same shall arise from any cause or causes beyond the control of Contractor or Participant, including but not limited to the following, which, for the purpose of this CRADA, shall be regarded as beyond the

11

January 25, 2007

CRADA Number Y-1207-0104

control of the Party in question: Acts of God, acts or omissions of any government or agency thereof, compliance with requirements, rules, regulations, or orders of any governmental authority or any office, department, agency, or instrumentality thereof, fire, storm, flood, earthquake, accident, acts of the public enemy, war, rebellion, insurrection, riot, sabotage, invasion, quarantine, restriction, transportation embargoes, or failures or delays in transportation.

## ARTICLE XXV: ADMINISTRATION OF THE CRADA

It is understood and agreed that this CRADA is entered into by the Contractor under the authority of its prime Contract with DOE. The Contractor is authorized to and will administer this CRADA in all respects unless otherwise specifically provided for herein. Administration of this CRADA may be transferred from the Contractor to DOE or its designee with notice of such transfer to the Participant, and the Contractor shall have no further responsibilities except for the confidentiality, use and/or non-disclosure obligations of this CRADA.

## ARTICLE XXVI: RECORDS AND ACCOUNTING FOR GOVERNMENT PROPERTY

The Participant shall maintain records of receipts, expenditures, and the disposition of all Government property in its custody related to the CRADA.

## ARTICLE XXVII: NOTICES

A.  Any communications required by this CRADA, if given by postage prepaid first class U.S. Mail or other verifiable means addressed to the Party to receive the communication, shall be deemed made as of the day of receipt of such communication by the addressee, or on the date given if by verified facsimile. Address changes shall be given in accordance with this Article and shall be effective thereafter. All such communications, to be considered effective, shall include the number of this CRADA.

B.  The addresses, telephone numbers and facsimile numbers for the Parties are as follows:

1.  CONTRACTOR:

a.  FORMAL NOTICES AND COMMUNICATIONS, COPIES OF REPORTS

Marilyn Giles
Manager, Office of Technology Transfer
Telephone: (865) 574-2214
Facsimile: (865) 241-4614
Email: gilesmh@y12.doe.gov

For Fedex, UPS, Freight:
BWXT Y-12, L.L.C.
Y-12 Plant, Bear Creek Road, Dock 47
Oak Ridge, TN 37830

January 25, 2007

CRADA Number Y-1207-0104

For U. S. Mail Only:
BWXT Y-12, L.L.C.
P. O. Box 2009
Building 9737, MS 8091
Oak Ridge, TN 37831-8091

**b.     TECHNICAL CONTACT, REPORTS, AND COPIES OF FORMAL NOTICES AND COMMUNICATIONS**

Paul DeMint
Telephone:  (865) 576-7418
Facsimile:   (865) 576-7649
E-mail :  demintpd@y12.doe.gov

For Fedex, UPS, Freight:
BWXT Y-12, L.L.C.
Y-12 Plant, Bear Creek Road
Oak Ridge, TN 37830

For U. S. Mail Only:
BWXT Y-12, L.L.C.
P. O. Box 2009
Building 9202, MS 8204
Oak Ridge, TN 37831-8204

**2.     PARTICIPANT**

**a.     TECHNICAL CONTACT, REPORTS, AND FORMAL NOTICES AND COMMUNICATIONS**

Name: James E. O'Keefe, Jr.
President & CEO
Telephone:  (201) 522-4720
Facsimile:  (201) 666-0443
E-mail:  jamesokeefe@optonline.net

For U. S. Mail, Fedex, UPS, Freight:
Demodulation, Inc.
121 Goodwin Terrace
Westwood, NJ 07675

## ARTICLE XXVIII: DISPUTES

The Parties shall attempt to jointly resolve all disputes arising from this CRADA.  If the Parties are unable to jointly resolve a dispute within a reasonable period of time, the dispute shall be

CRADA Number Y-1207-0104

decided by the DOE Contracting Officer, who shall reduce his/her decision to writing within 60 days of receiving in writing the request for a decision by either Party to this CRADA. The DOE Contracting Officer shall mail or otherwise furnish a copy of the decision to the Parties. The decision of the DOE Contracting Officer is final unless, within 120 days, the Participant brings an action for adjudication in a court of competent jurisdiction in the State of Tennessee. To the extent that there is no applicable U.S. Federal law, this CRADA and performance thereunder shall be governed by the law of the State of Tennessee.

## ARTICLE XXIX:  ENTIRE CRADA AND MODIFICATIONS

A.      It is expressly understood and agreed that this CRADA with its Appendices contains the entire agreement between the Parties with respect to the subject matter hereof and that all prior representations or agreements relating hereto have been merged into this document and are thus superseded in totality by this CRADA.

B.      Any agreement to materially change any terms or conditions of this CRADA or the Appendices shall be valid only if the change is made in writing, executed by the Parties hereto, and approved by DOE.

## ARTICLE XXX:  TERMINATION

This CRADA may be terminated by either Party upon thirty (30) days written notice to the other Party. This CRADA may also be terminated by the Contractor in the event of failure by the Participant to provide the necessary advance funding, as agreed in Article III.

In the event of termination by either Party, each Party shall be responsible for its share of the costs incurred through the effective date of termination, as well as its share of the costs incurred after the effective date of termination, and which are related to the termination. The confidentiality, use, and/or non-disclosure obligations of this CRADA shall survive any termination of this CRADA.

CRADA Number Y-1207-0104

**FOR CONTRACTOR, BWXT Y-12, LLC:**

By: _____

Name: _____Willie Wilson_____

Title: _____Senior Contracts Manager_____

Date: _____12 Feb 07_____


**FOR PARTICIPANT, Demodulation, Inc.:**

By: _____

Name: _____James E. O'Keefe, Jr._____

Title: _____President and CEO_____

Date: _____3/23/07_____

15

January 25, 2007

# EXHIBIT G

## STATEMENT OF CONSIDERATIONS

## CLASS WAIVER OF THE GOVERNMENT'S U.S. AND FOREIGN PATENT RIGHTS IN CERTAIN IDENTIFIED INVENTIONS MADE IN THE COURSE OF OR UNDER MANAGEMENT AND OPERATING (M&O) CONTRACT NO. DE-AC05-00OR22800 BETWEEN THE DEPARTMENT OF ENERGY AND BWXT Y-12; W(C)-00-003 [ORO-755]

The Department of Energy (DOE), unlike most other Government agencies, employs contractors, both nonprofit and for-profit organizations, to manage and operate certain of its major research, production and weapons facilities, including its National Laboratories. BWXT Y-12, LLC (BWXT Y-12), a large, for-profit corporation, has been selected, under Prime Contract No. DE-AC05-00OR22800 (22800 Contract), to manage and operate the facilities of the Y-12 National Security Complex in Oak Ridge, Tennessee.

These Government-owned, Contractor-operated facilities have for some fifty years benefitted DOE and its predecessor agencies in carrying out research, development, and demonstration programs. These facilities have had a remarkable record of scientific and technical success, this success being due, in part, to the unique contractual relationship that exists between DOE and its management and operating (M&O) contractors, and the dedication of both technical and administrative skills of private organizations, such as BWXT Y-12, to a significant Federal mission in a close, long-term, cooperative relationship.

Currently, the Department's nonprofit M&O contractors have the right to retain title to inventions made in the performance of their prime contract with DOE pursuant to Title 35 U.S.C. 202 (Public Law 96-517, as amended by Public Law 98-620), other than those inventions excluded by Section 202(a)(ii-iv).

In 1983, President Reagan's Memorandum on Government Patent Policy was promulgated, directing that:

> to the extent permitted by law, agency policy with respect to the disposition of any invention made in the performance of a federally funded research and development contract, grant or cooperative agreement award shall be the same or substantially the same as applied to small business firms and nonprofit organizations under Chapter 18, Title 35 of the United States Code.

DOE considered the impact of the President's Memorandum on its patent policy with respect to large business for-profit contractors, including its M&O contractors, and determined that Section 152 of the Atomic Energy Act of 1954 (42 U.S.C. 2182, as amended) and Section 9 of the Federal Non-Nuclear Energy Research and Development Act of 1974 (42 U.S.C. 5908), precluded DOE from automatically granting title to its large for-profit contractors pursuant to the President's Memorandum.

Nonetheless, under these same laws, large business entities, including for-profit M&O contractors, have the right to file patent waiver petitions, so that they may retain title to inventions made in the performance of their contracts. This process, however, imposes a substantial front end administrative burden, both on the Department and on the contractor in preparing and processing such individual waiver petitions.

With the overall goal of incorporating the research results from the 22800 Contract into the mainstream of American commerce in the most expeditious manner consistent with the President's Memorandum, as referenced in Executive Order 12591 dated April 10, 1987, and in accordance with the authority of Section 152 and Section 9, above, it is believed to be in the best interest of the United States and the general public to grant a Class Waiver to certain identified inventions made by BWXT Y-12 under the 22800 Contract as set forth herein.

The scope of this Class Waiver is directed to the class of identified inventions which comprises subject inventions made by employees of BWXT Y-12 in the performance of the 22800 Contract. It is intended that BWXT Y-12 be treated in substantially the same manner as M&O contractors which are small business or nonprofit organizations. More specifically, the scope of the Class Waiver shall include U.S. and foreign patent rights to identified inventions made in the performance of the 22800 Contract for the facilities managed by BWXT Y-12 at the Y-12 National Security Complex. The scope of this waiver also includes subject inventions made under Work for Others (WFO) agreements with third party sponsors where the sponsor either declines the Class Waiver provided for by W(A)-82-017 ("Use of DOE Facilities and Facility Contractors by or for Third Party Sponsors") or where it has been determined that the class waiver does not apply. Finally, the scope of this class waiver also includes subject inventions made by BWXT Y-12 employee-inventors who submit a request for rights in such inventions and provide written approval of such request by BWXT Y-12 pursuant to the 22800 Contract.

Excluded from the scope of this Class Waiver are inventions which: (1) fall within DOE's weapons programs, which inventions principally relate to weapons or inherently disclose or suggest a weapons application, where such disclosure or suggestion would be detrimental to national security, or relate to naval nuclear propulsion; (2) fall within or are covered by any exceptional circumstance determination issued by DOE; (3) relate to subject matter that is classified or sensitive under Section 148 of the Atomic Energy Act of 1954, as amended; (4) come within the ambit of international agreements or treaties in existence at the time of execution of the contract modification effecting this Class Waiver in the 22800 Contract, or future international agreements or treaties, provided BWXT Y-12 is formally advised in writing of the existence of such agreements, prior to the reporting of the inventions to DOE by BWXT Y-12; (5) are subject inventions covered by existing or future Class Waivers granted to third parties by DOE, such as "Work for Others," "Metals Initiative," etc., or (6) fall within any further exceptions that may, in the national interest, be designated by the Secretary and are added by unilateral amendment by DOE to the

22800 Contract. This Class Waiver does not include inventions of subcontractors under the 22800 Contract.

Like most inventions made at DOE's National Laboratories, inventions made under the 22800 Prime Contract will require additional development before they are available in the commercial marketplace. This is because many of the inventions made by BWXT Y-12 are founded upon basic or advanced scientific research. Additionally, many of these inventions are conceptual in nature and may be at a laboratory or proof-of-principle stage. Scaling-up to a commercial size demonstration of the inventive concept is often a prerequisite to negotiating royalty-bearing licenses. Finally, many of the inventions arising out of DOE's energy research will require substantial capital and other costs in order to translate the invention into commercial reality. Such costs may include further engineering, design, start-up and marketing.

A Class Waiver of the Government's rights in identified inventions as set forth herein will create sufficient exclusive rights in these inventions to bring forth private risk capital to expeditiously promote and move the technology into the commercial marketplace and thereby make the benefits of DOE's programs widely available to the public in the shortest time practicable. The grant of this class waiver will provide BWXT Y-12 with title to subject inventions which will permit early discussions and negotiations with industry with respect to intellectual property rights. It is expected that the waiver will help expedite licensing arrangements and other interactions with industry and assist BWXT Y-12 in implementing a licensing program for its inventions made under the 22800 Contract.

Additionally, under the authority of the "National Competitiveness Technology Transfer Act of 1989" (P.L. 101-189), BWXT Y-12 is authorized to enter into Cooperative Research and Development Agreements (CRADAs) with universities, the private sector and other Federal laboratories for the purpose of promoting technology transfer between the Federal laboratories and the private sector. By having a waiver of the Government's rights in subject inventions falling within the scope of this Class Waiver, BWXT Y-12 will be able to combine, where appropriate, these waived inventions with those waived under a separately issued Class Waiver for CRADAs through licensing arrangements with cost-sharing participants to enhance commercialization of the waived inventions.

Lastly, BWXT Y-12 has agreed to attempt to commercialize the waived inventions within five years from the time the waiver is effective. This commitment to early commercialization by BWXT Y-12 will best promote the commercial utilization of such inventions and make the benefits of the research effort conducted under the 22800 Contract widely available to the public in the shortest time practicable, consistent with the objectives and considerations of DOE's waiver regulations.

Implementation of this Class Waiver is by a simple procedure which requires the following:

(1)     BWXT Y-12 reporting inventions within the times specified in the 22800 Contract and identifying the source of the program funding in the invention disclosure;

(2)     BWXT Y-12 electing in writing whether or not to retain title to the invention at the time of disclosure or within one year of disclosure;

(3)     BWXT Y-12 representation, after reasonable internal inquiry, that the invention falls within the Class Waiver;

(4)     Representation that to BWXT Y-12's best knowledge and belief the invention is not subject to international agreements or treaties of the Government, subject to another class waiver, subject of any exceptional circumstances determination, or covered by any other exception to this class waiver; and

(5)     Representation that BWXT Y-12 will attempt to commercialize the invention through its licensees within five years from the time the waiver is effective.

After review of the invention disclosure and relevant facts, DOE Patent Counsel will certify whether the waiver is applicable to the invention.  The waiver of DOE rights in an elected invention shall be effective sixty (60) days after receipt by DOE Patent Counsel of BWXT Y-12's election of that invention, unless DOE Patent Counsel notifies BWXT Y-12 within the 60 day period (or a one time extension of thirty (30) days if Patent Counsel advises that the extension is needed for Patent Counsel to make its determination) that a determination has been made that the class waiver does not apply to the invention and the rational for such determination.

As noted above, the scope of this Class Waiver does not include two types of DOE Defense Programs funded inventions: (1) inventions which fall within DOE's Weapons Programs, which inventions principally relate to weapons or inherently disclose or suggest a weapons application where such disclosure or suggestion would be detrimental to national security or (2) inventions which relate to subject matter that is classified or sensitive under Section 148 of the Atomic Energy Act of 1954, as amended.  These inventions are, accordingly, not available for election under this Class Waiver and if BWXT Y-12 desires greater rights in these inventions, then identified waiver petitions must be pursued.

It is recognized that significant research under the 22800 Contract is funded by DOE's Weapons Programs which results in valuable patentable technology.  It is further noted that the ownership of such patentable technology by BWXT Y-12, in all instances, would not compromise national security or DOE's program or patent position by application of appropriate safeguards.

The fact that certain inventions arising under DOE's Weapons Programs may fall within the scope of this Class Waiver requires that particular attention be given to each invention to ensure that the transfer of technology would not directly or indirectly compromise national security or other aspects of this sensitive program.

With regard to any invention which BWXT Y-12 reports with an election to retain title, BWXT Y-12 shall, to its best knowledge or belief, provide to Patent Counsel a supporting statement with reasons, addressing:

(i)     Whether National Security will be compromised by development, commercialization or licensing activities involving the invention;

(ii)    Whether sensitive technical information (classified or unclassified) under the Naval Nuclear Propulsion Program or the Nuclear Weapons Programs or other defense activities of the DOE, for which dissemination is controlled under Federal Statutes and regulations, will be released to unauthorized persons;

(iii)   Whether failure to assert such a claim (i.e. failure by DOE to retain title to a subject invention) will adversely affect the operation of the Naval Nuclear Propulsion Program or the Nuclear Weapons Program or other defense activities of the DOE; and

(iv)    Whether there is any Export Controlled material present and, if so, how such material will be protected.

The election of Defense Programs' inventions falling outside the above Weapons exception shall not be effective until approved by the Patent Counsel, who shall use his best efforts to reach a determination within 90 days.  The Patent Counsel shall base the determination on the review of the written election containing the items set forth above and paragraph J of Article I.104 Technology Transfer Mission (Jan 1996) and BWXT Y-12 representation whether there is any Export Controlled material present and if so, how such materials will be protected.  Additionally, BWXT Y-12 shall provide a statement of any safeguards it proposes to use to protect national security in commercializing the subject matter of the invention.

This waiver of the Government's rights in inventions as set forth herein is subject to the Government's retention of: (1) a non-exclusive, non-transferable, irrevocable, world-wide, paid-up license to practice or to have practiced for or on behalf of the United States the waived invention, and (2) the standard Government march-in rights of 35 USC 203.  In addition, inasmuch as BWXT Y-12 has a right to elect to retain title under this class waiver without a showing of any plans and intentions for commercializing a specific invention at the time of its election, DOE, pursuant to the provisions of the 22800 Contract and as a condition of this class waiver, also has the right at the end of the five year period after an

-5-

election to require BWXT Y-12 to grant appropriate licenses, if BWXT Y-12 has not made a satisfactory demonstration that it or its licensee(s) is actively pursuing commercialization of any elected invention.

The grant of this Class Waiver should not adversely affect competition or market concentration.  Waived inventions will be subject to a royalty-free license to the Government, and DOE has the right to require periodic reports on utilization or the efforts at obtaining utilization of any waived inventions.  Also, if BWXT Y-12 is not making reasonable efforts to utilized a waived invention, DOE can exercise its march-in rights and require licensing of the invention.

This class waiver is implemented in conjunction with the implementation of technology transfer as a mission under the 22800 Contract.  Therefore, this class waiver is effective as of the effective date of the prime contract and shall apply to any subject inventions reported to DOE which may have been subject inventions under predecessor contracts for operation of the Y-12 National Security Complex

Accordingly, in view of the objectives and considerations set forth in DOE's statutory waiver policy, the objectives of Public Law 101-189, and Executive Order 12591, all of which have been considered, it is recommended that this Class Waiver be granted.

Emily G. Schneider
Assistant Chief Counsel
 for Intellectual Property

Date 2/7/01

Based on the foregoing Statement of Considerations, it is determined that the interest of the United States and the general public will best be served by a waiver of U. S. and foreign patent rights as set forth herein and, therefore, the waiver is granted subject to the terms of the 22800 Contract.  This waiver shall not affect any waiver previously granted.

CONCURRENCE:

Mr. Gerald E. Green, Director
Office of Institutional & Joint Programs
Defense Programs (DP-162)
National Nuclear Security Administration

Date: 10/1/01

APPROVAL:

Paul A. Gottlieb
Assistant General Counsel for
Technology Transfer and
Intellectual Property

Date: 10-1-01

-7-

# EXHIBIT H





Y/DX-2873

# FINAL REPORT

Cooperative Research and Development Agreement
(CRADA)

between

Demodulation Inc.
and
B&W Y-12 L.L.C.

Related to

## Glass-Covered Amorphous Metal
## Microwires and Detection Systems

L. Neville Howell, Jr., Section Manager (Y-12)
David K. Mee, Principle Investigator (Y-12)

Issue Date:  December 2009

Prepared by the
Y-12 National Security Complex
Oak Ridge, TN 37831
Managed by
Babcock & Wilcox Technical Services Y-12, LLC
for the
U.S. DEPARTMENT OF ENERGY
under contract DE-AC05-00OR22800

MANAGED BY
B&W Y-12, LLC
FOR THE UNITED STATES
DEPARTMENT OF ENERGY

UCN-13672 (1-08)



**DISCLAIMER**

This report was prepared as an account of work sponsored by an agency of the United States government. Neither the United States Government nor any agency thereof, nor any of their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise, does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof.

# ABSTRACT

The Y-12 National Security Complex, a Department of Energy and National Nuclear Security Administration owned facility, managed and operated by B&W Y-12 L.L.C.; and Demodulation, Inc., located in Westwood New Jersey, recently concluded a two-year Cooperative Research and Development agreement. Demodulation provided glass-covered amorphous metal wire, detection equipment, and intellectual property to Y-12. Y-12 personnel performed numerous laboratory experiments in the applications areas of electronic article surveillance, tamper detection, *in-situ* sensors, and encoding techniques. Furthermore, personnel performed limited research into applications areas such as energy harvesting, near-field and far-field communications, and characterization of magnetic fields. For the foreseeable future, Y-12 personnel plan to continue development of in-situ sensors for condition monitoring purposes and for characterization of magnetic fields.

# INTRODUCTION

The Y-12 National Security Complex, a Department of Energy (DOE) and National Nuclear Security Administration (NNSA) owned facility, managed and operated by B&W Y-12 L.L.C.; and Demodulation, Inc., located in Westwood New Jersey, recently concluded a two-year Cooperative Research and Development agreement (CRADA). Demodulation provided glass-covered amorphous metal wire, detection equipment, and intellectual property to Y-12. Y-12 personnel performed numerous laboratory experiments in the applications areas of electronic article surveillance, tamper detection, in-situ sensors, and encoding techniques. Furthermore, personnel performed limited research into applications areas such as energy harvesting, near-field and far-field communications, and characterization of magnetic fields.

Amorphous wire technology appears to be viable and suitable for many applications. There are numerous technical reports that have been published over the last twenty-five years that support this statement. Experiments conducted at Y-12 in FY2008 and FY2009 confirmed potential for the technology.

Demodulation provided a limited number of alloy compositions, none of which were explicitly tuned for a given application. It is evident from the research literature that slightly different alloy compositions can produce significant changes in responses.

Work was by the Control and Sensor Systems section of the Y-12 Applied Technologies Division, formerly known as the Development Division. A laboratory in the New Hope Center was used for the vast majority of the work, meetings, with the CRADA partner, and many tours and demonstrations of the technology. The New Hope Center is outside the security boundary of the Y-12 plant and offers an excellent venue for collaboration with private industry and academia.

From Y-12's perspective, the most promising application of amorphous wire technology is in the area of *in situ* sensors. Gas, pressure, temperature, humidity, and position sensors are in various state of development with the (partial pressure) gas sensor being the farthest along. These sensors have the capability of being embedded in non-magnetic items, they are passive (no battery required for energy), and they are wireless (no wires needed for data acquisition). Challenges remain in increasing stand-off detection distance; however, in some cases, adequate stand-off distance is already viable.

Another application area that is promising is in encoding information. Most people have had credit/debit cards or identification badges that must be replaced when the magnetic strip wears out. It may be possible to have many amorphous wires embedded in the card/badge itself in such a way as to represent the information. This technique would also serve as an excellent anti-counterfeiting solution.

For the foreseeable future, Y-12 personnel plan to continue development of in-situ sensors for condition monitoring purposes and for characterization of magnetic fields.

1

In context of cost and simplicity of the technological process, the glass-covered wires have a great advantage over those produced by the in-water spinning method.[3]

There are almost an unlimited number of potential alloy compositions. Y-12 experimented with two basic compositions: a Cobalt (Co) based composition with Iron (Fe), Silicon (Si), and Boron (B), (CoFeSiB); and a Iron (Fe) based composition with Silicon (Si) and Boron (B) (FeSiB). The magnetic properties of amorphous glass covered wires are strongly influenced by their chemical composition.[4]

In addition to amorphous wire, there are also amorphous ribbons. There appear to be two major manufacturing firms; Metglas®[5] of Conway S.C., a Hitachi (Japan) company, and Vacuumschmelze[6] (Germany). Amorphous ribbons are found in tags used for Electronic Article Surveillance systems. Both companies also make amorphous materials for highly efficient electrical voltage transformers.

Research in amorphous materials also led to development of similar types of materials with unique characteristics. One such example is Terfenol, a material with unique magnetostriction characteristics. The Naval Ordnance Labs, now known as Naval Surface Warfare Center - Carderock Division (NSWC-CD), developed the material in the 1970's and the manufacturing process was perfected in the 1980's at the Ames Laboratory with U.S. Navy funding.[7] ETREMA (Ames, IA) holds patents and licenses to many Terfenol-D applications, including the exclusive worldwide licenses to manufacture all types of Terfenol-D materials.[8] Another example is Vitreloy®, an amorphous material with high yield strength and other advantageous structural properties. Vitreloy® was developed at the California Institute of Technology with funding from the Department of Energy (DOE) and National Aeronautic and Space Administration (NASA).[9] LiquidMetal® Technologies[10] has exclusive licenses to the Vitreloy alloys and market them under the LiquidMetal® trade name.

Patents held or licensed by Demodulation Inc. are listed in Appendix A. Documents and presentations created by Y-12 personnel are listed in Appendix B. Considerable research has been performed on amorphous wires over the last twenty-five years, primarily from foreign institutions. A sample listing of the literature available can be found in Appendix C.

[3] D. P. Makhnovskiy and L. V. Panina, Field Stress-Tunable Microwave Composite Materials, page 261, Ferromagnetism Research, V. N. Murray, Editor, Nova-Science Publishers, Inc., 2006.
[4] Chiriac, H., Ovari, T.A., Amorphous Glass-Covered Magnetic Wires, Progress in Materials Science, p. 395, 1996.
[5] Metglas®, http://www.metglas.com/
[6] Vacuumschmelze. http://www.vacuumschmelze.de/dynamic/en/
[7] Terfenol-D, from Wikipedia, the free encyclopedia. http://en.wikipedia.org/wiki/Terfenol-D
[8] ETREMA Products, Inc. http://www.etrema-usa.com/
[9] Vitreloy, from Wikipedia, the free encyclopedia. http://en.wikipedia.org/wiki/Vitreloy
[10] LiquidMetal® Technologies. http://www.liquidmetal.com/index/default.asp

# WORK PERFORMED

The CRADA originally had two objectives; (1) Development of a Cell-Phone Detection System and (2) Demonstration of a Tamper Detection System. Other activities performed during the CRADA involved studies involving, but not limited to, *in-situ* sensors, energy harvesting, encoding techniques, near-field communications, detector stand-off distances, and signal analysis.

## Development of a Cell-Phone Detection System

At the time of the CRADA initiation, detecting non-government cell-phones entering the Y-12 National Security Complex was receiving a considerable amount of attention from the DOE/NNSA and Y-12 senior management. As for Demodulation, such a system could become the basis for an Electronic Article Surveillance (EAS) system applicable in the commercial environment.

Two different compositions of wire were used. Detection of the microwire within a magnetic field via the RF detection scheme was a total success, however, one composition performed much better than the other one. However, when the microwire was attached to some cell phones, particularly when the cell phone casing had a metal-like coating, it was difficult to detect the wire. It was during the early stages of conceptual design of a robust system that Y-12 personnel had to re-evaluate the priorities of the CRADA. To have a useful cell-phone detection system at Y-12, detection systems would need to be deployed at the existing security portals. Most security portals are outside and must be protected against the environment. Furthermore, since all security portals are under formal "change control" procedures, any and all, modifications and/or additions to the portals would take an extensive review and approval process requiring detailed documentation and testing. A preliminary cost estimate indicated that funding for deployment would be unlikely. At that point, Y-12 researchers indicated a reluctance to spend the remainder of FY08 funding on designing, fabricating, and testing a robust system that would not be deployed at Y-12.

It needs to be stated that EAS systems based on amorphous microwire can be designed and deployed at a reasonable cost and with high success rates. However, there are some scenarios for EAS systems that would require an extremely robust design.

## Tamper Detection

Tamper Detection is another application that has benefit to government and commercial interests. At Y-12, tamper indication devices (TID) are used with containers that contain high value material. In the commercial world, "tamper indication" has been a priority for companies ever since the 1982 Chicago Tylenol murders. Complementary to a tamper detection application is the anti-counterfeiting application. In fact, in some cases the easiest way to defeat a TID is to simply counterfeit a replacement.

4

Glass-covered amorphous wires are an excellent technology for addressing tamper detection and counterfeiting. The most desirable features are their ability to be concealed/embedded, passive, and wireless. Many experiments were conducted which concluded the technology is viable.

There are several ways to determine a tampered wire. First, one can distinguish between wires of different lengths. For certain scenarios, a tamper indicating device (TID) can be configured to break a wire into two or more pieces. Detection of a wire is dependent on exceeding a minimum length using the RF detection technique. A different type of response, but just as effective, is indicated by using the magnetic pick-up technique.

A second way is devising a configuration that would change the tension on a wire. For wire compositions that are sensitive to stress, there is a linear relationship between response and the tension on a wire. This linear relationship exists for a workable range of values. Experiments demonstrated that for certain compositions of wire, 0.2 grams of change in tension can be detected.

A third way to determine tampering is by change in orientation of the wire. The response from a wire, with either detection method, is a function of the angle of the magnetic field vector and the longitudinal axis of the wire.

There are numerous other ways to configure a wire for a TID and/or anti counterfeiting application. However breakage, change-in-tension, and/or change-in-orientation are the most plausible configurations.

It was also of prime importance to demonstrate a form factor for a detection scheme that was clearly portable. For the RF detection scheme, a portable version was not fabricated due to costs and schedule constraints. However, a portable detection system incorporating the magnetic pick-up scheme was fabricated. The unit was fabricated using the casing and reels from a VHS cassette. The unit was connected to a sound card in a laptop. Although the stand-off range was only around one inch, it demonstrated the desired form factor and produced reliable results.

Three different compositions of wire were used during tamper detection experiments. All produced effective, but different, responses.

Y/DX-2791, "Characterization and Testing of Amorphous Microwire Using Magnetic and Radio Frequency Detection Schemes", was published in October 2008 and provides technical information about theory and experimental results. The Executive Summary of the document is unclassified, non-sensitive and is available for public release. The complete document is marked Protected CRADA Information.

*In-situ* Sensors

The amorphous wire can be embedded in non-magnetic items. Certain compositions are sensitive to stress, or change-in-tension. They are passive and do not require a battery. They are wireless; for data acquisition, they are interrogated by an external system. These attributes make amorphous wire excellent candidates for *in-situ* sensors.

With funds available after abandoning a robust design for cell phone detection and/or an EAS, there was focus on designing *in-situ* sensors. From a government point of view, there has been considerable interest in such sensors since the early 1990's. From a commercial point of view, there are few competing products. Whereas there are commercial companies entrenched in the EAS and tamper indication markets, the market for *in-situ* sensors appears to be open, un-contested, and available for exploitation.

Gas, pressure, temperature, humidity, and position sensors are in various stages of development at Y-12. All have been or will be tested in a closed stainless steel vessel. The stainless steel vessel can be evacuated or pressurized with a variety of gases and temperature cycled. At this time, a gas sensor is the farthest along in development. All of the sensors work on the same fundamental principle; a change in tension of the wire can be detected with precision and repeatability. For many of the sensors, the amorphous wire is attached to another component that changes the tension in the wire.

For example, for detection of a given gas, a commercially available component was procured that changes length when subjected to a relatively small partial pressure of a gas. The amorphous wire is fixed at two locations on the component. When the component changes length, a stress is induced in the amorphous wire. Y/DX-2869, "Gas Sensor for Condition Monitoring", was published in October 2009 and describes in detail the configuration, theory, and experimental results. The report is marked Protected CRADA Information.

Another example is the pressure sensor. In this configuration an amorphous wire is fixed to one end of a sealed bellows that expands and contracts as a function of the difference of pressure inside the sealed bellows and the pressure inside the stainless steel vessel. The expansion and contraction changes the tension on the amorphous wire. A detailed report on the pressure sensor should be available in 2010.

Technical work in FY2010 will address increasing the stand-off distance between the embedded sensor, sensor optimization, and the detection hardware. Previous work predicts this may be very challenging and may limit the number of applications this technology can be used. However, there could be an alloy composition that would be more effective than that used and which could possibly minimize the challenges.

**Other Studies**

A limited amount of effort went into investigating the potential for **energy harvesting**. It was concluded that a single 40 micron diameter wire may have a few micro-watts of energy stored during magnetic domain switching. Configuring many (hundreds to thousands) wires together

may provide hundreds of milliwatts comparable to published research that utilized amorphous metal ribbons. Due to commercially available products that address energy harvesting on this scale, further research by Y-12 is not warranted at this time.

Due to the dependency on the frequency and strength of the magnetic field for response from the wire; a limited amount of effort went into the potential for **near-field** (less than 1 meter) and **far-field communications.** It was concluded that although unique systems could be developed for communications, there are basic barriers in using an amorphous wire systems within the ISO/IEC and ECMA standards. For example, All Near Field Communication transponders must be able to operate within a magnetic field strength of 1.5 to 7.5 A/m RMS; for alloy compositions tested, the amorphous wire needs 4.5 A/m to be detected. In addition, sampling rates would need to accommodate a maximum data rate of 848 kb/second. At this time, those rates are not achievable with Y-12's current laboratory configurations.

Research was also conducted in creating and reading multi-bit **identification tags**. The tag was comprised of parallel lengths of amorphous wire of identical alloy composition, but they could have different lengths. The identification tag is read by applying a ramped or AC magnetic field while simultaneously applying a DC bias field that was created with novel coil geometry. The main advantage of using amorphous wire versus the magnetic strips found on credit cards and other such items is concealment and length of service. Magnetic strips wear out, there should no degradation of amorphous wires since they can be embedded with the card. This technique could also be useful for certain anti-counterfeiting applications.

— what about encoding techniques described up front.

## CONCLUSIONS

Amorphous metal wire technology, using Iron (Fe) and Cobalt (Co) based alloys, appear to be a viable technology. Considerable research has been performed and published world-wide over the last twenty-five years that support this conclusion. It is also evident that, even with an abundant source of high-quality research material, a non-trivial amount of engineering is required to develop prototypes that function properly and are cost-effective outside of a laboratory environment.

Amorphous wire technology can be used in a number of different application areas. However, in certain application areas, markets have already been established and a robust supply and value chain is in place. The best example of this is in the area of Electronic Article Surveillance (EAS). Another example is the magnetic strip technology used on credit/debit cards, identification badges, and such. In other application areas there may not be a robust value chain in place, however, there are a wide variety of commercial products, and technologies, that compete with each other. For example, in energy harvesting/scavenging there are solar cells, thermoelectric modules, and piezoelectric elements that can harvest energy from the environment and produce energy on the same scale as a few hundred amorphous wires. Amorphous wire technology may not be "disruptive" or "game-changing" enough to supplant those firmly entrenched technologies.

However, the "greenfield" appears to be in the application area of sensors; in particular, *in-situ* sensors. There are few, if any, commercial sensors that can be embedded, and are passive and wireless. Gas, pressure, temperature, and humidity sensors, just to name a few, appear to be viable from a cost, quality, and performance perspective. A challenge, in some cases, will be the stand-off distance between the sensor and the detection hardware.

## Appendix A:  Intellectual Property of Demodulation, Inc.

This appendix covers intellectual property of Demodulation, Inc. "Demodulation Inc. enjoys an exclusive worldwide license from its assignee, the National Institute for Research and Development of Technical Physics (NIRDTP) in Iasi, Romania," under the patents a through c. Items b and c are "European patents that have been registered and maintained in 37 countries." Patents a through c "provide broad coverage for the compositions and processes used to produce glass-coated microwire having highly advantageous properties." Items d through l "identify United States patents covering detection methods and systems, as well as encoding methods related to detecting and identifying objects remotely." Items m through s "identify published patent applications, which strengthen and extend the core patents listed above and are at stages of prosecution near issuance."[11]

US 6,270,591 B2—*Amorphous and Nanocrystalline Glass-Covered Wires*

EP0870308—*Amorphous Magnetic Glass-Covered Wires and Process for Their Production*

EP1288972—*Nanocrystalline Magnetic Glass-Covered Wires and Process for Their Production*

US 6,018,297—*Method and Device for Coding Electronic Labels*

US 6,232,879—*Sensor and Method for Remote Detection of Objects*

US 6,137,411—*Article Surveillance System*

US 6,225,905—*Sensor for Remote Detection of Objects*

US 6,417,771—*Sensor, a Method and a System for Remote Detection of Objects*

US 5,739,752—*Method In Detecting Magnetic Elements*

US 5,551,158—*Method for Measuring Position and Angle*

US 5,557,085—*Method and Device for Electronic Identification*

US 5,576,693—*Method and Device for Remote Sensing of Objects*

US 20040070502—*Marker for Remote Detection of Articles*

Number: 20050158545—*Engineered Glasses for Metallic Glass-Coated Wire*

Number: 20050000599—*Amorphous and Nanocrystalline Glass-Coated Articles*

Number: 20050109435—*Multi-Bit Encoded Glass-Coated Microwire and Articles Composed Thereof*

Number: 20050221365—*Polymerase Chain Reaction Using Metallic Glass-Coated Microwire*

Number: 20050237197—*Detection of Articles Having Substantially Rectangular Cross-Sections*

Number: 20060086528—*Optically Encoded Glass-Coated Microwire*

---

[11] Earnest D. Buff of Ernest D. Buff & Associates in Bedminster, NJ letter to Robert Iszard, Project Manager at Empire State Department, Buffalo, NY detailing intellectual property of Demodulation, Inc., August 6, 2006.

## Appendix B:  Articles and Reports prepared by Y-12

Y-DX-2791, "Characterization and Testing of Amorphous Microwire Using Magnetic and Radio Frequency Detection Schemes", was published in October 2008 and describes work performed in fiscal year 2008.  This report contains Protected CRADA Information.  The Executive Summary, Y/DX-2791 Executive Summary, is unclassified, non-sensitive; and is available for public release.

"CRADA Team's Microwire Signals an Array of Applications", published in the August 2009 issue of The Federal Laboratory Consortium for Technology Transfer (FLC).  The link to the article is at *http://www.federallabs.org/news/top-stories/articles/?pt=top-stories/articles/0809-01.jsp*.

Y/DX-2869, "Sensor for Condition Monitoring", was published in October 2009 and describes work performed in fiscal year 2009 on an *in-situ* sensor.  This report contains Protected CRADA Information.

# Appendix C:  Selected Reference Papers

Hundreds, if not thousands, of papers, describing amorphous wires and their applications, are available.  Listed below is a representative sample of such publications

Chiriac H, Ovari TA, "Amorphous glass-covered magnetic wires: Preparation, properties, applications", PROG MATER SCI 40 (5): 333–407, 1996.

J. R. Petta, M. B. Weissman and G. Durin, "Dependence of Barkhausen pattern reproducibility on hysteresis loop size," The American Physical Society, Vol 56, No. 3, pp. 2776–2780, September 1997.

C. A. Grimes et al., "Wireless Magnetoelastic Resonance Sensors: A Critical Review," Sensors 2002, 2, pp. 294–313.

C. A. Grimes et al., "Magnetoelastic sensors in combination with nanometer-scale honeycombed thin film ceramic $TiO_2$ for remote query measurement of humidity," J. Appl. Phys., Vol. 87, No.9, 1 May 2000.

E. E. Mitchell, R. DeMoyer and J. Vranish, "A New Metglas Sensor," IEEE Transactions on Industrial Electronics, Vol. IE-33, No. 2, May 1986, pp. 166–170.

M. Han, D. F. Liang, L. J. Deng, "Sensors development using unusual properties of Fe/Co-based amorphous soft magnetic wire", Journal of Material Science, 25 August 2005.

Richard R. Fletcher and Neil A. Gershenfeld, "Remotely Interrogated Temperature Sensors Based on Magnetic Materials", IEEE Transactions on Magnetics, VOL. 36, NO. 5, September 2000.

"Progress in Ferromagnetism Research", V. N. Murray, Editor, NOVA Publishers, March 2006.

Serghei Sandacci, Dmitriy Makhnovskiy, Larissa Panina, and Vladimir Larin; "Stress-Dependent Magnetoimpedance in Co-Based Amorphous Wires and Application to Tunable Microwave Composites", IEEE Xplore Digital Library, April 2005.

11